## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NO:** 1:21-cv-21698

ATHOS OVERSEAS, LTD,

        *Plaintiff,*

v.

YOUTUBE, INC.,
YOUTUBE, LLC,
and GOOGLE LLC,

        *Defendants.*

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, Athos Overseas, Ltd, ("Plaintiff"), files this Complaint against Defendants YouTube, Inc., YouTube, LLC (jointly "YouTube"), and Google LLC ("Google") (all collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.    Plaintiff is a wholly owned company of Carlos Vasallo ("Mr. Vasallo"), the renowned Spanish-language movie producer, who, through several holding companies, owns the world's largest collection of Mexican and Latin American movies.  Mr. Vasallo also owns several movie channels and FCC-licenses, including America Teve, the most viewed TV station amongst Cuban Americans in the United States of America, and the most watched TV station in Cuba, despite being officially banned by the Cuban government.

2.    Mr. Vasallo's movie collection, including those owned through Plaintiff,

are the most renowned films in Latin America's history. These films featured the most beloved Hispanic actors and actresses of all time, such as Cantinflas, Vicente Fernandez, La India Maria, and many others.  These renown actors and actresses are the United States' equivalent of stars like Gary Cooper, Clark Gable, Marlon Brando, Betty Davis, and Judy Garland.

3.     Mr. Vasallo, through Plaintiff and his other companies, has personally supervised the meticulous curation, maintenance, and digitalization of these movies at a cost of millions of dollars. The digitalization is performed at uniquely designed labs, which require special computers and physical storage to preserve these movies for future generations.

4.     Mr. Vasallo, through Plaintiff and his other companies, has invested millions of dollars to acquire and maintain the proper copyright registration for each movie within his collection. This includes the proper copyright registration for the films, both internationally and in the United States, where he has registered copyrights for thousands of movie titles.

5.     Mr. Vasallo's companies, including Plaintiff, are the primary sources of classic, Mexican movies for television giants, such as Univision, Telemundo, and Televisa. These television giants pay millions of dollars for the rights to show the above-mentioned films, including up to $250,000.00 for the right to show a single film in the United States and Mexico several times in the span of two years. In fact, Mr. Vasallo's films, including Plaintiff's films, are such a valuable part of Mexico's Golden Age that Carlos Slim – the most renown, multi-billion-dollar television mogul in Mexico and Latin America – previously offered Mr. Vasallo over one hundred million dollars for his entire

movie collection.

6.      Defendants operate a website called "YouTube," located at www.youtube.com; one of the most prominent and popular websites on the Internet.

7.      Defendants are entirely aware of the value and importance of Mr. Vasallo's iconic movie collection to the Spanish-speaking public and specifically, to the Mexican and Mexican American audiences, who grew up watching the films. Despite full awareness of the value associated with Mr. Vasallo's film collection, Defendants purposefully promote and exploit the piracy of Plaintiff's movies on their video platform to generate traffic and revenue for Defendants, without paying any licensing fees for the pirated movies. In fact, Mr. Vasallo's movies have been viewed countless times on Defendants' platform and have generated significant revenue for Defendants at the expense of and detriment to Plaintiff.

8.      Defendants' repeated and intentional misappropriation of Plaintiff's movies has not only resulted in Defendants' unjust and illicit enrichment, but also a loss in the value attributed to Plaintiff's movie collection. In fact, Mr. Vasallo discovered Defendants' rampant piracy of his movie collection, including those owned by Plaintiff, when one of his traditional buyers objected to pay for licensing fees and the right to transmit the movie, when the same movie was exhibited freely on Defendants' YouTube platform.

9.      Upon learning that the movie collection Mr. Vasallo built over the course of a lifetime, at great expense and risk, was now being freely and widely pirated on YouTube, thereby threatening the very existence of his library, and his ability to maintain the films, Mr. Vasallo contacted Defendants, YouTube and Google, on or about 2015, at

their offices in New York City.

10.     Mr. John Farrell, head of YouTube's Latin America division in New York, promptly responded, acknowledging his awareness of Mr. Vasallo's history and the importance and value of his movie collection. Mr. Farrell, a Mexican national, and former head of Google Mexico, previously worked for Televisa (one of Mr. Vasallo's largest clients) and would routinely screen Plaintiff's movie titles as a Televisa employee. Televisa was one of the clients, who often approached Mr. Vasallo about purchasing his movie collection, including those corporately owned by Plaintiff, for values exceeding one hundred million U.S. Dollars.

11.     Mr. Farrell referred Mr. Vasallo to Google's Director of Latin Media and Entertainment, Mr. Juanjo Duran, whose office was based in Coral Gables, Florida.

12.     Mr. Duran led the Entertainment segment at Google for the Americas, which included Multicultural partnerships. Mr. Duran was responsible for the relations and growth of this area within Google's platforms and Ecosystems (Android, Android TV, Chrome, and Google Play).

13.     Prior to his current position, Mr. Duran spent eight years leading the Spanish Speaking Americas for Google's video platform, YouTube, as Head of Hispanic Content for YouTube. Mr. Duran also initiated the Multicultural team at YouTube prior to his expanded regional role in both YouTube and Google.

14.     Mr. Duran, immediately recognized Mr. Vasallo because Mr. Duran was not only a former employee of SatMex, a company which served one of Mr. Vasallo's movie channels, but also a former employee of Televisa, the same network where Mr. Farrell worked. During Mr. Vasallo's initial interaction with Mr. Duran, Mr. Duran

recalled and reiterated the value of Mr. Vasallo's movie collection, listing and highlighting individual titles, many of which remain readily available as pirated films on the YouTube platform.  Mr. Duran also voiced his respect for Mr. Vasallo, as he reflected on Mr. Vasallo's leadership in the Mexican movie industry, as well as Mr. Vasallo's significant role in the preservation of Mexican culture.

15.     Mr. Duran immediately acknowledged that Mr. Vasallo's movies, including those owned by Plaintiff, were routinely and repeatedly pirated on the YouTube platform.

16.     Mr. Duran proudly indicated that Defendants had the ability to detect and discontinue all acts of piracy "very easily" with their Content ID system, which recognizes pirated material prior to its upload on the YouTube platform.

17.     The Content ID system allows YouTube to instantaneously block infringing content.

18.     Mr. Duran, on behalf of YouTube, offered the Plaintiff, through Mr. Vasallo, three options to address the outright piracy of Mr. Vassallo's movies:

a.   Mr. Duran suggested that Mr. Vasallo allow the piracy to continue.  In this case, YouTube would direct a portion of all revenues generated from the third-party, pirated videos to Mr. Vasallo's preferred bank account.  This option would also provide YouTube the benefit of financial reward, as well as continue to attract millions of users and maintain YouTube's desired traffic allowing Plaintiff's catalog to become part of Defendants, Google and YouTube.

b.   Mr. Duran also suggested a strategic partnership where Defendants Google/YouTube would restrict the content, so that only Mr. Vasallo, through

*Athos Overseas, Ltd v. YouTube, Inc. et. al.*

his companies, could publish his movies on YouTube.  Meanwhile, all piracy would easily and immediately cease, as Mr. Vasallo and Defendants would both share the profits generated through the views of Mr. Vasallo's catalogue on YouTube.

    c.   Alternatively, Mr. Duran suggested a hybrid of the preceding two options.  Mr. Vasallo would allow the piracy to continue and split the revenue with the Defendants.  Meanwhile, Mr. Vasallo would upload high-definition versions of the movies, so that users could see a better quality of the movies. The Plaintiff and the Defendants would then split the revenue derived from the high-definition versions of the movies as well.

19.    There was one caveat to the solutions proposed by YouTube through Mr. Duran; Mr. Vasallo would have to agree to release YouTube from all possible claims arising from prior acts of piracy related to Mr. Vasallo's movie collection.  Mr. Vasallo neither agreed to this nor to the continued exploitation of his movies on Defendants' platform.

