UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:  1:21-cv-21698-DPG

ATHOS OVERSEAS LIMITED CORP.,

       Plaintiff,

   v.

YOUTUBE, INC., YOUTUBE, LLC, and
GOOGLE, LLC,

       Defendants.

**DEFENDANTS YOUTUBE, LLC AND GOOGLE LLC'S
MOTION FOR SUMMARY JUDGMENT AND
<u>SUPPORTING MEMORANDUM OF LAW</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.......................................................... 2

ARGUMENT ...................................................................................................................... 7

I.      PLAINTIFF'S CLAIMS FOR CLIPS-IN-SUIT REMOVED OR POSTED
        BEFORE MAY 3, 2018 ARE TIME-BARRED................................................... 7

II.     PLAINTIFF CANNOT PROVE OWNERSHIP OF ALL WORKS-IN-SUIT AND
        CANNOT SUE ON CLIPS UNRELATED TO THE WORKS-IN-SUIT ........................ 8

III.    YOUTUBE IS ENTITLED TO SUMMARY JUDGMENT UNDER THE DMCA ......... 9

        A.      YouTube Satisfies the Threshold Safe Harbor Requirements ................................ 9

        B.      Plaintiff's Claims Arise by Reason of "Storage at the Direction of a User" ........ 11

        C.      Plaintiff Cannot Meet Its Burden to Disqualify YouTube from the DMCA ........ 12

                1.      YouTube Expeditiously Removed the Videos Identified in DMCA
                        Notices ...................................................................................................... 12

                2.      YouTube Lacked Specific Knowledge of the Infringements at
                        Issue ........................................................................................................... 13

                3.      Plaintiff's Takedown Notices Did Not Confer Disqualifying
                        Knowledge of Other Unidentified Alleged Infringements of the
                        Clips-In-Suit............................................................................................. 14

                4.      YouTube Did Not Have the Right and Ability to Control Coupled
                        with a Direct Financial Benefit from the Alleged Infringements ............ 17

IV.     PLAINTIFF CANNOT PROVE INDUCED INFRINGEMENT (COUNT IV) .............. 20

CONCLUSION.................................................................................................................. 20

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Atl. Recording Corp. v. Spinrilla, LLC*,
   506 F. Supp. 3d 1294 (N.D. Ga. 2020) ...................................................................13

*Bus. Casual Holdings, LLC v. YouTube, LLC*,
   2022 WL 17177970 (S.D.N.Y. Nov. 22, 2022) .......................................................13

*BWP Media USA, Inc. v. Clarity Digital Grp., LLC*,
   820 F.3d 1175 (10th Cir. 2016) ..........................................................................7, 11

*Capitol Recs., LLC v. Vimeo, LLC*,
   2021 WL 2181252 (S.D.N.Y. May 28, 2021) ...........................................................2

*Capitol Recs., LLC v. Vimeo, LLC*,
   826 F.3d 78 (2d Cir. 2016) ............................................................................ *passim*

*Capitol Recs., LLC v. Vimeo, LLC*,
   972 F. Supp. 2d 500 (S.D.N.Y. 2013) ........................................................10, 14, 16

*Corbis Corp. v. Amazon.com, Inc.*,
   351 F. Supp. 2d 1090 (W.D. Wash. 2004) ...............................................................7

*Davis v. Pinterest*,
   — F. Supp. 3d —, 2022 WL 1316566 (N.D. Cal. May 3, 2022) .............................6, 7

*Downs v. Oath Inc.*,
   385 F. Supp. 3d 298 (S.D.N.Y. 2019) ....................................................................20

*Fahmy v. Jay-Z*,
   835 F. Supp. 2d 783 (C.D. Cal. 2011) .....................................................................8

*Io Grp., Inc. v. Veoh Networks, Inc.*,
   586 F. Supp. 2d 1132 (N.D. Cal. 2008) ...................................................................7

*Long v. Dorset*,
   369 F. Supp. 3d 939 (N.D. Cal. 2019) ...................................................................12

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) ..............................................................................................20

*Obodai v. Demand Media, Inc.*,
   2012 WL 2189740 (S.D.N.Y. June 13, 2012), *aff'd*,
   522 F. App'x 41 (2d Cir. 2013) ...............................................................................7

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007) ...............................................................................10

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) ..............................................................................6, 20

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014)...................................................................................................8

*Salazar v. Norwegian Cruise Line Holdings, Ltd.*,
  188 F. Supp. 3d 1312 (S.D. Fla. 2016) ....................................................................7

*Saregama India Ltd. v. Mosley*,
  687 F. Supp. 2d 1325 (S.D. Fla. 2009), *aff'd*,
  635 F.3d 1284 (11th Cir. 2011) .................................................................................8

*Sieger Suarez Architectural P'ship, Inc. v. Arquitectonica Int'l Corp.*,
  998 F. Supp. 2d 1340 (S.D. Fla. 2014) .....................................................................8

*Steinmetz v. Shutterstock, Inc.*,
  — F. Supp. 3d —, 2022 WL 4342174 (S.D.N.Y. Sept. 19, 2022) ...............7, 12, 15

*Totally Her Media, LLC v. BWP Media USA, Inc.*,
  2015 WL 12659912 (C.D. Cal. Mar. 24, 2015)..........................................................9

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
  718 F.3d 1006 (9th Cir. 2013) ....................................................................... *passim*

*Ventura Content, Ltd. v. Motherless, Inc.*,
  885 F.3d 597 (9th Cir. 2018) ......................................................................... *passim*

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012)............................................................................. *passim*

*Viacom Int'l Inc. v. YouTube, Inc.*,
  718 F. Supp. 2d 514 (S.D.N.Y. 2010)............................................................ *passim*

*Viacom Int'l Inc. v. YouTube, Inc.*,
  940 F. Supp. 2d 110 (S.D.N.Y. 2013)............................................................ *passim*

*Vient v. Raycom Media*,
  2019 WL 2158235 (M.D. Ala. Apr. 25, 2019), *adopted*,
  2019 WL 5680793 (M.D. Ala. Oct. 31, 2019)............................................................7

*Wolk v. Kodak Imaging Network, Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012), *aff'd*,
  569 F. App'x 51 (2d Cir. 2014).......................................................................7, 15, 16

*Wood v. Santa Barbara Chamber of Com., Inc.*,
  705 F.2d 1515 (9th Cir. 1983) ...................................................................................8

**Statutes**

17 U.S.C. § 501(b) ...........................................................................................................8

17 U.S.C. § 507(b) ...........................................................................................................7

17 U.S.C. § 512...................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 56(a) ............................................................................................................7

S. Rep. No. 105-190 (1998) ................................................................................................2

Melville B. Nimmer & David Nimmer, Nimmer on Copyright (rev. ed. 2021)...........................11

Register of Copyrights, Section 512 of Title 17 (May 2020) .......................................................11

## INTRODUCTION

This case is about Plaintiff's dissatisfaction with the statutory regime Congress created in the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512 *et seq.* YouTube fully complied with that regime—in fact, far exceeded its requirements—but for Plaintiff that is not enough. Plaintiff's effort to upend established law should be rejected.

