**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT FLORIDA**

**CASE NO. 1:21-cv-21698-DPG**

ATHOS OVERSEAS LIMITED CORP.,

    *Plaintiff,*

v.

YOUTUBE, INC., YOUTUBE, LLC, and
GOOGLE, LLC,

    *Defendants.*

_____/

**PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT**

                                  Respectfully submitted,

                                  **DORTA & ORTEGA, P.A.**

                                  /s/ Omar Ortega_____
                                  Omar Ortega, Esq.
                                  Florida Bar No.: 0095117
                                  Reinaldo Dorta, Esq.
                                  Florida Bar No.: 0084920
                                  Rosdaisy Rodriguez, Esq.
                                  Florida Bar No.: 0112710
                                  3860 S.W. 8th Street, PH
                                  Coral Gables, Florida 33134
                                  Telephone: (305) 461-5454
                                  Facsimile: (305)461-5226
                                  Email: OOrtega@dortaandortega.com
                                  Email: RDorta@dortaandortega.com
                                  Email: RRodriguez@dortaandortega.com
                                  Email: DKoch@dortaandortega.com
                                  Email: DCruz@dortaandortega.com

                                  ***Counsel for Plaintiff.***

Plaintiff, Athos Overseas Limited Corp. (the "Plaintiff" or "Athos"), pursuant to Federal Rule of Civil Procedure 72 and Local Magistrate Rule 4, respectfully submits these Objections to the Report and Recommendation issued by the Honorable Magistrate Judge Edwin G. Torres on the Parties' Motions for Summary Judgment (the "Report") [DE 171]. The Magistrate Judge erred in recommending the Motion for Summary Judgment filed by Defendants (the "Defendants" or "YouTube") on their safe harbor affirmative defense be granted.

## INTRODUCTION

For more than eight (8) years, YouTube has infringed on Plaintiff's movies, which include some of the most important films in Mexican and Latin-American cinema – movies akin to *Gone with the Wind* and starred by iconic actors the equivalent of Marlon Brando. In compliance with copyright law, Plaintiff has sent thousands of requests asking YouTube to remove the infringing clips from its platform. YouTube, flaunting its perceived protection by the interpretation of the Second and Ninth Circuits of the Digital Millennium Copyright Act (the "DMCA") and claiming entitlement to the safe harbors of the DMCA, knows of the specific clips infringing on Plaintiff's copyrighted works, but refuses to remove them. YouTube also has the right to control the infringement and receives a financial benefit from it, thus is liable under the vicarious liability test (Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 262 (9th Cir. 1996)) and the material contribution test (id. at 76 F.3d at 264). Congress provided a safe harbor for each of these two forms of secondary copyright liability in §§ 512(c)(1)(A) (vicarious liability) and 512(c)(1)(B) (material contribution), if YouTube expeditiously removes the infringing content, but YouTube fails to do so.

In response to Plaintiff's lawsuit for copyright infringement, YouTube filed a motion to dismiss which was denied in part [DE 44], and for expensive discovery, and a motion seeking summary judgment arguing it meets the safe harbor of the DMCA. The Court referred the motion to Magistrate Judge Torres, who despite acknowledging that the Eleventh Circuit has not interpreted the safe harbors in the DMCA, granted summary judgment based on decisions of the Second and Ninth Circuits, which as stated below, interpreted the statute during a time where internet service providers ("ISPs") were entitled to grand protection to develop the industry. However, as both the technology and economics have vastly changed,[1] ISPs are no longer entitled

---

[1] See United States Copyright Office, Section 512 of Title 17, A Report of the Register of Copyrights, (May 2020), https://www.copyright.gov/policy/section512/section-512-full-

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 2 of 22

to that deference. YouTube is a multi-billion-dollar company to which more than 500 hours of video are uploaded to YouTube every minute. (SUF[2] ¶2). YouTube's magnitude makes it economically impossible for copyright holders, and specifically Plaintiff, to effectively monitor and control infringement of their material within YouTube without the collaboration anticipated by Congress. If YouTube collaborates with Plaintiff to detect and reduce copyright infringement, as Congress intended when it enacted Title II of the DMCA, Plaintiff's copyrights would be protected. Yet, YouTube intentionally fails to cooperate by not expeditiously removing infringing clips it knows of its exact location through its fingerprinting software in conjunction with Plaintiff's identification of substantially similar infringements. Instead, YouTube allows the infringement it specifically knows about to continue on its website, generating revenue for it, until Plaintiff sends another takedown request. YouTube is willfully blind to the infringement of Plaintiff's works on its platform, and the Magistrate Judge's decision approves its continued infringement. The Magistrate Judge erred in granting summary judgment in Defendants' favor

---

report.pdf, at p. 27 (acknowledging the significant changes that "have altered the effectiveness of the DMCA statutory scheme" since Congress enacted the DMCA in the 1990s). The Report outlines the immense commercial and technological changes as follows:

> At the time the DMCA was crafted and then enacted, the internet had only recently evolved beyond the "walled gardens" of AOL and CompuServe.[] Yahoo!, Amazon, and eBay were each a few years old, and "social media," to the extent it existed was mainly instant messaging services, on-line dating sites, and Classmates.com.[] There was no Facebook or YouTube or Twitter; the first MP3 player had just been launched, and Napster, which popularized peer-to-peer ("P2P") file-sharing, would not exist until the following year.[] Today, the internet is a rich tapestry of social media sites and niche networked communities,[] online retail giants and e-commerce side businesses,[] as well as an almost endless amount of music and audiovisual entertainment from major studios and publishers, indie artists, and future stars.[] Every day countless new internet services join the mix. And new artists continue to find an audience without having to first convince a third party that there is a demand for what they do.[]
>
> The technological landscape also has shifted dramatically since the DMCA's passage— from dial-up, to fiber and WiFi, to the early stages of 5G.[] Download times today are but a fraction of what they were in 1998. A thirty-second movie clip would have taken thirty minutes to download in 1998; today users with [] the lowest tier of broadband connection (defined as a minimum download speed of 25 Mbps) can download a 4 GB movie file in approximately twenty minutes.[]A four-minute song would have taken eighty minutes to download; today, it needs about one second.