20.    In response, YouTube indicated that without the above-mentioned agreement in place, Defendants would not use their Content ID system to detect the copyright infringement of Plaintiff's films, and as a result, the piracy and infringement of Plaintiff's copyrighted films on Defendants' platform would continue.

21.    YouTube advised Mr. Vasallo that instead of the Content ID system, he would have to use the unreasonable, expensive, and outdated self-monitoring procedure of policing YouTube's platform for Plaintiff's copyrighted movies. This procedure requires 24-hour monitoring of the platform in search of pirated movies and pirated

channels; thereafter, YouTube requires it be informed of the pirated materials found pursuant to YouTube's "catch me if you can" program.

22.     When asked why Defendants would take this unreasonable position, YouTube's response was simple: "…because we are YouTube, we are part of Google, and we are protected by the Digital Millennium Copyright Act (DMCA)."

23.     As a result, Mr. Vasallo seeks to understand the following: if Defendants confidently rely on the protections afforded to them by the DMCA, then why did Defendants adamantly insist that Mr. Vasallo, as well as Plaintiff, release Defendants from all claims associated with Defendants' prior acts of piracy? The clear answer to this question is the following: Defendants consistently use the DMCA as both a shield and sword against the average copyright owner, such as Plaintiff in this case.

24.     Defendants have not treated other movie collections, owned by non-Hispanic companies, in the same manner as they are treating Mr. Vasallo's movie collection.

25.     Mr. Vasallo, on behalf of his companies, including the Plaintiff, hired Gibney Anthony & Flaherty, LLP, a specialized law firm in New York City, to police YouTube's platform in search of his pirated movies. Once a pirated movie was found, Mr. Vasallo and Plaintiff would send YouTube a takedown notice. YouTube would then remove the pirated video movie in its entirety. However, YouTube would not remove all matching videos, as YouTube would specifically only remove the one video from the one infringer related to the single infringing upload identified in the takedown notice. The same infringer would be free to upload the video again until three takedown notices were filed against him within a ninety (90) day period. Then and only then, would YouTube

*Athos Overseas, Ltd v. YouTube, Inc. et. al.*

cancel the infringer's username. The same infringer could then create a new username and begin the process of posting the pirated videos all over again, beginning the causal loop of a vicious cycle, with no one profiting other than Defendants at the expense of Plaintiff. Defendant's conduct of unlawful infringement has continued through 2021 to the present.

26.     Even under this draconian and intentionally obtrusive procedure, the Plaintiff has sought removal of infringed content related to more than 500 million views on the Defendants' platform. Meanwhile, Defendants have either monetized or profited from the traffic generated by the Plaintiff's infringed content on their platform.

27.     Using the only means available, Plaintiff and Mr. Vasallo's other companies have collectively sent more than ten thousand (10,000) notices of copyright infringement to YouTube, at the rate of five (5) to ten (10) notices per day, for over six (6) years, without any meaningful success.  In fact, over that period, Plaintiff's and Mr. Vasallo's movie titles have been viewed hundreds of millions of times on YouTube.   As such, Defendants are aware of Plaintiff's copywritten content being uploaded to their platform and to date, continue to infringe on Plaintiff's copywritten content.

28.     For example, the classic film, *Una Pura y Dos Con Sal*, starring Vicente Fernandez, has been the subject of countless takedown notices sent by Mr. Vasallo and the Plaintiff to the Defendants. Despite the foregoing, the movie has more than seven million views, as reflected on the Defendants' webpage. Not only has the movie attracted users to the Defendants' website, as evidenced through the seven million views of the movie on YouTube, but the Defendants have also profited on these views, as evidenced by the several advertisements displayed before the movie can be viewed.  Moreover, the page's side bar entices users to see more infringing content from other links; this promotes

users' repeated use of Defendants' platform and, thereby generates more advertising revenue for the Defendants. *See* illustration below:



29.     Even on pages where advertisements are not directly displayed within Plaintiff's pirated movies, users viewing Plaintiff's pirated movies are often redirected to pages where Defendants do engage in direct advertisement, thereby utilizing Plaintiff's pirated movies to generate additional income for the Defendants.

30.     Originally, YouTube would preclude users from uploading lengthy movies causing a movie to be uploaded in various segments. Now, users have the ability to load full movies, as generally described by the users, thereby giving the Defendants even more notice of the piracy.  At the onset of the creation of YouTube TV (a direct competitor to Plaintiff), YouTube stopped taking down the entire movies, which YouTube was previously doing on a voluntary basis as they now acquire content for their own purposes.

31.     Plaintiff files this lawsuit against the Defendants as a result of years of continued, pervasive, and unmitigated abuse of Plaintiff's copyrights.

*Athos Overseas, Ltd v. YouTube, Inc. et. al.*

## JURISDICTION, VENUE AND PARTIES

32.     This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*

33.     This Court has original subject matter jurisdiction over all claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

34.     This Court has personal jurisdiction over Defendants. Google engages in continuous and systematic business in Florida. It maintains an office and employs personnel in Miami, FL and in this District; thus, Google is physically present in the state. Defendants have also committed infringing acts outside of Florida causing injury to Plaintiff in Florida. Defendants regularly do or solicit business in Florida, derive substantial revenue from interstate commerce, derive substantial revenue from goods used or services rendered in Florida, and expect or reasonably should expect their infringing conduct to have consequences in Florida.

35.     Plaintiff has its principal place of business in Miami-Dade County and has been injured in Florida by Defendants' infringing conduct.

36.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(a).

37.     Defendants' conduct directly infringes the copyrights of works owned by, or exclusively licensed to, Plaintiff, that are the subject of valid Certificates of Copyright Registration from the Register of Copyrights, including, but not limited to, those listed in "Exhibit A" attached to this Complaint.

38.     Defendant, YouTube, Inc., is a Delaware corporation with its principal place of business in San Bruno, California. However, YouTube, Inc. also maintains and

operates a place of business in Florida.

39.    Defendant, YouTube, LLC, is a Delaware limited liability company with its principal place of business in San Bruno, California. However, YouTube, LLC also maintains and operates a place of business in Florida. On information and belief, YouTube, LLC is the successor in interest of YouTube, Incorporated. Accordingly, YouTube, Inc. and YouTube, LLC are referred to collectively herein as "YouTube."

40.    YouTube is a wholly owned and controlled subsidiary of Defendant, Google LLC, a Delaware corporation. While YouTube's principal place of business is in Mountain View, California, YouTube maintains and operates a place of business in Florida.

41.    Google exercises substantial and continuing control over YouTube's continuing acts of piracy that form the subject matter of this Complaint.

42.    Plaintiff retained the undersigned counsel for representation in this action, and as a result, Plaintiff is responsible for the reasonable attorneys' fees and costs incurred by undersigned counsel while prosecuting this action.

43.    All conditions precedent to bringing this action are satisfied.

## GENERAL FACTUAL BACKGROUND

44.    With the emergence of broadband networks, Internet protocol, and inexpensive wireless networks, Americans inform and entertain themselves using various internet service providers ("ISPs"). Using these platforms, millions have provided content and creative works by posting pictures and videos of their everyday life. ISPs have made fortunes providing the networks, the tools, and the creative work to the public. Yet, these same innovations have facilitated the infringement of copywritten materials, as users have

unlawfully duplicated copy-written content facilitated by digital technology. ISPs, such as YouTube, have exploited and continue to exploit the infringement of copyrighted materials, rather than respecting the intellectual property rights of copyright owners.

45.    YouTube, an ISP with the largest video-sharing platform in the world, knowingly and persistently engages in copyright piracy, as its platform is overwhelmed with infringed content at the expense of copyright holders. YouTube deprives copyright holders from compensation for the use of their copyrighted materials by allowing users to illegally post protected materials on a consistent and systematic basis, while profiting from such infringed materials and attempting to hide behind the safe harbor provisions of the DMCA that allows it to profit from the piracy, so long as they provide a "reasonable" mechanism for copyright owners to protect themselves.