The Court has already ruled that the Copyright Act's three-year limitations period bars most of Plaintiff's infringement claims. And discovery has revealed that Plaintiff cannot prove ownership of a number of the copyrighted works it put at issue. Any remaining claims run headlong into the DMCA safe harbor. Congress enacted that law to protect online services from all claims for copyright infringement that, like Plaintiff's, arise from the actions of users who allegedly post infringing material. *See, e.g.*, *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110 (S.D.N.Y. 2013) ("*Viacom III*"). The DMCA creates an easy-to-use mechanism by which copyright owners can identify particular instances of alleged infringement that online services will then expeditiously remove. That is exactly what happened here.

The thrust of Plaintiff's case is that while YouTube swiftly removed all videos identified in Plaintiff's takedown notices, YouTube did not affirmatively search for and block similar videos that Plaintiff did ***not*** identify. But that theory is fundamentally at odds with the DMCA, which "expressly disclaims any affirmative monitoring requirement," *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 41 (2d Cir. 2012) ("*Viacom II*") (citing 17 U.S.C. § 512(m)), and "places the burden of policing copyright infringement on the copyright owner, not on the person or firm storing and hosting the material," *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 603 (9th Cir. 2018). Under the DMCA, this is an easy case: the statute bars Plaintiff's effort to hold YouTube liable for direct or secondary infringement. Finally, while the Court need not reach the issue because of the DMCA, Plaintiff separately cannot carry its burden to establish a triable issue on its claim for inducement. There is no evidence that YouTube intentionally promoted infringement; to the contrary, the record is clear that YouTube prohibits infringement, operates a robust DMCA regime,

and went beyond what the law requires to develop a suite of tools to help copyright owners manage and protect their content. The Court should grant summary judgment to YouTube.

## FACTUAL AND PROCEDURAL BACKGROUND

*The DMCA.* Congress enacted the DMCA notice-and-takedown regime "to update domestic copyright law for the digital age." *Viacom II*, 676 F.3d at 26. Recognizing that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability," *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting S. Rep. No. 105-190, at 8 (1998)), Congress established four "safe harbors" for everyday activities of online service providers, *see* 17 U.S.C. § 512(a)-(d). The safe harbor relevant here is § 512(c), which applies to claims that arise "by reason of the storage at the direction of a user" of copyrighted material:

> [W]hat Congress intended in passing § 512(c) was to strike a compromise under which, in return for the obligation to take down infringing works promptly on receipt of notice of infringement from the owner, Internet service providers would be relieved of liability for user-posted infringements of which they were unaware, as well as of the obligation to scour matter posted on their services to ensure against copyright infringement.

*Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 89-90 (2d Cir. 2016). Courts have repeatedly applied the § 512(c) safe harbor to protect YouTube and similar online video services from "liability for all monetary relief for direct, vicarious and contributory infringement." *Shelter Cap.*, 718 F.3d at 1028, 1031; *accord Viacom III*, 940 F. Supp. 2d at 123; *Capitol Recs., LLC v. Vimeo, LLC*, 2021 WL 2181252, at *13 (S.D.N.Y. May 28, 2021).

Section 512(c) has a set of threshold requirements: the defendant must be a "service provider," § 512(c)(1); designate an agent to receive notifications of claimed infringement ("DMCA notices") from copyright holders, § 512(c)(2); adopt, reasonably implement, and inform users of a policy for terminating repeat infringers, § 512(i)(1)(A); and accommodate "standard technical measures," § 512(i)(1)(B). Once the service provider meets those thresholds, the burden shifts to the copyright owner to show that the provider is disqualified from DMCA protection based on the statute's knowledge provision, § 512(c)(1)(A), or its control-and-financial-benefit

provision, § 512(c)(1)(B). *Vimeo*, 826 F.3d at 95. This framework reflects that the DMCA puts "the burden of policing infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *Shelter Cap.*, 718 F.3d at 1022. To that end, Congress expressly provided that nothing in the DMCA "shall be construed" to condition immunity on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." § 512(m)(1). "In other words, the safe harbor expressly disclaims any affirmative monitoring requirement[.]" *Viacom II*, 676 F.3d at 41.

*YouTube.* YouTube operates a leading online platform for users to share their video creations. YouTube offers users the opportunity to access an enormous and extraordinarily diverse library of original, creative expression. It also provides an unparalleled medium for free marketing and exposure for creators, filmmakers, individuals, and businesses. Defendants' Separate Statement of Undisputed Facts ("SUF") ¶ 1.

YouTube has devoted substantial resources to ensuring that material appearing on its service is authorized by copyright holders. Decl. of Chenyuan Zhu ("Zhu Decl.") ¶ 25. YouTube has obtained blanket licenses from thousands of major copyright holders, including major record labels, music publishers, television studios, and sports leagues. *See, e.g.*, *id.* Additionally, ordinary users grant YouTube and other users a license to the materials they upload, representing in the process that they have the rights to do so. *Id.*

YouTube recognizes that, despite its efforts, users sometimes upload videos that they are not authorized to share. But YouTube has long been committed to working with copyright owners to prevent the infringing use of their content, and to give those rightsholders tools to help identify and, if they wish, remove unauthorized material. Zhu Decl. ¶ 26. To begin, YouTube complies in all respects with the safe-harbor provisions of the DMCA. SUF ¶¶ 3-14. YouTube offers a "Webform" that enables copyright holders to efficiently request that YouTube remove allegedly infringing material from the service and guides them through the process, but also accepts requests by email, fax, or postal mail. Zhu Decl. ¶ 19; *accord* SUF ¶ 9; *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 516 (S.D.N.Y. 2010) ("*Viacom I*").

But YouTube's copyright-management tools go far beyond what is required by the DMCA. YouTube has invested extensively in industry-leading technologies that assist rightsholders in protecting against unauthorized use of their works. Those tools include the Copyright Verification Program ("CVP"), Copyright Match, and Content ID. Zhu Decl. ¶¶ 26-28; Ex. 18 at 11-15.[1] CVP and Copyright Match help rightsholders more efficiently identify and request removal of videos containing their works. Zhu Decl. ¶¶ 26-28; Ex. 18 at 11-15. Content ID is an Emmy-award winning video-fingerprinting technology that allows participating rightsholders to upload reference files of their copyrighted works and scan those files against the corpus of YouTube content. Zhu Decl. ¶ 27. When Content ID finds a video that matches a reference file, it follows the copyright owner's instructions for that video. Copyright owners may choose to "block" the video from appearing on YouTube, "monetize" the video by sharing in advertising revenue it generates, or simply "track" views of the video. SUF ¶ 19.