[2] "SUF" refers to Defendants' Separate Statement of Undisputed Material Facts. ECF No. 116.

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 3 of 22

because, as a matter of law, the Eleventh Circuit has not adopted the interpretations of the Second and Ninth Circuit[3], and as a factual matter, a jury should decide whether YouTube is protected by the safe harbors of the DMCA. As set forth below, the evidence shows the Defendants' motion for summary judgment should be denied.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 72(b) vests Magistrate Judges with authority to issue reports and recommendations on dispositive matters. Fed. R. Civ. P. 72(b). When a party objects to such a report and recommendation, the district court uses a *de novo* standard of review. Fed. R. Civ. P. 72(b)(3).

---

[3] Although when appropriate it may be persuasive, the caselaw of the Second and Ninth Circuit is not binding on the Eleventh Circuit. Given that this is a case of first impression in the Circuit, the Court should also be mindful of the position that has been taken by the Copyright Office regarding the DMCA. See United States Copyright Office, Section 512 of Title 17, A Report of the Register of Copyrights, (May 2020) (the "Section 512 Report"). The position of the Copyright Office on the effect of the DMCA in light of the tremendous technological changes since the DMCA was enacted supports Plaintiff's position. This and that fact that this is a case of first impression in the Eleventh Circuit make this case highly inappropriate for summary adjudication.

The Section 512 Report was published on May 21, 2020. In reviewing the system of Section 512, the Copyright Office identified five principles that guided its analysis. First, copyright protection online must be meaningful and effective, so that rightsholders can appropriately enforce their rights when they are infringed. Second, OSPs operating in good faith must be afforded legal certainty and leeway to innovate, for the benefit of not only their shareholders, but the public and the content industry as well. Third, while Congress intended to incentivize cooperation between OSPs and rightsholders, cooperation cannot be the only answer; voluntary initiatives certainly have their place, but experience shows that they are no substitute for balanced legislation. Fourth, whenever possible, government decision-making should be based on facts. But because much of the data underlying the (largely private) operation of the section 512 system remains inaccessible, this limits the ability of policymakers to consider such data in order to inform and develop solutions. Fifth, and finally, internet policy in the 21st century cannot be one-size-fits-all. Section 512 Report, p. 2. The Copyright Office concluded that the operation of the section 512 safe harbor system today is unbalanced and that Congress' original intended balance has been "tilted askew." Section 512 Report, p. 1. The Report highlights areas where current implementation of section 512 is out of sync with Congress' original intent, including, among others: knowledge requirement standards and specificity within takedown notices. The Copyright Office does not recommend any wholesale changes to section 512, but identifies certain areas where Congress may wish to fine-tune section 512's current operation in order to better balance the rights and responsibilities of online service providers and rightsholders in the creative industries. Given these concerns, the Eleventh Circuit should not mechanically rely on the persuasiveness of sister circuits but should instead read the statute itself, particularly in light of the actual practices adopted by the companies seeking a safe harbor rather than rely on outdated and nonbinding case law.

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 4 of 22

**OBJECTIONS**

I.   **The Magistrate Judge erred in finding that Defendants did not have knowledge of the infringement of Plaintiff's copyrights because the notice of infringement Plaintiff sent to Defendants met the identification requirements of the DMCA and removing the additional located infringement does not require Defendants to self-monitor infringement.**

The Magistrate Judge erred in finding that YouTube could freely ignore content it had located through Plaintiff's takedown requests and its fingerprinting and flagging software. The Magistrate Judge determined that "when YouTube became aware of allegedly infringing clips as a result of Plaintiff's DMCA takedown requests, YouTube expeditiously removed all of the noticed items" (R&R[4], p. 14), but could continue displaying what the Magistrate characterized as "non-noticed" infringing clips (R&R, p. 15) despite YouTube's admission that as part of their regular course of business it has knowledge of those "non-noticed" infringing clips and its system regularly flagged the clips as infringing content. This was error and Defendants are not protected by the safe harbor provision of the DMCA.

YouTube, as a matter of business policy, . YouTube, however, despite knowing of the location of the flagged content which matches infringing content, deliberately ignores the infringement under the pretext that it did not learn of it directly from the copyright owner through a takedown request submitted with the specific URL where that content

---

[4] 'R&R" refers to the Magistrate's Report and Recommendation [DE 171].
[5] "Zhu Depo" refers to the deposition of Chenyuan Zhu, and the transcript is attached as Ex "1."

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 5 of 22

is. The DMCA requires YouTube removes infringing content once it obtains actual or red flag knowledge of the infringement through whatever means such a knowledge is acquired.

> [T]he legislative history explicitly states that a takedown notice is not a prerequisite for an OSP to obtain either actual or red flag knowledge—indeed, the House Committee Report "emphasizes" this point.[] As Congress recognized, OSPs can obtain actual knowledge in a number of different ways: by personally using the service and uncovering infringing material or activity, having a monetizing system repeatedly identify a content match, or receiving an email that points out infringement of an unreleased work on the site, in the absence of undertaking to affirmatively monitor the service for infringements.

Section 512 Report, p. 113. Defendants' actions therefore take them outside the safe harbor of the DMCA because the statute does not protect its willful blindness.

There is no possible question there is evidence to more than sufficiently overcome the Defendants' motion for summary judgment. Here, the record reflects a material dispute over YouTube's willful blindness such that a jury should decide whether YouTube is protected by the safe harbor or infringed on Plaintiff's copyrights. The evidence reflects Athos sent takedown notices for 376 of the movies it discovered were illegally displayed on YouTube. AC[6], Ex. B. When those clips were uploaded to the platform, ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████ but, YouTube failed to remove all other clips that matched the movies in Plaintiff's takedown notices.