46.    YouTube originated as a platform intended to provide users the instant ability to share "user generated" video content. However, the widespread use of YouTube to upload copyrighted materials, rather than "user-generated" content, has resulted in the continuous infringement of copyright holders' rights. Aware of the extensive, ongoing infringing activity on its platform, YouTube developed Content ID. Content ID is a copyright management tool that allows users to compare uploaded content with a catalogue of copyrighted materials through digital fingerprinting. YouTube exclusively offers Content ID to its preferred holders – an exclusive class predominantly comprised of the few major players within the creative industry. While denying approximately ninety-five (95) percent of all Content ID applications and aware of the average copyright holder's lack of leverage and resources to combat the extensive, infringing activity prevalent on the YouTube platform, Defendants require that each copyright holder engage

in self-monitoring, detecting, and presenting of a takedown notice to YouTube any time their copyrighted materials are infringed. Meanwhile, YouTube fails to provide any reasonable means to monitor such activity and as a result, YouTube's Content ID perpetuates, facilitates, and encourages the infringement of materials created by average copyright holders, like Plaintiff, as it insulates the vast group of repeat infringers under YouTube's repeat infringer policy.

47.     Under YouTube's current copyright policy, even when copyright owners successfully monitor and detect copyright infringement on their own, the takedown notices are ineffective in protecting those copyright owners from further infringement. Not only does a significant time lag exist between the time an infringing video is posted, and such video is detected by the copyright owner, but the copyright owner must then formally inform YouTube in writing and await YouTube's removal of the infringed material from its platform. Moreover, in the case where YouTube successfully removes the infringing clip specified in the takedown notice, YouTube fails to remove all clips that can be reasonably located using the information in the takedown notice, thereby willfully allowing the infringement to continue. Furthermore, as detailed above, YouTube's policy, fails to block repeat offenders from signing up for their website again using a different username and further allows altered copies of the very same video that was taken down to be uploaded again.

48.     Meanwhile, not only is YouTube currently profiting from its users' uploads of infringed materials at the expense of non-preferred copyright holders, such as the Plaintiff in this case, but preferred users with Content ID also have the option to share in YouTube's profits. Preferred Content ID holders can monitor infringement of their

copyrighted materials with the ***instant*** ability to block the content from subsequent views, as well as monetize from the detected infringement through the retention of viewership statistics and the additional ability to run counter-ads on infringed materials.

49.     YouTube's practice of willful blindness, while purposely refusing to address copyright infringement amongst its users and denying most copyright holders an effective means of protection against repeated YouTube infringers, is understandable when evaluating YouTube's role in the market and its sources of revenue. YouTube's revenue is considerably driven by the volume of content uploaded by its users, including infringed content. YouTube reportedly entertains two (2) billion users monthly.  However, YouTube purposefully fails to implement any anti-piracy measures because YouTube is fully aware that its success depends on users' ability to efficiently upload and disseminate content without exercising the pre-publication diligence required to protect copyright owners. YouTube's reliance on its users' copyright infringement to produce additional revenue is most evident through Google's acquisition of YouTube.

50.     On November 13, 2006, Google purchased YouTube for 1.65 billion US dollars. Pursuant to Google's purchase of YouTube, Google deviated from its longstanding commitment to copyright owners, as it adopted YouTube's practice of willful blindness towards copyright infringement and refused to implement anti-piracy tools previously developed by Google to protect copyright owners on its similar video-sharing platform, Google Video. Instead, Google entered into expensive licensing agreements with certain providers of copyrighted content, all of which retain access to Content ID. As stated previously, neither Plaintiff, nor most copyright owners, are

amongst the major players within the creative industry chosen to engage in the above-mentioned license agreements with YouTube.

51.     YouTube's hotbed of piracy remains hidden behind the DMCA, a statute providing a safe harbor from copyright infringement claims for entities, such as YouTube, if such entities formulate a policy to reasonably expel repeat infringers from their platform. YouTube appears compliant with the DMCA, as it purports to combat and successfully eliminate most of the copyright infringement taking place on its platform through its copyright, three-strike policy. However, YouTube's copyright policy only applies when a takedown notice is issued, and the repeat infringer accrues three strikes within ninety (90) days. YouTube's own Help page states that ninety-eight (98) percent of its copyright claims are resolved through its use of Content ID. Thus, it is imperative to note that any copyright infringement detected by Content ID is not recorded nor subject to YouTube's copyright, three-strike policy. As a result, most of the copyright infringement occurring on YouTube goes undetected and unpunished because most copyright holders do not have the resources to effectively detect and combat the extensive infringing of copyrighted materials on YouTube's platform.

52.     In addition to the forfeiting practices mentioned above, YouTube further forfeits its DMCA protection, as copyright holders who have exercised their right to provide takedown notices due to copyright infringement on the YouTube platform are at risk of losing their access to their Case Management Accounts and YouTube's copyright prevention tools necessary to monitor copyright infringement and provide takedown notices in the future.

53.     Defendants' continuous inducement of copyright infringement, willful blindness, and selective enforcement of copyright detection tools has harmed and continues to harm the interests of the Plaintiff and its extensive video catalog of copyrighted material.  In efforts to further maximize profits, YouTube attempts to coerce copyright owners to engage in licenses extremely favorable to the YouTube platform at the expense of copyright holders, such as the Plaintiff.  When coercing copyright holders to engage in exploitative licensing agreements, YouTube opts to utilize its filtering technology to identify and remove the associated copyrighted materials. Similarly, YouTube provides Content ID access only to a few major players of the creative industry, when the technology could be used to detect all copyright infringement prevalent on the YouTube platform.  However, Defendants instead choose to disregard the copyright infringement that could be detected via Content ID and further fail to offer any reasonable means to protect the rights of average copyright holders, such as the Plaintiff. With the improvements in artificial intelligence, databases, and other technological advancements, companies, such as Defendants, should be required to take reasonable steps to anticipate and filter potential copyright infringements. While YouTube is a known leader in the subject industry with access to the resources necessary to detect and prevent the exploitation and infringement of copyrighted materials, YouTube foregoes its use of the referenced resources to further its profit-driven purpose of monetizing all uploaded videos.  Accordingly, YouTube has intentionally chosen not to use the Content ID process because such use is incompatible with its economic goals; such goals are not part of §512 and inconsistent with the purpose of the safe harbor.   Accordingly, Defendants knowingly

and willingly induced, facilitated, engaged, and promoted the infringement of Plaintiff's copyrighted materials for their own financial benefit.

54.     Based on the foregoing, YouTube's practices and policies are not protected by the safe harbor established by the DMCA and Plaintiff has no choice but to seek immediate redress to protect and preserve the value of its intellectual property. Accordingly, Plaintiff seeks (i) a declaration that Defendants' conduct willfully infringes Plaintiff's copyrights, (ii) a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiff's copyrighted material, and (iii) statutory damages for Defendants' past and present willful infringement, or actual damages plus profits.

## NATURE OF THE ACTION

55.     Under Section 106 of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"), Plaintiff has distinct, severable, and exclusive rights to, among other things, reproduce, publicly perform, and publicly display its copyrighted works. 17 U.S.C. §§ 106(1), (4), (5).

I.     **YouTube is a Platform Designed to Enable and Facilitate Copyright Infringement**

   A.  **YouTube Encourages Video Uploads for Display on Its Platform as well as the Sharing of Videos from Its Server for Display on Other Platforms**

56.     Defendants encourage their users to upload videos to the YouTube site, where they are made available for immediate viewing by members of the public, free of charge. Using these uploads of pirated copyrighted programming, YouTube drives traffic to its site, meanwhile garnering profits arising from advertisements displayed on the pirated programming without a license from the programming's copyright owner.