**Plaintiff Athos Overseas and Carlos Vasallo.** Plaintiff Athos Overseas Limited Corp. is one of the offshore holding companies owned and controlled by Carlos Vasallo, a wealthy international businessman, which purports to own the copyrights in hundreds of Mexican and Latin American movies. According to Plaintiff, it became aware, as early as 2012, that videos third parties had posted on YouTube allegedly infringed its copyrights in certain of those movies. Ex. 1 at 9; Dkt. 100 ("Am. Compl.") ¶ 9.

In 2014, Mr. Vasallo contacted YouTube to discuss those issues. Ex. 1 at 136-37; Ex. 14 at 37:24-38:14, 44:15-46:20. The parties met in early 2015, and it is undisputed that YouTube at that time offered Mr. Vasallo access to Content ID. SUF ¶ 35. In 2015, YouTube (twice) sent Mr. Vasallo a standard form contract ("CHSA") to use Content ID. SUF ¶ 36. Mr. Vasallo ignored the CHSA and made clear he did not want to use Content ID, demanding instead that YouTube affirmatively police its platform for possibly infringing videos. SUF ¶¶ 40, 43. YouTube explained that it could not manage Mr. Vasallo's content on his behalf, while again informing Mr. Vasallo

---

[1] Citations to "Ex. _" are to the exhibits attached to the Declaration of Brian Willen ("Willen Decl.").

that Content ID was available for his use at "no cost." SUF ¶ 39. Mr. Vasallo did not respond, and neither he nor Athos ever elected to use Content ID (or any of YouTube's other advanced copyright-management tools, such as Copyright Match). SUF ¶¶ 40-43.[2]

Instead, Mr. Vasallo hired a law firm to monitor YouTube and send DMCA takedown notices to YouTube identifying allegedly infringing videos via email—eschewing the simple Webform YouTube created to guide users through the DMCA process. SUF ¶¶ 22, 42-43. There is no dispute that YouTube expeditiously removed those videos from its service. SUF ¶¶ 23, 25. Even so, many of Plaintiff's notices were successfully challenged by the user who uploaded the targeted video. SUF ¶ 24. For example, after Plaintiff submitted a DMCA notice for a clip from the work-in-suit, *Mafia Latina en USA*, the uploader responded that his posting was authorized because he held a license to the film. Ex. 9. In another case, an uploader responded by explaining that his use of a clip in a film review was fair use. Ex. 10. In both cases, Plaintiff pursued no action against the uploader, so the video was reposted to YouTube, as contemplated by the DMCA. Ex. 12 at 68:09-73:18; 17 U.S.C. § 512(g)(2). Nor can Plaintiff deny that at least some of the clips of his films on YouTube are licensed: Plaintiff's own subsidiaries have uploaded promotional clips of some of the movies at issue—clips similar to those Plaintiff claims as infringing. SUF ¶ 33.

***Procedural History.*** Although it had been on notice of alleged infringement on YouTube for nearly a decade, Plaintiff did not file this lawsuit until May 3, 2021. Dkt. 1. Plaintiff asserted claims for copyright infringement, along with several other causes of action. *Id.* Defendants filed a partial motion to dismiss, Dkt. 14, which the Court granted in significant part by dismissing

---

[2] Plaintiff alleged that YouTube conditioned the offer of Content ID on Plaintiff's agreement to display and "monetize" its content on YouTube and to release any infringement claims against YouTube. Am. Compl. ¶¶ 18-21. But discovery has established that Plaintiff's allegation is false. Plaintiff has since admitted that the "terms on which [YouTube] offered Content ID [were] reflected in the Hosting Services Agreement that was provided to [Plaintiff]." SUF ¶ 37. Those terms were clear that Plaintiff could have used Content ID solely to block videos matching its works, without any requirement to display or monetize such content. SUF ¶ 38. Plaintiff's own witnesses recognize as much. Ex. 20 at 28 ("YouTube does not force their [Content ID] Partners to monetize any specific videos."); Ex. 19 ¶¶ 49-50. And nothing in the CHSA required Plaintiff to release any infringement claims. Exs. 3b, 4b. But even if there were a factual dispute here, it would be legally irrelevant: as a matter of law, "YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms." *Viacom II*, 676 F.3d at 41; *see infra* Section III.C.3.

Plaintiff's FDUTPA and Sherman Act claims, Dkt. 44 ("MTD Order"). As to the copyright claims, the Court explained that "based on the Complaint, Plaintiff's copyright infringement cause of action began accruing as early as 2015 when Plaintiff knew or should have known of the alleged infringement. Thus, Plaintiff's claims that accrued before May 3, 2018, must be dismissed as time-barred." MTD Order at 8. Plaintiff later realized that its copyright management information claim was baseless and dismissed it. Dkt. 80; Ex. 1 at 140.

Accordingly, all that remains of Plaintiff's case are certain copyright infringement claims. Those claims are based on a particular set of clips-in-suit—approximately 7,000 allegedly infringing video clips that Plaintiff contends include portions of certain copyrighted motion pictures that it purports to own (the works-in-suit). The works-in-suit were initially listed in Exhibit A to the Complaint, but when Plaintiff realized that it did not actually own all those works, it produced a spreadsheet (Ex. 21) that culled the universe of works-in-suit that are now at issue in this case. SUF ¶ 30; *see Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017) (copyright-infringement lawsuit "is a specific lawsuit by a specific plaintiff against a specific defendant about specific copyrighted [works]; it is not a lawsuit against copyright infringement in general"). Likewise, the clips-in-suit—which are listed in Exhibit B to Plaintiff's Amended Complaint—define the full scope of Plaintiff's copyright infringement claims of the works-in-suit. Am. Compl. ¶ 70 & Ex. B; *accord Viacom II*, 676 F.3d at 34 ("By definition, only the current clips-in-suit are at issue in this litigation."); *Davis v. Pinterest*, — F. Supp. 3d —, 2022 WL 1316566, at *6-7 (N.D. Cal. May 3, 2022) (rejecting copyright plaintiff's attempt to belatedly put at issue specific instances of alleged infringements).

Each clip-in-suit was uploaded to YouTube by a third party between 2006 and 2021. SUF ¶ 20. Each has long been removed from YouTube, most in response to Plaintiff's DMCA notices. SUF ¶¶ 23, 25. (Some of the clips-in-suit were removed because the uploader's YouTube channel was terminated, while a few others were removed by the uploaders themselves. Am. Compl. Ex. B.) It is undisputed that none of the clips-in-suit was allowed to remain on YouTube after Plaintiff identified it in a valid DMCA notice. SUF ¶¶ 23-25.

# ARGUMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the material facts are undisputed and all that remains are questions of law, summary judgment may be granted." *Salazar v. Norwegian Cruise Line Holdings, Ltd.*, 188 F. Supp. 3d 1312, 1315 (S.D. Fla. 2016) (Gayles, J.). In copyright cases, courts have routinely granted summary judgment to YouTube and other online services based on the DMCA safe harbors. *See, e.g.*, *Viacom III*, 940 F. Supp. 2d at 123.[3]

## I.   PLAINTIFF'S CLAIMS FOR CLIPS-IN-SUIT REMOVED OR POSTED BEFORE MAY 3, 2018 ARE TIME-BARRED

Copyright claims must be brought within three years of accrual. 17 U.S.C. § 507(b). Plaintiff filed this suit on May 3, 2021. Dkt. 1. In granting YouTube's motion to dismiss, this Court held that Plaintiff's copyright claims that accrued before May 3, 2018 are time-barred. MTD Order at 7-8. This motion identifies the specific clips-in-suit that are barred under the Court's prior order.

*First*, there are at least 3,003 clips-in-suit for which Plaintiff sent DMCA notices to YouTube, or that were identified in reports generated by Plaintiff's agent, Gibney, before May 3, 2018. Am. Compl. ¶ 70 & Ex. B at 1-89; Willen Decl. ¶ 14; Ex. 13 (Column D). This Court already dismissed this category of clips on the basis that Plaintiff indisputably had actual knowledge of alleged infringement more than three years before this case was filed. MTD Order at 8. Thus, under this Court's Order, YouTube is entitled to summary judgment on the clips-in-suit identified in this first category. *Id.*; Ex. 13 (Column D); *see, e.g.*, *Vient v. Raycom Media*, 2019 WL 2158235, at *4-5 (M.D. Ala. Apr. 25, 2019), *adopted*, 2019 WL 5680793 (M.D. Ala. Oct. 31, 2019).

*Second*, there are the clips-in-suit (at least 676) that were publicly posted on YouTube

---

[3] *Accord Motherless*, 885 F.3d at 619; *BWP Media USA, Inc. v. Clarity Digital Grp., LLC*, 820 F.3d 1175, 1177 (10th Cir. 2016); *Shelter Cap.*, 718 F.3d at 1031; *Steinmetz v. Shutterstock, Inc.*, — F. Supp. 3d —, 2022 WL 4342174, at *8 (S.D.N.Y. Sept. 19, 2022); *Davis*, 2022 WL 1316566, at *16-17; *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 751 (S.D.N.Y. 2012), *aff'd*, 569 F. App'x 51 (2d Cir. 2014); *Obodai v. Demand Media, Inc.*, 2012 WL 2189740, at *9 (S.D.N.Y. June 13, 2012), *aff'd*, 522 F. App'x 41 (2d Cir. 2013); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1155 (N.D. Cal. 2008); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1110 (W.D. Wash. 2004).

before May 3, 2018, but were only later included in Plaintiff's DMCA notices or monthly reports. Willen Decl. ¶ 14; Ex. 13 (Column E). As to these clips, Plaintiff had (at least) constructive knowledge of the alleged infringement more than three years before this case was filed. It is undisputed that Plaintiff began monitoring YouTube for potential infringement of its works as far back as 2012. SUF ¶ 22; Ex. 1 at 9. In the years that followed, Plaintiff had an established practice of using YouTube's search function to identify allegedly unauthorized videos. SUF ¶ 34. These videos were publicly available, were being actively reviewed for infringement by Plaintiff's agent, and thus readily could have been identified and removed before May 3, 2018. *See id.*; Willen Decl. ¶ 14. Under this Court's Order, Plaintiff's failure to file suit for more than three years bars its claims for this set of clips-in-suit as well.[4] MTD Order at 7-8; *accord Sieger Suarez Architectural P'ship, Inc. v. Arquitectonica Int'l Corp.*, 998 F. Supp. 2d 1340, 1355 (S.D. Fla. 2014) (claims time-barred where plaintiff was on notice of need to investigate potential infringement); *Fahmy v. Jay-Z*, 835 F. Supp. 2d 783, 789-90 (C.D. Cal. 2011) (same); *Wood v. Santa Barbara Chamber of Com., Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983) (same, where plaintiff believed defendant infringed one work but failed to investigate other works).

## II.    PLAINTIFF CANNOT PROVE OWNERSHIP OF ALL WORKS-IN-SUIT AND CANNOT SUE ON CLIPS UNRELATED TO THE WORKS-IN-SUIT

There is another threshold issue with Plaintiff's case: despite YouTube's repeated requests, Plaintiff has provided no evidence that it owns all the works-in-suit. And Plaintiff now admits it does ***not*** own at least three works-in-suit: *El Dandy y Sus Mujeres*, *Las Calenturas De Juan Camaney II*, and *El Asesino Del Metro*. SUF ¶ 51. Plaintiff has the burden of establishing ownership, and it does not have standing to proceed with infringement claims for works it does not own. *See* 17 U.S.C. § 501(b); *Saregama India Ltd. v. Mosley*, 687 F. Supp. 2d 1325, 1332 (S.D. Fla. 2009) (copyright plaintiff carries burden of proving ownership), *aff'd*, 635 F.3d 1284 (11th Cir. 2011). YouTube thus is entitled to summary judgment on any works-in-suit that Plaintiff cannot affirmatively prove it owns—including the three works listed above. But Plaintiff's

---

[4] And if this Court were to apply the injury rule, no showing of constructive knowledge would be necessary. *See, e.g.*, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 (2014).

problems run deeper. As explained above, Plaintiff withdrew dozens of movies from its definitive list of works-in-suit after realizing that they were actually owned by third parties. *Supra* p. 6. Yet, Plaintiff's clips-in-suit list includes at least 1,155 clips from those withdrawn works—titles that Plaintiff itself has indicated it does not own. SUF ¶ 53. YouTube is entitled to summary judgment on all those clips as well, for three independent reasons: (1) the clips do not relate to works-in-suit, so by definition they cannot be at issue in this case (*supra* p. 6); (2) Plaintiff has not produced any evidence showing that it owns these works; and (3) as to at least some of the withdrawn works, the record is clear that Plaintiff does ***not*** own them (Willen Decl. ¶ 24).

## III.   YOUTUBE IS ENTITLED TO SUMMARY JUDGMENT UNDER THE DMCA

Any infringement claims for the remaining clips-in-suit, which Plaintiff can prove it owns and that survive the statute of limitations, are covered by the DMCA safe harbor. 17 U.S.C. § 512(c). YouTube satisfies the threshold requirements for safe-harbor eligibility, and Plaintiff cannot carry its burden of establishing that YouTube had disqualifying knowledge or disqualifying control-plus-direct-financial-benefit from the specific infringements at issue.

### A.   YouTube Satisfies the Threshold Safe Harbor Requirements

1. ***YouTube is a service provider.*** "YouTube is a service provider for purposes of § 512(c)." *Viacom I*, 718 F. Supp. 2d at 518; *accord* § 512(k)(1)(B). Plaintiff has admitted as much. SUF ¶ 3.