By way of example, on May 7, 2018, Athos sent a notice to YouTube requesting it removes its movie "Sinvergüenza, pero honrado" because it was displayed on its platform without authorization. See AC, Ex. B.  YouTube removed only one url where the movie was displayed. There is no dispute that its system flagged videos matching the removed infringing content – as YouTube fingerprints all material uploaded to its platform and flags material that matches infringing content. Yet, YouTube did not remove it. On May 8, 2018, Athos was forced to send a second notice to again inform YouTube it continued displaying its movie without authorization.

---

[6] "AC" refers to the Amended Complaint. [DE 100]

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 6 of 22

Id. On June 1, 2018, Athos was forced to send a third notice. Id.  On June 6, 2018, Athos had to send a fourth notice. Id.  On June 8, 2018, Athos was forced to send a fifth notice. Id. In total, Athos sent seventy six (76) notices to stop YouTube from displaying "Sinvergüenza, pero honrado" without authorization. Id. The copyrighted work may still be displayed on YouTube but Athos simply does not have the resources to perpetually monitor the website, which has more than 500 hours of video uploaded to it every minute (SUF ¶2), to protect copyrighted work YouTube knows it is not authorized to display. Like "Sinvergüenza, pero honrado" there are at least 311 movies owned by Athos, which YouTube knows it is not allowed to display them because Athos has sent multiple takedown requests to YouTube to have them removed. Athos has been forced to send approximately 3,389 repeated notices and will have to continue sending takedown requests in perpetuity for its limited copyrighted works because YouTube simply refuses to stop the pirated showing of the movies. A jury should determine whether YouTube's refusal to block the matched infringing content it locates through Plaintiff's takedown notices is a violation of the DMCA.

The statute requires a copyright owners' notification of infringement to "(ii) [i]dentif[y] the copyrighted work claimed to have been infringed, [] and (iii) [i]dentif[y] the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, [with] information ***reasonably sufficient*** to permit the service provider ***to locate the material***." 17 U.S.C. § 512 (c)(3)(A) (emphasis added). In this case, Plaintiff owns more than five hundred (500) classic Mexican movies – some of the most iconic and important in Mexican and Latin-American cinema. Through its monitoring efforts, Plaintiff discovered at least 376 of its movies were pirated through YouTube's platform.  To stop the piracy, Plaintiff complied with the statute requiring it provides notice of the infringing content and sent notices to YouTube demanding the  movies be taken down from its website. ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████. Specifically, the Magistrate concluded that "charging YouTube with the affirmative obligation of going beyond the specific URLs identified in Plaintiff's DMCA takedown requests would in effect shift from the copyright owner to the ISP the burdens of policing and identifying infringement on its systems." R&R pp. 20-21. The Magistrate recognizes Plaintiff's argument that limiting the removal of infringing

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 7 of 22

content to specific URLs despite YouTube's awareness of identical infringing content is not appropriate in light of today's existing technology (and YouTube's routine activity). (R&R, p. 21). Nonetheless, the Magistrate found YouTube's failure to remove previously identified infringing material to be "consistent with the statutory scheme set forth by the DMCA as currently enacted" (R&R, p. 21) relying on an interpretation of the statute by the Second and Ninth Circuit Court of Appeals that is inconsistent with its text and provides ISPs exponential advantage, in light of today's technological, that results in a disproportionate detrimental effect to the copyright owners. This was fundamental error.

First, the statute does not require a copyright owner to identify the URL where the infringing content is located in order to trigger an internet service provider's obligation to remove the content. All the statute requires is that the initial takedown notice ***identify the copyrighted work*** alleged to be infringed and contain information ***reasonably sufficient*** to permit YouTube ***to locate the material***. 17 U.S.C. § 512 (c)(3)(A). Specifically, the statute provides, in relevant part, that effective notification of infringement must "substantially" contain the following:

> (ii) **Identification of the copyrighted work** claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.
>
> (iii) **Identification of the material that is claimed to be infringing** or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, **and information reasonably sufficient to permit the service provider to locate the material**.

17 U.S.C. § 512(c)(3)(A) (emphasis added). The statute does not require the takedown notice to contain a URL identifying the location of the infringement. The Legislative History of the statute reveals the reason for not requiring such specificity. It explains the following:

> Subsection (c)(3)(A)(iii) requires that the copyright owner or its authorized agent provide the service provider with information reasonably sufficient to permit the service provider to identify and locate the allegedly infringing material. An example of such sufficient information would be a copy or description of the allegedly infringing material and the URL address of the location (web page) which is alleged to contain the infringing material. The goal of this provision is to provide the service provider with adequate information to find and address the allegedly infringing material expeditiously.

S.Rep. No. 105-190 at p. 46. The URL is merely an example of "adequate information to find" the infringing material. Id. Moreover, and most importantly, it ████████████████████████████

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 8 of 22



▮▮▮▮▮▮▮▮▮▮ As such, Plaintiff complied with the statutory requirement. It is YouTube that knowing of the content continues to violate copyright law. The URL is not the *only* adequate information the service provider can use to find it. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ YouTube obtains information identifying each uploaded video as part of its monetization strategy. Once it has this information, the receipt of the takedown notice provides YouTube actual, or at a minimum red flag, knowledge of infringement of all the locations in YouTube's complex storage and retrieval system, details that no copyright owner could ever obtain. This actual notice when combined with the business information already in YouTube's hands imposes an affirmative duty under Subsection 512(c)(3)(A)(iii) to remove the content, which is the same obligation that every publisher has when it becomes aware of infringing content. Without any kind of undue burden (other than risk lowering traffic to its website and thus revenue, but protecting copyrights), YouTube could have stopped Plaintiff's works from repeatedly being infringed the moment it received a takedown notice and the additional infringing content located in conjunction with the fingerprint technology because Plaintiff had provided "information **reasonably sufficient** to permit the service provider **to locate the material**" (17 U.S.C. § 512 (c)(3)(A)). A jury needs to know that Plaintiff's content has been viewed millions of times and has been subject to over 3,452 take down notices. AC, Ex. B. At the same time, the jury should learn of YouTube's inaction given their knowledge. Interpreting the DMCA in this manner does not change existing copyright law, it merely aligns the provisions of the DMCA with the rest of the statute. The Supreme Court applied this similar, common sense approach recently in <u>Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith</u>, to balance the "benefits of incentives to create against the  costs of restrictions on copying." <u>Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith</u>, 143 S. Ct. 1258, 1273 (2023).[7]