57.     When uploading content to YouTube, YouTube requires users to upload the

original video into a platform-specific video file. Once the video is uploaded, YouTube automatically develops the video into its own software format, adding several copies of the platform-specific video file to its server. Upon the video's download to the YouTube server, the video automatically becomes part of the YouTube library, where the video is accessible by the general public for views, rating, comments, and sharing to all who enter the YouTube platform.

58.     When a user visits the YouTube website and enters a description of what the user is looking for into the search bar, YouTube populates a list with all video matches, metadata, and thumbnails associated with the video. By clicking on a thumbnail, YouTube displays the audiovisual content from the YouTube server as the video streams on the user's device. While viewing, the YouTube logo, as well as all advertising banners remain visible. YouTube itself commits the infringing duplication, public performance, and public display of Plaintiff's copyrighted works, and that infringement occurs on YouTube's own website, which is operated and controlled by Defendants, not users.

59.     Moreover, YouTube allows any viewer to "embed" and engage in further publication of the Plaintiff's content found within the YouTube library, as the default setting for each video allows viewers to share the content to another website or directly to others through alternative messaging means. Any time the video is accessed while displayed on another website, the audiovisual content will stream from the YouTube server on the viewer's device, while displaying the YouTube logo. If a video is shared through an e-mail or text, a link will be generated and supplied to the recipient. Once the recipient clicks on the link, the recipient will be forwarded to the YouTube website to watch the video.

*Athos Overseas, Ltd v. YouTube, Inc. et. al.*

60.     Further supporting Defendants' central role in knowingly providing unlawful and unauthorized access to Plaintiff's copyrighted materials, YouTube has self-proclaimed its ability to control seventy (70) percent of the materials viewed by users on its platform through YouTube's algorithm-based recommendations and auto-play feature. Accordingly, each time Plaintiff's infringed materials are viewed, it is more than likely that the Defendants not only displayed the infringed materials on its platform, but also directed the viewers to watch the infringed materials available on the YouTube library without any affirmative actions on behalf of the viewers.

**B. Maximizing Content Volume, Including Infringed Content, Remains Pivotal to YouTube's Growth and Success**

61.     YouTube's business model is driven by the "network effect," whereby the volume of content, including infringed content, uploaded by users determines the volume of new users, as well as the associated content uploaded by those new users. Therefore, YouTube consistently benefits from users' infringed uploads, such as the uploads containing Plaintiff's infringed materials, as less restrictions on the content uploaded by users ensures an increase in both users and additional content, and in turn, generates vast opportunities for YouTube's advertising revenue.

62.     As mentioned above, Google's acquisition of YouTube and its failure to address the rampant infringing activity on the YouTube platform further evidence Google's complacency with such practice and Defendants' reliance on copyright infringement for pecuniary gain. Although Google's financial advisor, Credit Suisse, publicly expressed concerns over the composition of YouTube's views, as only ten (10) percent of YouTube's views were of licensed material, while more than sixty (60) percent of YouTube's views were of "premium" copyrighted material, Google disregarded the

19

*Athos Overseas, Ltd v. YouTube, Inc. et. al.*

voiced concerns and chose to continue YouTube's established practice of copyright piracy when Defendants intentionally forewent the opportunity to incorporate their own pre-screening tool designed to protect copyright holders on its similar, video-sharing platform, Google Video.

63.     Unsurprisingly, with thirty thousand (30,000) hours of new content uploaded to YouTube each hour, it is infeasible for the Plaintiff to adequately enforce its rights as a copyright holder. Meanwhile, it is equally infeasible that YouTube effectively process and resolve the resulting takedown requests. However, the above-mentioned scenario proves favorable to Defendants and thus is willfully ignored by Defendants, as copyright infringement of Plaintiff's materials give rise to substantial increases in revenue related to advertising and data generation. In 2019, Defendants earned about $15 billion US dollars in advertising revenue generated by advertisers attracted to user-uploaded content, including Plaintiff's infringed materials. More specifically, Defendants acquired 45% percent of all advertising revenue displayed during the viewing of Plaintiff's infringed materials, while the infringers retained the remaining revenue. However, Plaintiff was not provided any share of the revenue generated from its infringed materials, but rather subjected to losses in revenue as its works diminished in value due to the unauthorized availability of its infringed materials on YouTube, free of charge.

## C. YouTube's Delayed and Selective Copyright Enforcement Tools Exist to Maximize Revenues and Create Obstacles for Plaintiff to Exercise its Rights

64.     As demonstrated through YouTube's practices, YouTube's business model focuses on increasing advertising opportunities while securing additional viewers. Therefore, YouTube does not concern itself with the distribution of revenue between copyright enforcers and infringers. However, YouTube does concern itself with fostering

an environment where infringers continue to profit and remain incentivized to upload additional videos, as access to infringed materials increases advertising opportunities and viewers. Accordingly, YouTube's decision to deny Content ID to average copyright holders is aligned with Defendants' business model to maximize profits, as denying widespread access to Content ID allows infringers to continue uploading infringed materials, which increases content volume, viewers, advertising, and ultimately profits. Meanwhile, other preferred Content ID holders with extensive catalogues of copyrighted materials can determine whether to block uploads of their copyrighted materials, run counter ads on the material, or gather valuable data on the viewers watching their infringed materials. In doing so, YouTube deliberately induces copyright infringement to secure its own profits at the expense of average copyright holders, such as the Plaintiff in this case.

65.    As indicated above, the Plaintiff raised the copyright issues with YouTube after retaining a service dedicated to the monitoring of the YouTube website for Plaintiff's copyrighted materials, as well as sending takedown notices of the violations to YouTube.

66.    For the past six years, Plaintiff's representatives have sent over ten thousand (10,000) notices of violations to YouTube for copyright infringement of Plaintiff's content on the YouTube website. Despite the foregoing, YouTube currently maintains posts that are a direct infringement on Plaintiff's copyrighted works.

**D.  YouTube's Failure to Protect Plaintiff's Rights Despite Actual and Constructive Knowledge of Infringing Activity on Plaintiff's Works Evidences Defendants' Intent to Permit and Induce Copyright Infringement on Their Platform**

67.    In Plaintiff's case, neither YouTube nor its users, have received a valid license, authorization, permission, or consent to use the registered copyrighted works owned by Plaintiff that have appeared and continue to appear on the YouTube website,

including but not limited to those listed in "**Exhibit A**," attached hereto.

68.     Instead, in violation of Plaintiff's rights under copyright law, YouTube has willfully, intentionally, and purposefully reproduced, publicly performed, and publicly displayed Plaintiff's copyrighted works, as well as knowingly facilitated, enabled, induced, and materially contributed to infringing uses thereof, and refused to exercise its ability to control or supervise infringing uses thereof from which it obtains direct financial benefits.

69.     As stated above, Defendants have actual knowledge and clear notice of the infringement. Further, Defendants were actually and subjectively aware of the ongoing infringement extending well past the individual take-down notices.   Plaintiff, at a considerable expense, retained counsel who, for over five (5) years, monitored Defendant's platform for infringements of Plaintiff's movies daily.

70.     Plaintiff's counsel would send daily letters to YouTube, which advised and provided notice to Defendants of the continuing infringement of Plaintiff's copyrighted materials on the YouTube platform, as well as requested that Defendants takedown the pirated materials from the YouTube platform. *See* "**Exhibit B**," *Chronological List of Notices*.

71.     Despite years of being advised of the same violations for the same copyright-protected works, Defendants have failed, and continuously fail to prevent the continued pervasive and uncontrolled infringement of Plaintiff's movies.

72.     YouTube's site is also filled with "***red flags***" of infringing activity as descriptive language and search tags identify both the Plaintiff's infringed works and copyrighted works.