2. ***YouTube has registered a DMCA agent.*** It is also undisputed that YouTube maintained a designated agent "to receive notifications of claimed infringement" at all times relevant to this case. § 512(c)(2); *see* Zhu Decl. ¶ 16. The agent's contact information was available on both YouTube's and the Copyright Office's websites throughout that time. SUF ¶¶ 5, 8-9.

3. ***YouTube has and enforces a repeat-infringer policy.*** Under § 512(i)(1)(A), a service provider must "(1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable manner; and (3) inform its subscribers of the policy." *Totally Her Media, LLC v. BWP Media USA, Inc.*, 2015 WL 12659912, at *8 (C.D. Cal. Mar. 24, 2015); *see also Motherless*, 885 F.3d at 614-

18; *Viacom I*, 718 F. Supp. 2d at 527-28. YouTube readily satisfies all three prongs.

**First**, YouTube has a policy for terminating users who are repeatedly accused, through DMCA notices, of infringing copyright. SUF ¶ 4. YouTube assigns a "strike" to a user's channel if the user has uploaded a video that is the subject of a valid DMCA notice. SUF ¶¶ 26-30; Zhu Decl. ¶¶ 20, 23. Termination occurs when a channel accrues three or more active copyright strikes. Zhu Decl. ¶¶ 20, 23. YouTube's three-strikes policy is well within the broad discretion afforded to service providers regarding the terms of their repeat-infringer policies. *See, e.g.*, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (DMCA "permits service providers to implement a variety of procedures"). Indeed, it has been expressly approved in prior litigation. *Viacom I*, 718 F. Supp. 2d at 527-28.

**Second**, YouTube employs an extensive team to enforce its DMCA and repeat-infringer policies. Ex. 18 at 11-15. These specialists terminate thousands of users each year, including over a thousand users who were identified in DMCA notices sent by Plaintiff. Decl. of Blake Godwin ¶¶ 2, 4. The scale and sophistication of YouTube's copyright-enforcement regime far surpasses the requirement of "reasonable" implementation. *See, e.g.*, *Motherless*, 885 F.3d at 618-19 ("No trier of fact could conclude from the evidence in the record that Motherless had failed to reasonably implement a repeat infringer policy. As the district court pointed out, there is a paucity of proven failures to terminate. Safe harbor eligibility does not require perfection, just 'reasonable' implementation of the policy 'in appropriate circumstances.'"); *Capitol Recs., LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 515-16 (S.D.N.Y. 2013) (similarly upholding repeat-infringer policy and explaining that implementation of a policy "need not be perfect"; "[r]ather, by the terms of the statute, it need only be 'reasonable'").

**Third**, YouTube informs users of its repeat-infringer policy through several public webpages. SUF ¶¶ 6, 8-9. Those pages satisfy the DMCA's modest disclosure requirement. *See, e.g.*, *Motherless*, 885 F.3d at 615-16 (approving website's simple statement that "[it] is the firm policy of the [site] to terminate the account of repeat copyright infringers, when appropriate").

4. ***YouTube does not interfere with "standard technical measures."*** The DMCA requires

that an online service "accommodates and does not interfere with standard technical measures ["STMs"]." § 512(i)(1)(B) & (i)(2). It defines STMs as "technical measures that are used by copyright owners to identify or protect copyrighted works" that, *inter alia*, "have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process." § 512(i)(2)(A)-(C).

At present, there are no STMs for YouTube to comply with—and certainly no such measures that Plaintiff ever used to protect its works. SUF ¶¶ 13-14. That is because a "broad consensus" has not coalesced around any STM. *See* Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12B.02 (rev. ed. 2021) ("[N]o published judicial decision has recognized the existence of qualifying standard technical measures[.]"); Register of Copyrights, Section 512 of Title 17 at 66 n.352 (May 2020) ("Congress' vision of broad, open, cross-industry standards-setting for the creation of standard technical measures has not come to pass."). Despite the absence of recognized STMs, YouTube has built its own suite of copyright tools beyond anything Congress imagined, including Content ID, which offers copyright owners (including Plaintiff) the ability to block, monetize, or track their videos as they elect. *Supra* pp. 3-4; SUF ¶ 19.

## B.    Plaintiff's Claims Arise by Reason of "Storage at the Direction of a User"

The DMCA provides safe harbor for particular activities. This case arises under § 512(c), which protects against "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network" operated by the service provider. § 512(c)(1). The § 512(c) safe harbor extends "to software functions performed 'for the purpose of facilitating access to user-stored material,'" including the "transcoding" and "playback" of such content. *Viacom II*, 676 F.3d at 39; *accord Motherless*, 885 F.3d at 604-08 (rejecting argument "that altering the file format to make it accessible before posting … takes the posting of the content out of the 'at the direction of a user' definition"); *Clarity Digital*, 820 F.3d at 1181 ("[I]f the infringing content has merely gone through a screening or automated process, the ISP will generally benefit from the safe harbor's protection."). Here, it is undisputed that all the clips-in-suit were stored on YouTube's system at the direction of third-party users. SUF ¶¶ 20-21. Plaintiff's infringement

claims arise from YouTube's storage, hosting, or display of that user-uploaded content in response to users' activity on the service. *Id.* This is the heartland of § 512(c). *See Viacom II*, 676 F.3d at 38-40; *Shelter Cap.*, 718 F.3d at 1015-20.

### C. Plaintiff Cannot Meet Its Burden to Disqualify YouTube from the DMCA

Because YouTube meets the DMCA's threshold requirements, the burden shifts to Plaintiff to show that YouTube is disqualified from the DMCA (as to the clips-in-suit) because: (1) YouTube failed to remove those specific clips in response to DMCA notices or when it otherwise had knowledge that they were infringing; or (2) YouTube had the right and ability to control the specific alleged infringements *and* earned a financial benefit from them. *See Vimeo*, 826 F.3d at 95. Plaintiff cannot carry that burden.

#### 1. YouTube Expeditiously Removed the Videos Identified in DMCA Notices

The centerpiece of the § 512(c) safe harbor is a notice-and-takedown mechanism by which a copyright holder may send a "notification of claimed infringement," and if the notice includes the required elements, the provider must "expeditiously" remove the identified alleged infringement. § 512(c)(1)(C). This mechanism "*assumes* that, from time to time, material belonging to someone else ends up on service providers' websites, and establishes a process for ensuring the prompt removal of such unauthorized material." *Shelter Cap.*, 718 F.3d at 1024.