---

[7] The Court noted the following:

The Copyright Act encourages creativity by granting to the author of an original work "a bundle of exclusive rights." <u>Harper & Row, Publishers, Inc. v. Nation Enterprises</u>, 471 U.S. 539, 546, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); <u>see</u> U. S. Const., Art. I, § 8, cl. 8 ("The Congress shall have Power ... To Promote the

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
<u>Plaintiff's Objections to Report and Recommendation</u>
Page 9 of 22

The Magistrate Judge therefore erred in granting Defendants' motion for summary judgment by relying on case law from the Second and Ninth Circuit Court of Appeals which adopted a URL specificity standard that is not required by the DMCA.

Second, the Magistrate's conclusion that Plaintiff's takedown notices did not give YouTube specific knowledge of the additional locations of infringing material, which YouTube locates as a matter of course through its fingerprinting software that flags additional infringing content because doing so would "'[]put the provider to the factual search forbidden by §512(m)'" (R&R, p. 19) is also error and contrary to the statute. This is a factual determination which is inconsistent with the record. Also, the Magistrate's understanding that Plaintiff's request signifies YouTube engages in self-monitoring its platform or affirmatively seek facts indicating infringing activity, which is not required by the DMCA (R&R, p. 20), is incorrect. One, it is Plaintiff - not YouTube - who is constantly monitoring YouTube's infinite platform to try to protect its content. Such monitoring allowed Plaintiff to send the takedown requests mandated by the DMCA. Plaintiff is not asking the Court to force Defendants to monitor whether Plaintiff's movies are on YouTube. What Plaintiff seeks is for YouTube to remove all infringing material that matches the infringing content Plaintiff has already identified in its takedown request. YouTube's action would not "shift from the copyright owner to the ISP the burdens of policing and identifying infringement on its systems" as the Magistrate found. (R&R, p. 20-21). Plaintiff has provided YouTube "information ***reasonably sufficient*** to permit the service provider ***to locate the material***" as is required by the statute. (17 U.S.C. § 512 (c)(3)(A)). ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries"). That bundle includes the rights to reproduce the copyrighted work, to prepare derivative works, and, in the case of pictorial or graphic works, to display the copyrighted work publicly. 17 U.S.C. § 106.

The Act, however, "reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975). Copyright thus trades off the benefits of incentives to create against the costs of restrictions on copying. Goldsmith, 143 S. Ct. at 1273.

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 10 of 22

████████████████████████████████████████████████████████. To be
blunt, after fingerprinting the content, there is no further step necessary to locate the additional
material.

Protecting Plaintiff's copyrights as requested is not only consistent with the DMCA, but
also does not change the process YouTube follows when a creator's[8] content has been flagged as
infringing. Namely, all content identified as infringing upon receiving the takedown requests and
located through the fingerprint matches will continue to be flagged, YouTube then notifies the
creator of the challenge, and then the creator and Plaintiff resolve who has paramount rights. See

████████████ █████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████ The copyright owner is still the one in control over its copyrighted work and
YouTube is not looking for infringing content on its own without the owner's input, and in this
case, without Plaintiff having previously notified of the infringing copyrighted work. The
Magistrate's conclusion that Plaintiff is asking YouTube "to engage in proactive surveillance or
investigative efforts" (R&R, p. 20) is therefore erroneous.[10]

More importantly, although it is not what Plaintiff seeks, Subsection 512(m) of the statute
does not *prohibit* YouTube from searching its platform to remove infringing content. Section
512(m) states as follows:

> (m) **Protection of Privacy**.—Nothing in this section shall be construed to condition
> the applicability of subsections (a) through (d) on—

---

[8] YouTube refers to the user who uploads content to its platform as "creator."

[9] "Carver Depo ___" refers to the deposition of Defendants' Corporate Representative on
Defendants' affirmative defenses, Brian Carver. The transcript is attached hereto as Ex "2."

[10] The Magistrate's finding that Plaintiff's counsel's letters to YouTube in 2015 where Plaintiff
asked for YouTube to filter videos based on movie titles or other key words and asking that
YouTube to proactively remove infringing videos (R&R, p. 20) means that Plaintiff is asking for
YouTube to engage in an affirmative investigation is a misunderstanding of Plaintiff's request.
The Magistrate's reliance on this correspondence is misplaced. Certainly, had counsel at that time
known that YouTube already had fingerprints of all the content and could remove it at the snap of
a      finger      like      Thanos      in      Avengers:      Infinity      War
(https://www.youtube.com/watch?v=zWhEgdh0X9c), the contents of the letter would have been
much different. What matters today, is not what was written in a demand letter almost 8 years ago,
but rather what occurs every day in YouTube's ivory tower.

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 11 of 22

> (1) a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or

> (2) a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited by law.