73.     As mentioned above, YouTube retains the ability to control the uploaded content on its site. YouTube has a user agree to its Terms of Use for access to its website. Under these Terms of Use, YouTube has the power to <u>review</u>, <u>block</u>, and <u>remove</u> any upload it deems inappropriate from its website. For example, YouTube polices and removes pornographic videos from its library, yet refuses to do the same for videos that obviously infringe Plaintiff's copyrights.

74.     Furthermore, as stated above, YouTube offers Content ID, a copyright management tool that would "very easily" prevent the harm suffered by Plaintiff in this case. Despite actual and constructive knowledge of the unauthorized uploads and subsequent dissemination of Plaintiff's copyrighted materials on its YouTube platform, Defendants refuse to offer Content ID to Plaintiff and fail to create a digital fingerprint for the uploaded content to avoid additional copyright infringement of Plaintiff' materials unless a hefty ransom is paid. Meanwhile, Defendants limit the number of takedown notices Plaintiff can submit and further fail to provide Plaintiff with an automated tool or reasonable method to monitor the ongoing infringement of their copyrighted materials on YouTube. As a result of Defendant's intentional acts or omissions described above, Plaintiff remains at a loss and copyrighted materials continue to be unlawfully available on the Defendants' platform to the detriment of Plaintiff.

**E. Defendants' Disregard of Copyright Management Information Has Enabled the Inducement, Concealment, and Contribution of Infringement of Plaintiff's Copyrighted Materials**

75.     The DMCA, §1202 encourages the recognition and preservation of copyright management information ("CMI"), which often includes metadata and additional identifying information that is vital to the lawful distribution of creative works,

as well as proper attribution and rightful compensation to those who created the works. In this case, one of the CMIs capable of providing protection to Plaintiff against copyright infringement platforms, such as YouTube, is the International Standard Record Code ("ISRC"). Despite YouTube's awareness of CMI, as outlined by the DMCA, as well as the protections CMI affords to copyright holders, YouTube does not require users to include the original CMI data when uploading content onto its platform. Moreover, Defendants alter the content's CMI to facilitate the dissemination of the infringed content on their own site and additional platforms. As a result, YouTube frustrates the purpose of DMCA, § 1202, as Defendants designed and utilize an uploading system that disregards CMI, which inherently insulates infringers and encourages the unlawful and unauthorized distribution and use of Plaintiff's copyrighted materials.

**F. Defendants are Not Entitled to Protection Under the Digital Millennium Copyright Protection Act, 17. U.S.C. § 512**

76.    While DMCA § 512 was created to provide ISPs, such as YouTube, protection against copyright infringement claims, YouTube is not entitled to DMCA's protection as it fails to comply with several of the requirements outlined by the statute.

77.    To qualify for protection under the safe harbor provided to video-sharing platforms, such as YouTube, the platform must designate an agent to process all takedown notifications, while each notice must identify the copyrighted material, the infringed material, and "sufficient information to permit the service provider to locate the material." 17 U.S.C. § 512(c)(3)(iii). Although YouTube provides copyright holders the means to submit takedown notices, Defendants place arbitrary limitations on how many takedown notices copyright holders are entitled to submit before they are denied access to both YouTube's copyright prevention tools and their Case Management Accounts.

Furthermore, YouTube has recently increased the significant burden imposed on most copyright holders by requiring each takedown notice to indicate the exact time the infringement begins and concludes when embedded in other materials, thereby furthering forfeiting the protection afforded under the DMCA.

78. Moreover, the DMCA requires that service providers adopt and implement a policy that addresses and, in appropriate circumstances, terminates repeat infringers. YouTube's repeat infringer policy fails to comply with DMCA's requirement, as its three-strike infringer policy only applies when infringers receive three strikes of copyright infringement within ninety (90) days. However, the infringer may continue utilizing YouTube to upload infringed content, such as the Plaintiff's copyright materials, as long as he refrains from doing so three times within those 90 days. At the conclusion of the 90 days, the infringer is welcomed to continue uploading infringed content until another takedown notice is filed against him and the 90-day process is initiated all over again at the copyright owner's expense. Moreover, YouTube's repeat infringer policy fails to prevent repeat infringers who violate the three-strike policy from creating a new user account on the YouTube platform and engaging in additional infringing activity. As a result, copyright holders must not only monitor, detect, and provide takedown notices, at the risk of losing access to YouTube's copyright prevention tools and their Case Management Accounts, but also repeatedly provide notice of the same uploads by the same infringers. Therefore, YouTube's repeat infringer policy fails to address repeat infringers and thus, YouTube is non-compliant with the DMCA's requirement. Therefore, YouTube is not entitled to protection under the DMCA's safe harbor provision.

79. Furthermore, YouTube does not utilize Content ID concurrently with its

copyright, three-strike policy to address repeat infringers. On the contrary, YouTube exclusively utilizes Content ID to maximize profits, while only allowing major players of the creative industry to choose whether to block the upload of their copyrighted materials or allow the upload of the infringed materials for the purpose of running counter ads and gathering valuable user data, a practice that exclusively benefits Content ID holders and Defendants.

80.     While YouTube's Content ID database is mostly automated and can be utilized to protect all copyright holders from repeat infringers, YouTube instead withholds access of Content ID from most copyright holders, while choosing to insulate repeat infringers as YouTube's three-strike policy does not apply to the infringed materials detected by Content ID. Therefore, it is undisputable that YouTube utilizes copyright management tools to maximizes Defendants' profits rather than protect the rights of copyright holders, such as the Plaintiff in this case.

81.     YouTube further fails to comply with the DMCA, as the safe harbor provision only applies where Defendants do not have actual or constructive knowledge of the copyright infringement taking place on their platform. In this case, Plaintiff not only provided Defendants with actual and constructive knowledge of copyright infringement without any response or redress, but Defendants also retained actual and constructive knowledge of the infringed materials through its use of Content ID, which detects all copyrighted and infringed materials on the YouTube platform. As a result, Defendants clearly forfeited the protection afforded to them by the DMCA's safe harbor provision.

82.     The DMCA requires that any protected entity under its safe harbor provision refrain from profiting from any infringing activity existing on its platform. As extensively

described above, Defendants not only directly profited and continue to profit from forty-five (45) percent of all advertising displayed on infringed materials, as well as one hundred (100) percent of advertising present on its homepage and search pages, but they also intentionally deny most copyright holders access to Content ID, a system that would prevent and address the damages incurred by Plaintiff in this case, for the sole purpose of maximizing profits. Accordingly, YouTube is undoubtedly exempt from protection by the DMCA's safe harbor provision.

83.    Moreover, YouTube admits to its non-compliance with the DMCA's requirement that service providers maintain a neutral platform that refrains from interfering with user behavior, as YouTube openly declares its ability to control about seventy (70) percent of the content viewed by users on its platform. YouTube's control extends from its gathering of data on viewer preferences, which YouTube subsequently uses to offer recommendations and auto-play content in accordance with those preferences. Therefore, through Plaintiff's hiring of counsel, who provided actual and constructive knowledge to Defendants of the unauthorized uploading and viewing of Plaintiff's copyrighted materials on the YouTube platform, it is evident that Defendants not only intentionally refused to protect Plaintiff's copyrights despite their access and use of Content ID to maximize profits, but further directed viewers to Plaintiff's pirated materials, whereby Defendant's profited from the advertisements displayed on the infringed works during each view.

84.    YouTube's forfeiture of the DMCA safe harbor provision is further demonstrated by YouTube's failure to comply with the requirement that service providers accommodate and refrain from interfering with standard technical measures utilized by

copyright holders to protect their works. Defendants' continuously refuse to accommodate copyright holders and intentionally interfere with the standard technical measures utilized by copyright holders to protect their copyrights, as YouTube denies Content ID to the majority of copyright holders, as well as disincentivizes the filing of takedown notices by requiring copyright holders to identify additional facts not required by the DMCA and imposing abstract limitations on the number of takedown notices copyright holders may file before inexplicably losing access to YouTube's copyright prevention tools and their Case Management Accounts.