In this case, the DMCA regime worked exactly as intended. When Plaintiff's agent sent DMCA notices for the clips-in-suit, YouTube expeditiously removed those clips, as identified by URL. SUF ¶¶ 7, 23; *see also* Am. Compl. Ex. B. Plaintiff concedes that when "it notified [YouTube] of the infringing content through the take down notices," YouTube "thereafter removed the offending URLs." SUF ¶ 23. "The DMCA did not require Defendant to do more." *Steinmetz*, 2022 WL 4342174, at *3, *7 (removal requirement satisfied when website removed "the offending URL" identified in DMCA notice five weeks later); *accord Motherless*, 885 F.3d at 612 (same, when service promptly removed "the URLs to the infringing clips" provided by copyright owner); *Viacom I*, 718 F. Supp. 2d at 519, 528-29 (granting summary judgment because when YouTube "received specific notice that a particular item infringed a copyright, [it] swiftly removed it"); *Long*

*v. Dorset*, 369 F. Supp. 3d 939, 945-46 (N.D. Cal. 2019) (collecting "numerous cases" that "have granted summary judgment based on the defendant's compliance with the expeditious requirement"); *cf. Bus. Casual Holdings, LLC v. YouTube, LLC*, 2022 WL 17177970, at *7 (S.D.N.Y. Nov. 22, 2022) (rejecting argument that YouTube had actionable knowledge of infringement because it took 23 days to remove video).

2.    <u>YouTube Lacked Specific Knowledge of the Infringements at Issue</u>

The DMCA also provides that where a service provider has actual or "red flag" knowledge that particular material is infringing, it must expeditiously remove that material. § 512(c)(1)(A)(i)-(iii). Plaintiff cannot create a triable issue under this provision either.

"Both actual and red flag knowledge relate to *specific* instances of copyright infringement. A general awareness that infringing activity occurs on the provider's site does not preclude use of the safe harbor defense." *Atl. Recording Corp. v. Spinrilla, LLC*, 506 F. Supp. 3d 1294, 1317 (N.D. Ga. 2020); *accord Viacom II*, 676 F.3d at 31 ("[T]he actual knowledge provision turns on whether the provider actually or 'subjectively' knew of ***specific*** infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the ***specific*** infringement 'objectively' obvious to a reasonable person." (emphasis added)). Specificity is required because the § 512(c) safe harbor "aims at individual infringements, not the service as a whole." *Motherless*, 885 F.3d at 614. And the plaintiff bears the burden of showing that the service provider had disqualifying knowledge of the specific infringements at issue. *See Vimeo*, 826 F.3d at 93-95; *Motherless*, 885 F.3d at 610-11. In short, the "copyright owner must show knowledge, actual or red flag, for the videos that infringed its copyright and are the subject of its claim. And for red flag knowledge, infringement must be apparent, not merely suspicious." *Motherless*, 885 F.3d at 610; *accord Spinrilla*, 506 F. Supp. 3d at 1317 (citing *Vimeo*, 826 F.3d at 94).

There is no evidence that YouTube had such knowledge regarding the clips-in-suit. SUF ¶ 45. This case is similar to *Viacom*. That case involved 63,060 clips-in-suit, and on summary judgment, Viacom was unable "to fill in the blanks" on how YouTube had obtained knowledge of any of those alleged infringements before they were removed. *Viacom III*, 940 F. Supp. 2d at 113-

15 (rejecting as "extravagant" plaintiff's suggestion that "the volume of material" on YouTube and "the absence of record evidence" regarding knowledge somehow "combine[d] to deprive YouTube of the statutory safe harbor"); *accord Shelter Cap.*, 718 F.3d at 1023 (knowledge requirement not met where plaintiff relied on "Veoh's general knowledge that it hosted copyrightable material and that its services could be used for infringement"); *Motherless*, 885 F.3d at 608-12 (affirming summary judgment on lack of knowledge).

3.   Plaintiff's Takedown Notices Did Not Confer Disqualifying Knowledge of Other Unidentified Alleged Infringements of the Clips-In-Suit

Plaintiff's effort to overcome these problems has been to throw a legal Hail Mary: Plaintiff argues that, even though YouTube promptly removed the clips-in-suit after receiving its DMCA notices, YouTube did not affirmatively search for, then remove, ***additional unidentified clips*** that may have been similar to the ones identified in its notices. On Plaintiff's telling, YouTube's failure to unilaterally use Content ID on Plaintiff's videos—after Plaintiff ***rejected*** YouTube's offer to use Content ID itself (SUF ¶¶ 35-43)—disqualifies it from DMCA protection. Ex. 1 at 137-39. Plaintiff's argument fails both on the law and the facts.[5]

***Plaintiff's theory is wrong on the law.*** To begin, Plaintiff's theory is refuted by multiple provisions of the statute and the cases applying it. ***First***, § 512(m) says expressly that a service provider's immunity cannot be conditioned on "monitoring its service or affirmatively seeking facts indicating infringing activity." § 512(m)(1); *see Viacom II*, 676 F.3d at 41 ("[T]he safe harbor expressly disclaims any affirmative monitoring requirement[.]"); *Vimeo*, 826 F.3d at 98 (same). The law itself thus rules out any suggestion that YouTube was required to use its proprietary tools to affirmatively search for Plaintiff's works. *See Viacom III*, 940 F. Supp. 2d at 117 n.3 ("Plaintiffs often suggest that YouTube can readily locate the infringements by using its own identification tools. It had no duty to do so."); *Vimeo*, 972 F. Supp. 2d at 525 ("§ 512(m) and attendant case law make clear that service providers are under no affirmative duty to seek out infringement. This

___

[5] In fact, while not required by the DMCA, when YouTube removed the clips identified in Plaintiff's DMCA notices, under its standard policies, it applied hashing technology to prevent subsequent uploads of identical copies of those videos. Zhu Decl. ¶ 22.

remains the case even when a service provider has developed technology permitting it to do so.").

**Second**, the DMCA requires that a valid notice identify the actual "material that is claimed to be infringing" and provide "information reasonably sufficient to permit the service provider to locate the material" and "expeditiously" remove it. § 512(c)(1)(C) & (c)(3)(A)(iii). The statute further states that a notice "that fails to comply substantially with" the statutory requirements "shall not be considered" for the purposes of determining whether the service provider has knowledge of infringement under the DMCA. § 512(c)(3)(B)(i); *accord Shelter Cap.*, 718 F.3d at 1022. These provisions make clear that a DMCA notice identifying **one video** does not create an obligation to search for and remove **different videos** at unknown locations that may have similar content. *See Wolk*, 840 F. Supp. 2d at 747 ("Notices that do not identify the specific location of the alleged infringement are not sufficient to confer 'actual knowledge' on the service provider."); *Steinmetz*, 2022 WL 4342174, at *7 (because takedown notice that did not include URLs of infringing images "did not comply with the DMCA, Defendant had no obligation to act").

Unsurprisingly, therefore, courts have repeatedly rejected nearly identical arguments to the one Plaintiff makes here. The Ninth Circuit's decision in *Shelter Capital* is clear:

> According to UMG, Veoh should have taken the initiative to use search and indexing tools to locate and remove from its website any other content by the artists identified in the [DMCA] notices. … As we have explained, however, to so require would conflict with § 512(m), § 512(c)(1)(C) and *CCBill's* refusal to impose investigative duties on service providers.