17 U.S.C. § 512 (m). Section 512 Report explains the purpose of Subsection 512(m) and how it does not interfere with YouTube's obligation to remove content it learns exists on its platform because matches other identified infringing material. Note 591 explains the following:

> Of note, section 512(m) is intended not as a protection for OSPs, but to protect the privacy of an OSP's users—the section is entitled "Protection of Privacy," and section 512(m)(2) states that an OSP will not have an obligation to access user communications in instances when it has a legal duty not to do so. But absent such a legal prohibition, section 512(m) does not prohibit an OSP from either monitoring its system or acting upon evidence of infringement that it gains on its own; instead, it simply provides that an OSP cannot lose its safe harbor for failing to engage in such monitoring "except to the extent consistent with a standard technical measure complying with the provisions of subsection (i)." 17 U.S.C. § 512(m) (emphasis added). The existence of some obligation to take action to investigate further upon obtaining evidence of infringement is entirely consistent with legislative history. See H.R. REP. NO. 105-551, pt. 1, at 26 (1998) ("[The knowledge standard] shall not be construed to condition the limitation [on liability] on monitoring a network for infringement or searching out suspicious information. Once one becomes aware of such information, however, one may have an obligation to check further.") (emphasis added).

> This is consistent with the rest of section 512, including section 512(c)(1)(A), in which Congress imposed a duty on hosting providers to "act expeditiously to remove, or disable access to" material if it either has "actual knowledge that the material or  an activity using the material on the system or network is infringing" or becomes "aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A). Notably, the language of section 512(c)(1)(A) is not limited to knowledge or awareness of facts obtained via a takedown notice from a rightsholder or other third party. Section 512(c)(1)(C) states that an OSP has an obligation to remove infringing content expeditiously in the event it receives a compliant notice under section 512(c)(3). Sections 512(c)(1)(A) ("knowledge"), (c)(1)(B) ("right and ability to control"), and (c)(1)(C) (receipt of a compliant takedown notice) are fashioned to be separate analyses, the occurrence of which will place an OSP outside of the safe harbors. This interpretation is supported by the language of section 512(c)(3)(B)(i), which provides that a notice that fails to comply with the requirements of section 512(c)(3)(A) "shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent." This language anticipates that an OSP  could have either actual or red

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 12 of 22

flag knowledge in the absence of a compliant notice, leading to the conclusion there are other ways for an OSP to gain knowledge that it is then obligated to act upon. 17 U.S.C. § 512(c)(3)(B)(i) (emphasis added). These provisions, taken together, support an interpretation that Congress intended OSPs to have an obligation act upon information regarding infringing activity even in the absence of a takedown notice under some circumstances. This interpretation is supported by the legislative history of the DMCA. See S. REP. NO. 105-190, at 45 (1998) ("A service provider wishing to benefit from the limitation on liability under subsection (c) must 'take down' or disable access to infringing material residing on its system or network of which it has actual knowledge or that meets the 'red flag' test, even if the copyright owner or its agent does not notify it of a claimed infringement."). Thus, reading section 512(m) to shield OSPs from having any duty to act upon evidence of infringement that they uncover, absent a takedown notice, would be in tension with the rest of section 512 and the clearly articulated intent of Congress.

Section 512 Report, p. 111 at n. 591. Therefore, the Magistrate's conclusion that YouTube is not required to remove clips that its automatic software flags as matching other content previously identified as infringing is erroneous. The record here shows YouTube had knowledge of content that infringed on Plaintiff's copyrights and Defendants failed to expeditiously remove it. This is a jury question. YouTube, instead of removing the infringing content when it becomes aware of it, sits idly by until Plaintiff is forced to send takedown request after takedown request for clips YouTube has already flagged as infringing. A jury should decide whether YouTube's delay in removing the infringing clips runs afoul to the DMCA or is protected by its safe harbor.

## II. The Magistrate Judge erred in finding Defendants did not know the clips-in-suit infringed on Plaintiff's copyrighted works.

The Magistrate's conclusion that the record has no evidence showing "YouTube acquired knowledge of infringement relative to any of the particular clips-in-suit here" (R&R, p. 22) is error and forever immunizes YouTube of infringement liability.

First, the Magistrate's finding that a reasonable juror could not find that "had YouTube used its video-detection technology as [Plaintiff] suggests, the software would have identified, blocked or removed any of the specific clips-in-suit in this case" (see R&R, p. 23) is contradicted by the record. There is overwhelming evidence for a jury to conclude that by at least preponderance of the evidence. ████████████████████████

████████████████████████ . ████████████

████████████████████████

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 13 of 22



This is sufficient evidence from which a juror could conclude that when Plaintiff sent a takedown notice identifying infringing content any future video that matched the one removed was flagged by its software as matching the previously removed infringement, but YouTube ignored that red flag, allowed the content to be displayed, thus intentionally violating Plaintiff's copyrights. YouTube chooses not to notify the creator of Plaintiff's infringement claim, and keeps the content on its platform until Plaintiff sends additional takedown requests for the same copyrighted work. Upon receiving the first takedown request, YouTube should have stopped not only the clip identified in the notice but also the additional clips that its system prompted as nearly identical to the one removed. The thousands of repeated notices in the record show YouTube's deliberate blindness to those repeated instances of infringement. For instance, YouTube has received more than 70 takedown notices for the movie "Mi Querido Viejo" and despite the routinary use of its fingerprint technology to flag clips of "Mi Querido Viejo" YouTube *still* allows its infringement. Rettke Depo. Exhibits 6-7. Therefore, the Magistrate erred in finding Plaintiff's argument unsubstantiated by the record.