85.     Defendants' non-compliance with the DMCA is even further apparent through YouTube's use of a system that alters, conceals, and eliminates metadata used to identify and protect copyright holders, despite its awareness of §1202 CMI. YouTube also alters, conceals, and eliminates the technical measure, ID3 data, which is commonly used and approved by the International Organization of Standardization (ISO). Moreover, YouTube denies access to its Application Programming Interface (API) and prohibits the use of automated tools on its platform, both of which are often associated with standard technical measures utilized by copyright holders, such as Plaintiff, to protect their rights.

86.     As a result, Defendants' willful blindness and intentional inducement of copyright infringement to maximize profits not only diminishes the value of Plaintiff's film catalogue, but also impedes Plaintiff's ability to grant licenses for publication, as few individuals are willing to purchase a license for a product already offered on a website, free of charge.

## CLAIMS FOR RELIEF

### COUNT I

**(YouTube's Direct Copyright Infringement - Public Performance)**

87.    Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

88.    YouTube has failed to adhere to its obligation under the safe harbor protections afforded by §512.

89.    YouTube, without the permission or consent of Plaintiff, and without authority, are publicly performing and purporting to authorize the public performance of Plaintiff's registered copyrighted audiovisual works. YouTube publicly perform infringed works pursuant to user requests. YouTube's conduct constitutes direct infringement of Plaintiff's exclusive rights under the Copyright Act to publicly perform its copyrighted, audiovisual works.

90.    YouTube's acts of infringement have been willful, intentional, purposeful, and in complete disregard of, and indifferent to Plaintiff's rights.

91.    As a direct and proximate result of YouTube's infringement of Plaintiff's copyrights and exclusive rights under U.S. copyright law, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to its actual damages plus YouTube's profits from infringement, as will be proven at trial.

92.    Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

93.    YouTube's conduct is causal and, unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated nor measured in monetary funds. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction requiring YouTube to employ

reasonable methodologies, including, but not limited to, Content ID or other similar technologies developed or to be developed by YouTube, to prevent or limit infringement of Plaintiff's copyrights.

## COUNT II

### (YouTube's Direct Copyright Infringement - Public Display)

94.    Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

95.    YouTube has failed to adhere to its obligation under the safe harbor protections afforded by §512.

96.    YouTube, without the permission or consent of Plaintiff, and without authority, are publicly displaying and purporting to authorize the public display of Plaintiff's registered copyrighted audiovisual works. YouTube caused the public display of these infringed works by showing individual images of infringing video clips in response to user searches for videos on YouTube. YouTube's conduct constitutes direct infringement of Plaintiff's exclusive rights under the Copyright Act to publicly display its copyrighted, audiovisual works.

97.    YouTube's acts of infringement have been willful, intentional, purposeful, and in complete disregard of, and indifferent to Plaintiff's rights.

98.    As a direct and proximate result of YouTube's infringement of Plaintiff's copyrights and exclusive rights under copyright law, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to its actual damages plus YouTube's profits from infringement, as will be proven at trial.

99.    Plaintiff is also entitled to its costs, including reasonable attorneys' fees,

pursuant to 17 U.S.C. § 505.

100.   YouTube's conduct is causal and, unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully measured nor compensated in monetary funds. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction requiring YouTube to employ reasonable methodologies, including, but not limited to, Content ID or other similar technologies developed or to be developed by Defendants, to prevent or limit infringement of Plaintiff's copyrights.

## COUNT III

### (YouTube's Direct Copyright Infringement - Reproduction)

101.   Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

102.   YouTube has failed to adhere to its obligation under the safe harbor protections afforded by §512.

103.   YouTube, without authority, are making, causing to be made, and purporting to authorize the making of unauthorized copies of Plaintiff's registered copyrighted, audiovisual works. YouTube's conduct constitutes direct infringement of Plaintiff's exclusive rights under the Copyright Act to reproduce its copyrighted works.

104.   YouTube's acts of infringement have been and continue to be willful, intentional, purposeful, and in complete disregard of, and indifferent to Plaintiff's rights.

105.   As a direct and proximate result of YouTube's infringement of Plaintiff's copyrights and exclusive rights under U.S. copyright law, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to their actual damages

plus YouTube's profits from infringement, as will be proven at trial.

106.   Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

107.     YouTube's conduct is causal and, unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated nor measured in monetary funds. Plaintiff has no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction requiring YouTube to employ reasonable methodologies, including, but not limited to, Content ID or other similar technologies developed or to be developed by Defendants, to prevent or limit infringement of Plaintiff's copyrights.

**COUNT IV**

**(Inducement of Copyright Infringement)**

108.    Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

109.   YouTube and Google have failed to adhere to their obligations under the safe harbor protections afforded by §512.

110.   YouTube users have infringed and are infringing on Plaintiff's rights related to Plaintiff's registered copyrighted audiovisual works by, *inter alia,* uploading infringing copies of Plaintiff's copyrighted works onto YouTube's website and publicly performing or displaying or purporting to authorize the public performance or display of such infringing videos, all without authorization. YouTube users are therefore directly infringing Plaintiff's exclusive rights of reproduction, public performance, and public display under 17 U.S.C. §§ 106(1), (4) and (5).

111.   Defendants are liable under the Copyright Act for inducing the infringing

acts of YouTube users. Defendants operate the YouTube website with the objective of promoting use of the YouTube website to infringe on Plaintiff's copyrights and, by their clear expression and additional affirmative steps, Defendants are unlawfully fostering copyright infringement by YouTube users.

112. Defendants are fully aware that Plaintiff's audiovisual works are copyrighted and authorized for purchase through various outlets. Defendants are equally aware that YouTube users are employing the YouTube website and the services provided through that website to unlawfully reproduce, publicly perform, and publicly display Plaintiff's copyrighted works. Defendants intend, encourage, and induce YouTube users to employ the YouTube site in this fashion.

113. Defendants' acts of infringement have been willful, intentional, purposeful, and in complete disregard of, and indifferent to, Plaintiff's rights.

114. As a direct and proximate result of Defendants' infringement of Plaintiff's copyrights and exclusive rights under U.S. copyright law, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to its actual damages plus Defendants' profits from infringement, as will be proven at trial.

115. Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

116. Defendants' conduct is causal and, unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated nor measured in monetary funds. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction requiring Defendants to employ reasonable

methodologies, including, but not limited to, Content ID or other similar technologies developed or to be developed by Defendants, to prevent or limit infringement of Plaintiff's copyrights.

## COUNT V

### (Contributory, Copyright Infringement)

117.    Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

118.    YouTube and Google have failed to adhere to their obligations under the safe harbor protections afforded by §512.

119.    YouTube users have infringed and are infringing on Plaintiff's rights related to Plaintiff's registered copyrighted, audiovisual works by, *inter alia,* uploading infringing copies of Plaintiff's copyrighted works onto YouTube's website and publicly performing or displaying or purporting to authorize the public performance or display of such infringing videos, all without authorization. YouTube users are therefore directly infringing on Plaintiff's exclusive rights of reproduction, public performance, and public display under 17 U.S.C. §§ 106(1), (4) and (5).

120.    Defendants are liable as contributory copyright infringers for the infringing acts of YouTube users. Defendants enable, induce, facilitate, and materially contribute to each act of infringement by YouTube users.

121.    Defendants have actual and constructive knowledge that YouTube users are employing the YouTube website to copy, publicly perform, and publicly display Plaintiff's copyrighted works.

122.    Acting with this actual and constructive knowledge, Defendants enable, facilitate, and materially contribute to YouTube users' copyright infringement, which

could not occur without Defendants' enablement.

123.   Defendants' acts of infringement have been willful, intentional, purposeful, and in complete disregard of, and indifferent to, Plaintiff's rights.

124.   As a direct and proximate result of Defendants' infringement of Plaintiff's copyrights and exclusive rights under U.S. copyright law, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to its actual damages plus Defendants' profits from infringement, as will be proven at trial.