718 F.3d at 1023-24 (cleaned up). Likewise, the plaintiffs in *Viacom* argued "that YouTube removes only the specific clips identified in DMCA notices, and not other clips which infringe the same works." *Viacom I*, 718 F. Supp. 2d at 528. The court explained that this argument "would eviscerate the required specificity of notice" and "would put the provider to the factual search forbidden by § 512(m)." *Id.* at 528-29. *Wolk* similarly held that plaintiff was "incorrect" in arguing that its DMCA notices identifying certain images "serve as DMCA-compliant notice of any and all other unidentified alleged infringements of these nine works that may appear on the Photobucket site." 840 F. Supp. 2d. at 746-47. As the court observed, "it would be irresponsible for Photobucket to assume infringement in the way the Plaintiff describes"—including because it

"could result in Photobucket unlawfully blocking others from uploading images to which they hold valid licenses." *Id.* at 747.[6]

The same argument fares no better here. Simply put, YouTube "cannot be held liable for its failure to remove [videos] for which the Plaintiff failed to provide proper notice." *Id*. And the fact that YouTube has Content ID—a tool Plaintiff flatly refused to use when offered—makes no difference. The DMCA imposes no obligation on service providers to develop or deploy fingerprinting technology to scan for potential infringements. That makes it especially misguided for Plaintiff to argue that YouTube loses its statutory safe harbor unless it uses Content ID to affirmatively seek out and block unknown videos that Plaintiff never actually identified (in a DMCA notice or otherwise). *See, e.g.*, *Vimeo*, 972 F. Supp. 2d at 525 (plaintiff's "frustration that Vimeo did not use sophisticated monitoring technology in its possession to seek out and remove instances of infringing content" provided no basis for stripping safe harbor protection).

Indeed, Plaintiff's approach would create perverse incentives. Service providers like YouTube that exceed their legal duties by creating copyright-management technology would face greater risk to their safe-harbor protection than services that did the bare minimum. That is not the regime that Congress created. *See Vimeo*, 826 F.3d at 98 ("Congress's objective was to serve the public interest by encouraging Internet service providers to make expensive investments in the expansion of the speed and capacity of the Internet by relieving them of burdensome expenses and liabilities to copyright owners[.]").

***Plaintiff's theory fails on the facts.*** Even if Plaintiff's theory were legally viable, it still would fail on the facts. As discussed, this case is not about the alleged infringement of Plaintiff's movies generally on YouTube. Rather, it is about a specific set of works-in-suit—and more specifically, about a defined set of clips-in-suit, which YouTube undisputedly removed upon

---

[6] The record here confirms that observation. Plaintiff's DMCA notices were at times mistaken, including by demanding removal of clips that were plausibly alleged to be either fair uses or licensed. *See supra* p. 5; Ex. 16 at 47:08-48:23; *accord* Exs. 9-10. Plaintiff also admitted (after repeatedly denying it) that its **own subsidiaries** uploaded clips of the works-in-suit to YouTube— promotional clips similar to third parties' allegedly unauthorized clips-in-suit. SUF ¶ 33. And even a cursory sampling of the clips-in-suit reveals others that are clear fair uses. *See, e.g.*, Am. Compl. Ex. B at 135 (video critiquing work-in-suit *Mision Suicida*); Ex. 16 at 28:11-30:14.

notice. *Supra* p. 6; Ex. 21, Am. Compl. Ex. B; Ex. 13. But there is no evidence that—even if YouTube had tried to use Content ID to search for near-matches of clips identified in Plaintiff's DMCA notices—doing so would have actually identified and blocked a single other clip-in-suit. SUF ¶ 44. After full discovery, that is, Plaintiff has not shown that applying Content ID that way would have made any difference for their clips-in-suit. Instead, their theory is an abstract legal argument that has no evidentiary connection to the actual infringements alleged in this case.

This failure of proof independently means that, even accepting Plaintiff's misguided theory, Plaintiff cannot establish the requisite clip-specific knowledge of the alleged infringements at issue. *See, e.g.*, *Viacom II*, 676 F.3d at 34 ("[b]y definition, only the current clips-in-suit are at issue in this litigation" and instructing the district court "to determine on remand whether any specific infringements of which YouTube had knowledge or awareness correspond to the clips-in-suit in these actions"); *Viacom III*, 940 F. Supp. 2d at 114-15 (on remand, granting summary judgment to YouTube for lack of evidence that it "knew or was aware of the specific infringements of the works in suit"); *Vimeo*, 826 F.3d at 99 (declining to address plaintiff's knowledge argument where the evidence "was not shown to relate to any of the videos at issue in this suit," which was "insufficient to justify a finding of red flag knowledge … as to those specific videos").

>    4.    <u>YouTube Did Not Have the Right and Ability to Control Coupled with a Direct Financial Benefit from the Alleged Infringements</u>

That leaves the DMCA's control-plus-financial-benefit provision, which requires Plaintiff to show **both** that YouTube had "the right and ability to control [the infringing] activity" **and** received a "financial benefit directly attributable" to the specific alleged infringements. § 512(c)(1)(B); *see, e.g.*, *Motherless*, 885 F.3d at 612.

***<u>YouTube does not control infringement.</u>*** Under the DMCA, the right and ability to control involves "something more than the ability to remove or block access to materials posted on a service provider's website." *Shelter Cap.*, 718 F.3d at 1030 (quoting *Viacom II*, 676 F.3d at 38). Rather, a service provider must exert "substantial influence on the activities of users." *Id.* That may include "high levels of control over activities of users" or "purposeful conduct" that

---

intentionally induces infringement. *Id.*; *accord Viacom III*, 940 F. Supp. 2d at 118 ("[A] service provider, even without knowledge of specific infringing activity, may so influence or participate in that activity, while gaining a financial benefit from it, as to lose the safe harbor.").

Plaintiff has no evidence of anything like that here. YouTube does not influence what users upload in ways that contribute to infringement (much less to the alleged infringement at issue, SUF ¶¶ 15, 46-47), nor does it somehow participate in infringement through "purposeful, culpable expression and conduct." *Shelter Cap.*, 718 F.3d at 1030. It is undisputed that third-party users—not YouTube—were responsible for uploading the clips-in-suit; YouTube's role was limited to automatically transcoding those videos so that they could be displayed on its service. SUF ¶¶ 18, 20-21; Am. Compl. Ex. B; *Motherless*, 885 F.3d at 613 (affirming summary judgment on DMCA's control provision where "uploaders, not [defendant], controlled what was uploaded").

YouTube certainly cannot be evicted from § 512(c)'s safe harbor because it works to prevent objectionable material from being posted on its system, or because it has developed various tools for helping copyright owners protect their works. *See Motherless*, 885 F.3d at 605 (rejecting argument that, "by screening out [illicit] material, [defendant] effectively directs what is posted"); *Shelter Cap.*, 718 F.3d at 1030 (rejecting arguments that service had control because it "could have implemented, and did implement, filtering systems" and "could have searched for potentially infringing content").