In addition, the Magistrate also erred in concluding YouTube had no knowledge of the infringing clips because "YouTube, though its employees, [n]ever came into contact, reviewed, or interacted in any way of the purportedly identified video matches for which Athos was allegedly required to send subsequent DMCA take down notices (*i.e.*, the clips-in-suit)" (R&R, p. 24). This finding gives YouTube perpetual immunity and a power certainly unintended by the DMCA. In a world filled with artificial intelligence, where human interaction is less and less necessary to perform tasks, finding that YouTube can be charged with having knowledge of the infringement upon receiving a takedown notice only if its employees interact with the clips flagged as matching the content in the notice, will impede a copyright owner's ability to enforce their copyrights against YouTube or any other ISP that fully automates its operations. It is unfathomable to believe the

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 14 of 22

standard necessary is that an employee actually be the person to view the clip. This concept would only be a legitimate process if YouTube had humans reviewing each clip uploaded to its site; which it does not. It is quite the position to let computers handle the universe of video clips uploaded but then refuse to remove an unauthorized clip unless it has been seen by the human eye of an employee. YouTube already has an automated system that requires minimal, if any, human interaction. Everything is done automatically and instantaneously. The Magistrate's decision empowers YouTube to continue ignoring infringing content in its platform as long as its system is fully automated, although its system is created for the purpose of flagging infringing content that matches clips in a takedown request. In addition, as stated above, the statute also contradicts this conclusion. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████  YouTube's refusal to remove content it knows is identical to other infringing content takes YouTube outside of the safe harbors in the DMCA. The record has sufficient evidence for a juror to conclude that the clips-in-suit were flagged as infringing content, but that YouTube ignored "facts or circumstances from which the infringing activity is apparent" – an act expressly prohibited by the DMCA. 17 U.S.C. §512(c)(1)(A)(ii). YouTube designed its software to monetize matching content and provide facts that reveal apparent infringement. YouTube should have blocked the matching content after Athos requested its material be taken off the platform instead of waiting until it received a separate takedown notice. There is sufficient evidence for a jury to decide whether YouTube "knew or blinded itself to actual infringement" of Athos' copyrighted works. See Disney Enterprises, Inc. v. Hotfile Corp., No. 11-20427-CIV, 2013 WL 6336286, at *28 (S.D. Fla. Sept. 20, 2013) (analyzing Section 512(c)(1)(A), finding "an issue of fact for a jury as to whether defendant knew or blinded itself to actual infringement of particular works, on a small or large scale"); See generally Venus Fashions, Inc. v. ContextLogic, Inc., No. 3:16-CV-907-J-39MCR, 2017 WL 2901695, at *26 (M.D. Fla. Jan. 17, 2017)("Considering ContextLogic's fingerprint technology in place by June 2016, ContextLogic arguably had actual knowledge of all of those Images notices by Venus in March 2016 and taken down by ContextLogic, including both identical Images and reconfigured substantially similar and clearly recognizable Images.")[11]

---

[11] The Magistrate Judge discounted the analysis in this unpublished opinion because it was a decision at a preliminary injunction and the case involved pictures rather than videos. However,

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 15 of 22

III.   **The Magistrate Judge erred in finding that Defendants do not control the infringement of Plaintiff's copyrighted works.**

The Magistrate erred in adopting the interpretation by the Second and Ninth Circuits of Section 512(c)(1)(B), which rejects that such a section codifies the elements of common law vicarious copyright liability. Therefore, the Magistrate interpreted the control provision in contravention to Congress' intent when it enacted the DMCA. "The financial benefit standard in subsection 512(c)(1)(B) is intended to codify and clarify the direct financial benefit element of vicarious liability. . . . The 'right and ability to control' language in Subparagraph (B) codifies the second element of vicarious liability." H.R.Rep. No. 105–551, pt. 1, at 25–26; see UMG Recordings, Inc. v. Shelter Cap. Partners LLC, 718 F.3d 1006, 1028 (9th Cir. 2013), (stating that "§512(c)(1)(B) was not modified following that report.")

As stated in Plaintiff's Response to the Defendants' Motion for Summary Judgment, the Ninth Circuit in Shelter Capital ignored the law of its own circuit in reaching its conclusion, and the Second Circuit in Viacom Intern., Inc.  v. YouTube, Inc., 676 F.3d 19 (2d Cir. 2012), followed the Ninth's erroneous interpretation. In Shelter Capital, the Ninth Circuit correctly stated that the "ability to remove materials posted by third parties does not satisfy the 'right and ability to control' prong, because such power is necessary for a service provider to satisfy the basic requirement of 'takedown' under the DMCA." Shelter Capital, 718 F.3d at 1027 (quoting Edward Lee, Decoding the DMCA Safe Harbors, 32 Colum. J.L. & Arts 233, 247 (2009) (internal marks omitted).

---

the substance of the Court's examination is highly valuable. The Court in Venus provides an analysis based on current uses of fingerprinting technology. Rather than imposing self-monitoring obligations on the ISP, fingerprinting technology highlights for the ISP material that is substantially similar to infringing material identified in takedown notices, and how such information could provide to the ISP with actual or red flag knowledge of infringement. Contrary to the Magistrate's finding here, removing videos that are flagged by YouTube as possible infringement of content previously removed because it infringed on Plaintiff's copyrighted works is not imposing a duty to seek indications of infringement because YouTube located such a content due to Plaintiff's prior identification of infringing material. As the Court in Venus underscored, "nothing in the DMCA requires the copyright holder to provide a URL address for every Image due to be taken down into the future, once sufficient Notice has been provided that the particular Image, as pinpointed on the website by an address infringes on a copyright." Venus Fashions, Inc., 2017 WL 2901695, at *27 (emphasis in original). "Imposing such a routine search requirement on ContextLogic does not run afoul of the DMCA's admonition that the provider is not required to continuously monitor its servers for infringement, 17 U.S.C. § 512(m) inasmuch as it imposes only a limited and targeted duty to use its 'fingerprint' software to search for known infringing Images as opposed to an '"amorphous"' duty to monitor in contravention of the DMCA." Id.

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 16 of 22

Nevertheless, the Ninth Circuit effectively wrote out of the statute the element of "material contribution," necessary under for liability under the common law, in a manner wholly inconsistent with Congress' stated intention to not address the common law doctrines when enacting the DMCA. S.Rep. No. 105-190 (stating "the Committee decided to leave current law [of contributory and vicarious liability] in its evolving state and, instead, to create a series of 'safe harbors,' for certain common activities of service providers" and noting the DMCA only "limits the liability of qualifying service providers for claims of direct, vicarious and contributory infringement").