125.   Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

126.   Defendants' conduct is causal and, unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated nor measured in monetary funds. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction requiring Defendants to employ reasonable methodologies, including, but not limited to, Content ID or other similar technologies developed or to be developed by Defendants, to prevent or limit infringement of Plaintiff's copyrights.

## COUNT VI

### (Vicarious Copyright Infringement)

127.   Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

128.   YouTube and Google have failed to adhere to their obligations under the safe harbor protections afforded by §512.

129.   YouTube users have infringed and are infringing on Plaintiff's rights related

to Plaintiff's registered copyrighted, audiovisual works by, *inter alia,* uploading infringing copies of Plaintiff's copyrighted works onto YouTube's website and publicly performing or displaying or purporting to authorize the public performance or display of such infringing videos, all without authorization. YouTube users are therefore directly infringing Plaintiff's exclusive rights of reproduction, public performance, and public display under 17 U.S.C. §§ 106(1), (4) and (5).

130.   Defendants are vicariously liable for the infringing acts of YouTube users. Defendants have both the right and the ability to supervise YouTube users' infringing conduct, and to prevent YouTube users from infringing Plaintiff's copyrighted, audiovisual works.

131.   Upon information and belief, YouTube currently engages in practices to enforce content restrictions and protect the copyrighted works of its business partners but withholds these same protections for the copyrights of persons, including Plaintiff, who have not granted licenses to YouTube.

132.   YouTube significantly and directly benefits from the widespread infringement propagated by its users. The availability of infringing copyrighted works on the YouTube platform, including Plaintiff's works, acts as a substantial draw, attracting users to the website and increasing the amount of time users spend on the YouTube platform once they visit. Defendants derive substantial advertising revenue tied directly to the volume of traffic they are able to attract to the YouTube site.

133.   Defendants' acts of infringement have been willful, intentional, purposeful, and in disregard of, and indifferent to, Plaintiff's rights.

134.   As a direct and proximate result of Defendants' infringement on Plaintiff's

copyrights and exclusive rights under U.S. copyright law, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to its actual damages plus Defendants' profits from infringement, as will be proven at trial.

135.    Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

136.    Defendants' conduct is causal and, unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated nor measured in monetary funds. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction requiring Defendants to employ reasonable methodologies, including, but not limited to, Content ID or other similar technologies developed or to be developed by Defendants, to prevent or limit infringement of Plaintiff's copyrights.

**COUNT VII**

**(YouTube's Removal and Alteration of Copyright Management Information Along with Intentional Distribution of Materials Lacking Copyright Management Information)**

137.    Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

138.    YouTube has failed to adhere to its obligation under the safe harbor protections afforded by §512.

139.    Plaintiff's works in this case contains copyright management information; while some of the Plaintiff's works include metadata on their digital files, others include the mentioned information in their packaging.

140.    The copyright management information found on Plaintiff's copyrighted

materials identifies Plaintiff as creator and copyright owner of the works.

141. This copyright management information is associated with each of the Plaintiff's audiovisual materials and is afforded protection under 17 U.S.C. § 1202(b).

142. While processing the unlawful and unauthorized uploading of Plaintiff's copyrighted materials, YouTube intentionally and knowingly removed or perpetuated the removal of the Plaintiff's copyright management information of the Plaintiff's works.

143. Thereafter, YouTube intentionally displayed and distributed Plaintiff's infringed materials, while aware that such infringed materials lacked the copyright management information, as YouTube had previously and intentionally removed the copyright management information from Plaintiff's materials.

144. Youtube not only removed Plaintiff's copyright management information, but also altered the metadata in efforts to exploit, display, and infringe Plaintiff's copyrighted materials on multiple systems with the knowledge and intent to induce, enable, facilitate, or conceal the ongoing and additional copyright infringement of the Plaintiff's materials.

145. Plaintiff hired counsel, who provided YouTube with actual and constructive knowledge of the copyright management information as Plaintiff's takedown notices identifies both the infringed materials and the Plaintiff as copyright owner of the materials.

146. YouTube thereafter continued to display and distribute Plaintiff's infringed materials, while aware that such infringed materials lacked copyright management information. YouTube engaged and continue to engage in the above-mentioned activities without the consent or authorization of the Plaintiff.

147. Plaintiff has been harmed and continues to experience harm due to

YouTube's violations of 17 U.S.C. § 1202(b) and is entitled to injunctive relief, removal and takedown of the infringing materials, damages, costs, and attorneys' fees. Under 17 U.S.C. § 1203(c)(3), Plaintiff is entitled to the maximum statutory damages for YouTube's violations of 17 U.S.C. § 1202(b).

## COUNT VIII

### (Google's Direct Copyright Infringement - Public Performance)

148.    Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

149.    Google has failed to adhere to its obligation under the safe harbor protections afforded by §512.

150.     Google, without the permission or consent of Plaintiff, and without authority, are publicly performing and purporting to authorize the public performance of Plaintiff's registered copyrighted audiovisual works, through YouTube. Google publicly perform infringed works pursuant to user requests. Googles' conduct constitutes direct infringement of Plaintiff's exclusive rights under the Copyright Act to publicly perform its copyrighted, audiovisual works.

151.    Google, through its search engine, provides users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer or hyperlink.

152.   Googles' acts of infringement have been willful, intentional, purposeful, and in complete disregard of, and indifferent to Plaintiff's rights.

153.   As a direct and proximate result of Googles' infringement of Plaintiff's copyrights and exclusive rights under U.S. copyright law, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiff's

election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to its actual damages plus Defendants' profits from infringement, as will be proven at trial.

154.   Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

155.   Googles' conduct is causal and, unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated nor measured in monetary funds. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction requiring Google to employ reasonable methodologies, including, but not limited to, Content ID or other similar technologies developed or to be developed by Google, to prevent or limit infringement of Plaintiff's copyrights.

## COUNT IX

### (Google's Direct Copyright Infringement - Public Display)

156.   Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

157.   Google has failed to adhere to its obligation under the safe harbor protections afforded by §512.

158.   Google, without the permission or consent of Plaintiff, and without authority, are publicly displaying and purporting to authorize the public display of Plaintiff's registered copyrighted audiovisual works. Google caused the public display of these infringed works by showing individual images of infringing video clips in response to user searches for videos on YouTube. Googles' conduct constitutes direct infringement of Plaintiff's exclusive rights under the Copyright Act to publicly display its copyrighted, audiovisual works.

159.     Google, through its search engine, provides users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer or hyperlink.

160.   Googles' acts of infringement have been willful, intentional, purposeful, and in complete disregard of, and indifferent to Plaintiff's rights.

161.   As a direct and proximate result of Googles' infringement of Plaintiff's copyrights and exclusive rights under copyright law, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to its actual damages plus Googles' profits from infringement, as will be proven at trial.

162.   Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

163.   Googles' conduct is causal and, unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully measured nor compensated in monetary funds. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction requiring Google to employ reasonable methodologies, including, but not limited to, Content ID or other similar technologies developed or to be developed by Defendants, to prevent or limit infringement of Plaintiff's copyrights.

## COUNT X

### (Google's Direct Copyright Infringement - Reproduction)

164.     Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

165.     Google has failed to adhere to its obligation under the safe harbor protections

afforded by §512.

166. Google, without authority, are making, causing to be made, and purporting to authorize the making of unauthorized copies of Plaintiff's registered copyrighted, audiovisual works. Googles' conduct constitutes direct infringement of Plaintiff's exclusive rights under the Copyright Act to reproduce its copyrighted works.

167. Google, through its search engine, provides users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer or hyperlink.

168. Googles' acts of infringement have been and continue to be willful, intentional, purposeful, and in complete disregard of, and indifferent to Plaintiff's rights.