Nor does Plaintiff's demonstrably false claim that YouTube conditioned access to Content ID on Plaintiff's willingness to monetize its content create a material dispute. In *Viacom II*, the Second Circuit expressly held that YouTube could not be excluded from DMCA protection because it supposedly "permitted only designated 'partners' to gain access to content identification tools by which YouTube would conduct network searches and identify infringing material." 676 F.3d at 40-41. On remand, the district court similarly rejected the argument that YouTube had "the right and ability to control" because it supposedly "would only use digital fingerprinting software … to filter 'videos infringing the works of content owners who had agreed to licensing and revenue sharing deals with YouTube.'" *Viacom III*, 940 F. Supp. 2d at 119-20, 122. Even if true, that

assertion was irrelevant: "YouTube's decisions to restrict its monitoring efforts to certain groups of infringing clips, like its decisions 'to restrict access to its proprietary search mechanisms,' do not exclude it from the safe harbor, regardless of their motivation." *Id.* at 120. So too here. Plaintiff cannot escape the DMCA by claiming that YouTube did not offer Content ID on the terms Plaintiff wanted or use the tool in the way it preferred.

**_YouTube did not receive a direct financial benefit._** Because Plaintiff cannot show that YouTube had the right and ability to control, the Court can stop its DMCA analysis here. *See Shelter Cap.*, 718 F.3d at 1026 n.16 (absent control, the court "need not consider" direct financial benefit). But Plaintiff also cannot show that YouTube received a "financial benefit directly attributable" to the alleged infringements. § 512(c)(1)(B).

To demonstrate a direct financial benefit, Plaintiff must show that YouTube earned revenue "distinctly attributable to the infringing material at issue." *Motherless*, 885 F.3d at 613. In *Motherless*, the court held that a video-sharing website had not received a direct financial benefit from infringement even though it derived ad revenue from its website. *Id.* While acknowledging that more content on the defendant's website would lead to "more users," "more views," and thus "more advertising revenue," the court explained that defeating the safe harbor required showing that "some revenue [was] distinctly attributable to the infringing material." *Id.* That link was missing because the website "did not advertise itself as a place to get pirated materials" and there was no evidence that the website "made any money directly from the [plaintiff's] clips." *Id.*

Here, Plaintiff has no evidence that YouTube derived *any* revenue with respect to the ▇▇ ▇Redacted▇ clips-in-suit. SUF ¶ 50. YouTube's uncontested data establishes that ▇▇▇▇ ▇▇▇▇▇▇▇▇Redacted▇▇▇▇▇▇▇. *Id.* Plaintiff has no contrary evidence. As to each of those clips-in-suit, there is no triable issue that YouTube financially benefitted from the clips. *See Motherless*, 885 F.3d at 613.

There is also no triable issue as to the ▇▇Redacted▇▇ clips-in-suit. Plaintiff has no evidence that ads were run on his videos *because* they were allegedly infringing. Decl. of Nicola Rettke ("Rettke Decl.") ¶ 4. Nor is there evidence that YouTube "advertise[d] itself as a place to

get pirated materials." *Motherless*, 885 F.3d at 613. To the contrary, YouTube employs mechanisms designed to avoid showing ads in connection with content that has been claimed by a copyright owner. Rettke Decl. ¶ 4. Thus, if any ad appeared before or after a small subsection of a clip-in-issue, that ad was merely coincidental. *See Downs v. Oath Inc.*, 385 F. Supp. 3d 298, 307 (S.D.N.Y. 2019) (no financial benefit where site "simply ran advertisements on user-generated articles, some of which inevitably contained infringing material").

## IV.   PLAINTIFF CANNOT PROVE INDUCED INFRINGEMENT (COUNT IV)

Because YouTube is protected by the DMCA, all of Plaintiff's infringement claims are barred, and the Court need go no further. But Plaintiff separately cannot support its claim for inducement of infringement, and YouTube thus is separately entitled to summary judgment on Count IV. Inducement requires evidence that the defendant promoted infringement through "purposeful, culpable expression and conduct"—i.e., "statements or actions directed to promoting infringement" or "clear expression or other affirmative steps taken to foster infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 914-16 (2005). "[M]ere knowledge of infringing potential or of actual infringing uses" is insufficient. *Id.* at 937. Plaintiff cannot meet this burden. Not only is there no evidence that YouTube promoted infringement (much less of Plaintiff's works), YouTube ***discouraged*** infringement. SUF ¶¶ 46, 52. It is undisputed that YouTube's terms and conditions prohibit users from posting infringing material, SUF ¶ 15, that YouTube took down each video for which Plaintiff submitted a valid DMCA notice, SUF ¶¶ 23-28, and terminated the accounts of users deemed to be repeat infringers, SUF ¶¶ 27, 30, and that YouTube offered advanced copyright-protection tools that Plaintiff declined to use, SUF ¶¶ 35-43. This is the antithesis of inducement. *See, e.g.*, *Giganews*, 847 F.3d at 672 ("no reasonable juror could conclude Giganews distributed its product 'with the object of promoting its use to infringe copyright'" (quoting *Grokster*, 545 U.S. at 936-37)).

### CONCLUSION

For these reasons, YouTube requests that the Court grant summary judgment in its favor.

Respectfully submitted,

Dated: November 30, 2022

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3229
Facsimile: (305) 789-2664

By: */s/ Jay B. Shapiro*
   Jay B. Shapiro, Esq.
   Florida Bar No. 776361
   jshapiro@stearnsweaver.com
   David T. Coulter, Esq.
   Florida Bar No. 119874
   dcoulter@stearnsweaver.com

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
   Brian M. Willen, Esq. (*pro hac vice*)
   bwillen@wsgr.com
   Lucy Yen, Esq. (*pro hac vice*)
   lyen@wsgr.com
   Dylan Byrd, Esq. (*pro hac vice*)
   dbyrd@wsgr.com

***Counsel for Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 30, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

*/s/Jay B. Shapiro*
JAY B. SHAPIRO, ESQ.

## SERVICE LIST

Case No. 1:21-cv-21698-DPG
United States District Court, Southern District of Florida

Rey Dorta, Esq.
Florida Bar No. 0084920
Omar Ortega, Esq.
Florida Bar No. 0095117
Rosdaisy Rodriguez, Esq.
Florida Bar No. 112710
Yvette C. Buergo, Esq.
Florida Bar No. 1003212
**DORTA & ORTEGA, P.A**
3860 SW 8th Street, PH
Coral Gables, Florida 33134
Telephone:(305) 461-5454
Facsimile: (305) 461-5226
oortega@dortaandortega.com
rdorta@dortaandortega.com
rrodriguez@dortaandortega.com
ybuergo@dortaandortega.com
dcruz@dortaandortega.com

*Counsel for Plaintiff*