The doctrine upon which Congress relied in enacting the DMCA is well summarized in Fonovisa. The Court stated:

> Contributory infringement has been described as an outgrowth of enterprise liability, see 3 Nimmer § 1204[a] [2], at 1275; Demetriades v. Kaufmann, 690 F.Supp. 289, 292 (S.D.N.Y.1988), and imposes liability where one person knowingly contributes to the infringing conduct of another. The classic statement of the doctrine is in Gershwin, 443 F.2d 1159, 1162: "[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." See also Universal City Studios v. Sony Corp. of America, 659 F.2d 963, 975 (9th Cir.1981), rev'd on other grounds, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (adopting Gershwin in this circuit).

Fonovisa, 76 F.3d at 264. "Contributory infringement originates in tort law and stems from the notion that one who directly contributes to another's infringement should be held accountable." Id. at 262. "[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." Id. at 264. The material contribution test for liability has long been recognized under copyright law. See Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co., 36 F.2d 354 (7th Cir.1929); Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir. 1971).

Applying these principles, the Ninth Circuit held that the defendant "materially contributed" to direct infringement because it provided "support services" without which "it would [have been] difficult for the infringing activity to take place." Fonovisa, 76 F.3d at 264. The defendant hosted a flea market at which vendors sold illegal copies of movies, and the vendors were dependent on the flea market for a space to sell the illegal merchandise and for marketing to attract customers. Id. The Court stated the following:

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 17 of 22

> There is no question that plaintiff adequately alleged the element of knowledge in this case. The disputed issue is whether plaintiff adequately alleged that Cherry Auction materially contributed to the infringing activity. We have little difficulty in holding that the allegations in this case are sufficient to show material contribution to the infringing activity. Indeed, it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet. These services include, inter alia, the provision of space, utilities, parking, advertising, plumbing, and customers.

Fonovisa, 76 F.3d at 264. Applying the analysis provided in Fonovisa here, which is the one intended by Congress, there are material questions of fact on whether YouTube's operations fail to meet the protection provided by § 512(c)(1)(B). Although the common law test has two prongs, namely (i) whether there is a direct financial benefit and, (ii) whether there is a sufficient right and ability to control the infringing conduct[12], in the context of the decisions under the DMCA, it is reasonably understood there is a third element, (iii) whether the expeditious removal of infringing content permits the ISP to avoid attribution of its direct financial benefit to the infringing activity. See 17 U.S.C. §512(c)(1)(C).

The Congressional scheme behind § 512, can still result in immunity even when the level of control expressed in Fonovisa is exercised and a direct financial benefit is received if, but only if, the infringing content is removed or disabled expeditiously. Understood in this manner,

---

[12] See e.g., Shapiro, Bernstein and Co. v. H.L. Green Co., 316 F.2d 304, 307 (2d Cir. 1963) ("When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials—even in the absence of actual knowledge that the copyright monolpoly (sic) is being impaired, [] the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation."); Gershwin, 443 F.2d at 1162 ("Although vicarious liability was initially predicated upon the agency doctrine of respondeat superior, see e.g., M. Witmark & Sons v. Calloway, 22 F.2d 412, 414 (E.D. Tenn. 1927), this court recently held that even in the absence of an employer-employee relationship one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities."); Fonovisa, Inc, 76 F.3d at 262 (""even in the absence of an employer-employee relationship one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'"); see also Disney Enterprises, Inc., 2013 WL 6336286, at *38  ("vicarious infringement has two elements, occurring 'when one profits from direct infringement while declining to exercise a right to stop or limit it.' ") The Eleventh Circuit Civil Jury Pattern Instruction 9.21 describe the elements of vicarious liability as whether defendant had "the right and ability to control or supervise" the infringement and whether defendant "directly profited from the other's infringement." Eleventh Circuit Civil Pattern Jury Instructions (Mar. 2022), 9.21 Copyright – Infringement – Vicarious Infringement.

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 18 of 22

§512(c)(1)(C) serves to provide limitations on liability when an ISP meets either of the secondary liability tests (i.e., vicarious liability or material contribution), but acts expeditiously and in good faith to collaborate with the copyright holder to limit copyright infringement. In this case, Defendants are not entitled to protection because they exercise the required control receive a direct financial benefit and failed to expeditiously remove the infringing content.

The activities of <u>Fonovisa</u> are illustrative of the activities of YouTube.[13]



Applying the principles enunciated in <u>Fonovisa</u>, as Congress intended, YouTube has the right and ability to control the infringing activity because tacitly encourages it and therefore it materially contributes to it.

Nonetheless, YouTube's activities are far more than the concerns raised in <u>Shelter Capital</u> which held that the right and ability to control should not be met simply because the ISP has the

---

[13] Defendants' control is similar to the control found by the Court in <u>Shapiro, Bernstein and Co. v. H.L. Green Co.</u>, 316 F.2d 304 (2d Cir. 1963), <u>Gershwin</u>, 443 F.2d at 1162, and <u>Fonovisa, Inc.</u>, 76 F.3d at 262. In <u>Shapiro</u>, the agreement between the direct infringer-concessionaire selling the infringed material and the store owner required the concessionaire and its employees to "abide to, observe and obey all regulations promulgated from time to time by [the store owner]" and the store owner had the "unreviewable discretion" to discharge the concessionaires' employees. <u>Shapiro</u>, 316 F. 2d at 306. In <u>Gershwin</u>, there wasn't a contractual ability to control the direct infringer but the defendant had "pervasive participation in the formation and direction" of the direct infringers" which led the court to find that the defendants were in a position to police the direct infringers. <u>Gershwin</u>, 443 F. 2d at 1163. In <u>Fonovisa</u>, the defendant controlled and patrolled the location from where the infringement occurred (*i.e.*, small booths); defendant also had the right to terminate the vendors for any reason and provided "space, utilities, parking, advertising, plumbing, and customers." Therefore the court concluded that defendant had the ability to control the activities of the direct infringers. <u>Fonovisa</u>, 76 F.3d at 262.