169. As a direct and proximate result of Googles' infringement of Plaintiff's copyrights and exclusive rights under U.S. copyright law, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to their actual damages plus Googles' profits from infringement, as will be proven at trial.

170. Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

171. Googles' conduct is causal and, unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated nor measured in monetary funds. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction requiring Google to employ reasonable methodologies, including, but not limited to, Content ID or other similar technologies developed or to be developed by Google, to prevent or limit infringement of

Plaintiff's copyrights.

## COUNT XI

**(Google's Removal and Alteration of Copyright Management Information Along with Intentional Distribution of Materials Lacking Copyright Management Information)**

172.     Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

173.     Google has failed to adhere to its obligation under the safe harbor protections afforded by §512.

174.   Plaintiff's works in this case contains copyright management information; while some of the Plaintiff's works include metadata on their digital files, others include the mentioned information in their packaging.

175.   The copyright management information found on Plaintiff's copyrighted materials identifies Plaintiff as creator and copyright owner of the works.

176.   This copyright management information is associated with each of the Plaintiff's audiovisual materials and is afforded protection under 17 U.S.C. § 1202(b).

177.   While processing the unlawful and unauthorized uploading of Plaintiff's copyrighted materials, Google intentionally and knowingly removed or perpetuated the removal of the Plaintiff's copyright management information of the Plaintiff's works.

178.   Thereafter, Google intentionally displayed and distributed Plaintiff's infringed materials, while aware that such infringed materials lacked the copyright management information, as Google had previously and intentionally removed the copyright management information from Plaintiff's materials.

179.   Google not only removed Plaintiff's copyright management information, but also altered the metadata in efforts to exploit, display, and infringe Plaintiff's

copyrighted materials on multiple systems with the knowledge and intent to induce, enable, facilitate, or conceal the ongoing and additional copyright infringement of the Plaintiff's materials.

180. Plaintiff hired counsel, who provided Google with actual and constructive knowledge of the copyright management information as Plaintiff's takedown notices identifies both the infringed materials and the Plaintiff as copyright owner of the materials.

181. Google thereafter continued to display and distribute Plaintiff's infringed materials, while aware that such infringed materials lacked copyright management information. Google engaged and continue to engage in the above-mentioned activities without the consent or authorization of the Plaintiff.

182. Plaintiff has been harmed and continues to experience harm due to Googles' violations of 17 U.S.C. § 1202(b) and is entitled to injunctive relief, removal and takedown of the infringing materials, damages, costs, and attorneys' fees. Under 17 U.S.C. § 1203(c)(3), Plaintiff is entitled to the maximum statutory damages for Googles' violations of 17 U.S.C. § 1202(b).

## COUNT XII

### (Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") against YouTube)

183. Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

184. This is an action for damages against YouTube based upon Chapter 501 of the Florida Statutes known as the Florida Deceptive and Unfair Trade Practices Act "FDUPTA".

185. Plaintiff is a "consumer" as defined under FDUPTA. Fla. Stat. §501.203(7).

186.     Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act, ("FDUPTA") is to be liberally construed to protect the consuming public, such as Plaintiffs in the instant case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

187.     Courts have defined a deceptive trade practice to be any act or practice that has tendency or capacity to deceive consumers, and an unfair trade practice to be any act or practice that offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Jones v. TT of Longwood, Inc., 2006 U.S. dist. LEXIS 70664 (M.D. Fla. Sept. 26, 2006)(citing Suris v. Gilmore Liquidating, Inc. 651 So.2d 1282, 1283 (Fla. 3d DCA 1995).

188.     YouTube's selective use of the Content ID system constitutes and unfair and deceptive trade practice.

189.     YouTube's requirement of shared revenue in order to implement their Content ID system to protect Plaintiff's copywritten catalog of movies is unfair to Plaintiff.

190.     The conditioning of the availability of the Content ID system for exclusive rights holders on waivers of their prior infringement is an unfair trade practice. YouTube's failure to adequately disclose that to the copyright holder and to the public is deceptive.

191.     YouTube holds out publicly that it uses Content ID but adds significant restrictions on the potential contractual partners.  YouTube's policy is coercive to the content producers and deceptive for the public.

192.     As a direct and proximate result of YouTube's policy regarding their Content ID, Plaintiff had been directly affected and has suffered damages.

## COUNT XII

### (YouTube's Violation of § 1 of the Sherman Act for Illegal Tying)

193.     Plaintiff incorporates by reference paragraphs 1 – 86 as if set forth herein.

194.     § 1 of the Sherman Act broadly prohibits "every contract, combination…or conspiracy, in restraint of trade or commerce…"

195.     YouTube's Content ID is a tied product.

196.     YouTube offered Content ID to Plaintiff in exchange for revenue sharing exclusively derived from Plaintiff's copyrighted works, as well as Plaintiff's waiver of any prior claims against YouTube for copyright infringement of Plaintiff's copyrighted works.

197.     YouTube's offer is a tying under the definition of § 1 of the Sherman Act.

198.     The Plaintiff could either accept the offer and preserve his copy-righted works from continued piracy, or reject the offer, and thereby YouTube would continue to allow the piracy of Plaintiff's works on the YouTube platform.

199.     YouTube is the worlds' second largest search engine and second most visited site after Google.

200.     YouTube is the second most popular social media platform with 1.9 billion users.

201.     500 hours of audio-visual content is uploaded to YouTube every minute.

202.     Consumers watch over 1 billion hours of YouTube videos a day, more than Netflix and Facebook combined.

203.     YouTube has sufficient economic power when tying a product in the subject market to coerce Plaintiff's acceptance of Content ID.

204.     YouTube's offer to provide Content ID for revenue sharing has an anticompetitive

*Athos Overseas, Ltd v. YouTube, Inc. et. al.*

effect on the tied market, as an individual's refusal to accept YouTube's Content ID offer places the individual, such as Plaintiff, at a disadvantage within the subject market.

205.     YouTube's offer to provide Content ID in exchange for a waiver of prior copyright infringement claims has an anticompetitive effect on the tied market, as an individual's refusal to release all prior claims of copyright infringement against YouTube ensures the continued piracy of the individual's copyrighted works on the YouTube platform, which inevitably places the individual, such as Plaintiff, at a disadvantage within the subject market.

206.     Accordingly, YouTube's unwillingness to prevent the continued piracy of an individual's copyrighted material without the individual's acceptance of YouTube's unreasonable Content ID offer has an anti-competitive effect on the tied market.

207.     YouTube is involved in a substantial amount of interstate commerce related to Plaintiff's infringed copywritten works that is tied to YouTube's offer of Content ID.

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1.     For a declaration that Defendants' YouTube service willfully infringes Plaintiff's copyrights both directly and secondarily.

2.     For a permanent injunction requiring that Defendants and their agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or any of them, cease directly or indirectly infringing, or causing, enabling, facilitating, encouraging, promoting and inducing or participating in the infringement of, any of Plaintiff's respective copyrights or exclusive rights protected by the Copyright Act, whether now in existence or hereafter created.

3.    For statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), for actual damages plus Defendants' profits from infringement, as will be proven at trial.

4.    For Plaintiff's costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

5.    For pre- and post-judgment interest according to law.

6.    For such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

**DORTA & ORTEGA, P.A.**

*/s/  Rey Dorta*
**Rey Dorta, Esq**.
Florida Bar No. 0084920
**Omar Ortega, Esq.**
Florida Bar No. 0095117
**Rosdaisy Rodriguez, Esq.**
Florida Bar No. 112710
**Natalie A. Ferral, Esq.**
Florida Bar No. 1012314
3860 SW 8th Street, PH
Coral Gables, Florida 33134
Telephone:(305) 461-5454
Facsimile: (305) 461-5226
oortega@dortaandortega.com
rdorta@dortaandortega.com
rrodriguez@dortaandortega.com
nferral@dortaandortega.com
dcruz@dortaandortega.com

*Counsel for Plaintiff*