[14] "Rettke Depo" refers to the deposition of Nicola Rettke, who testified as Defendants' corporate representative on monetization issues. The transcript to her deposition is attached as Ex "3". Exhibits 6 and 7 to Rettke's Depo are attached as Ex "3b".

[15] "Pollock Depo" refers to the deposition of Lucas Pollack. The transcript is attached as Ex "4."

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
<u>Plaintiff's Objections to Report and Recommendation</u>
Page 19 of 22

technical power to remove video content or block a user's account. In <u>Shelter Capital</u>, the plaintiff argued the defendant had the right and ability to control "as long as [defendant had] 'the ability to locate infringing material' and 'terminate users' access.'" <u>Shelter Capital</u>, 718 F.3d at 1027. Defendants here exert much more control over the users who upload the infringing material, its users in general and the infringing activity on its platform. Plaintiff does not argue YouTube is not entitled to protection under §512(c)(1)(B) because it has the ability to remove the content. Further, as set forth above, YouTube did not expeditiously remove the infringing content. It instead kept the content on its platform solely for its financial gain, until Plaintiff sent additional takedown notices again asking for the clips infringing on its works to be removed.

The Magistrate found "Athos []made no showing that YouTube received a financial benefit that was 'distinctly attributable to the infringing material at issue'" because "of the total clips-in-suit, 91% generated no advertising revenue on YouTube [and] ad [placement] was merely coincidental." R&R p. 29. At a minimum, the Magistrate's ruling recognizes that YouTube profits at least on 9% of Plaintiff's copyrighted work. Moreover, this conclusion disregards other manners in which YouTube monetizes infringing content. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

The Defendants intentionally only calculated advertising revenue rather than the total monetization of the works in suit to mislead this Court and a jury as to its "monetization" in the hopes of protection under the DMCA. The Court should not limit the amount of money made off the back of Plaintiff's copyrighted works to YouTube's cute and incredibly narrow interpretation of "advertising revenue."

"The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." <u>Venus Fashions, Inc.</u>, 2017 WL 2901695, at *24. "Additionally, '[f]inancial benefit exists where the availability of infringing material "acts as a draw" for customers.' " <u>Id.</u> at *25 (quoting <u>A&M Recs., Inc. v. Napster, Inc.</u>, 239 F.3d 1004, 1023 (9th Cir. 2001), and <u>Fonovisa</u>, 76 F.3d at 263-64). The clips in

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
<u>Plaintiff's Objections to Report and Recommendation</u>
Page 20 of 22

suit have generated more than 8 million views. Therefore, there are genuine issues of material fact for a jury to decide with regards to whether Defendants received a financial benefit from the infringement of Plaintiff's works. The Magistrate thus erred in granting summary judgment.

## CONCLUSION

The Magistrate Judge erred in finding that Defendants are entitled to the protection afforded by the safe harbor provisions in the DMCA. First, the record shows Defendants had actual or red flag knowledge of content infringing on Plaintiff's works. Specifically, upon receiving Plaintiff's takedown requests, YouTube's automatically located additional infringing content that match the one identified in the requests. The statute does not require Plaintiff to identify by URL each infringing instance. Rather, the statute requires Plaintiff provides sufficient information from which YouTube can identify and locate the infringement, You Tube located the infringement – because its system finds substantial matches automatically - , but refused to remove it until Plaintiff sent an additional takedown notice.  YouTube did not have to self-monitor the infringement to locate it; instead, Plaintiff provided all information necessary for YouTube to find the infringing content, but it simply refused to take it down. Further, YouTube's activities are sufficient for a jury to find it has the right and ability to control the infringing activity and that it receives a financial benefit from it. Drawing all inferences in the light most favorable to the Plaintiff, there are genuine issues of material fact in dispute that should be granted by a jury, and Defendants' motion for summary judgment should be denied. Plaintiff is not asking this Court to create new law, but simply to interpret the law as written with the application of common sense and in the light of todays' facts. Here, YouTube has actual knowledge of Plaintiff's content, has knowledge of where it has it, and makes money off the copyrighted material it has no right to display. This factual framework does not comport with common sense or the law. Plaintiff has the right to have a jury decide the merits of its claims.

**WHEREFORE,** Plaintiff respectfully requests the Court denies Defendants' Motion for Summary Judgment, and allows the case to proceed to a trial. Plaintiff also requests the Court considers Plaintiff's Motion for Partial Summary Judgment [DE 113], which the Magistrate Judge denied as moot [DE 171].

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
Plaintiff's Objections to Report and Recommendation
Page 21 of 22

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 16th day of June 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and that a true and correct copy of the foregoing has been served via automated e-mail on all counsel of record:

<u>/s/   Omar Ortega</u>
Omar Ortega

**Jay B. Shapiro, Esq.**
**David T. Coulter Esq.**
Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone:(305) 7869-3229
Facsimile: (305) 789-2664
Email: <u>jshapiro@stearnsweaver.com</u>
Email: <u>dcoulter@stearnsweaver.com</u>
***Counsel for Defendants***

**Brian M. Willen, Esq.**
**Lucy Yen, Esq.**
Wilson Sonsini Goodrich & Rosati, P.A.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: <u>bwillen@wsgr.com</u>
Email: <u>lyen@wsgr.com</u>
***Counsel for Defendants***

*Athos Overseas Limited Corp. v. YouTube, LLC, et. al.*
<u>Plaintiff's Objections to Report and Recommendation</u>
Page 22 of 22