UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:  1:21-cv-21698-DPG

ATHOS OVERSEAS LIMITED CORP.,

        Plaintiff,

    v.

YOUTUBE, INC., YOUTUBE, LLC, and
GOOGLE, LLC,

        Defendants.

**DEFENDANTS YOUTUBE, LLC AND GOOGLE LLC'S OPPOSITION TO
PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION ON THE
<u>PARTIES' MOTIONS FOR SUMMARY JUDGMENT</u>**

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

INTRODUCTION ........................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 1

     A.     Athos Declines YouTube's Offer to Use Content ID. ........................... 1

     B.     YouTube Moves for Summary Judgment Based on the DMCA Safe
             Harbor. .................................................................................................. 3

     C.     Magistrate Judge Torres Recommends Granting YouTube's Motion for
             Summary Judgment on the DMCA.......................................................... 5

ARGUMENT ................................................................................................................. 6

I.     PLAINTIFF HAS NO LEGAL OR FACTUAL BASIS FOR ESTABLISHING
       THAT YOUTUBE HAD KNOWLEDGE OF SPECIFIC INFRINGING CLIPS-
       IN-SUIT. ..................................................................................................... 7

     A.     Judge Torres Correctly Found That Plaintiff's Knowledge Argument Fails
             on the Law............................................................................................. 8

     B.     Plaintiff's Knowledge Theory Would Disincentivize Development of
             Copyright-Protection Technology and Threaten Non-Infringing Content. .......... 14

     C.     Judge Torres Correctly Found That Plaintiff's Knowledge Argument Fails
             on the Facts. ......................................................................................... 15

II.    JUDGE TORRES CORRECTLY HELD THAT PLAINTIFFS CANNOT
       CREATE A TRIABLE ISSUE ON THE DMCA'S CONTROL & DIRECT
       FINANCIAL BENEFIT PROVISION. ...................................................... 18

     A.     The DMCA Does Not Codify the Common Law of Vicarious
             Infringement.......................................................................................... 18

     B.     Plaintiff Cannot Carry Its Burden to Show a Direct Financial Benefit. ............... 19

CONCLUSION.............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Recording Corp. v. Spinrilla, LLC*,
  506 F. Supp. 3d 1294 (N.D. Ga. 2020) ...................................................................................7

*Capitol Recs., LLC v. Vimeo, LLC*,
  972 F. Supp. 2d 500 (S.D.N.Y. 2013) ...............................................................................9, 12

*Capitol Recs., LLC v. Vimeo, LLC*,
  972 F. Supp. 2d 537 (S.D.N.Y. 2013) .................................................................................17

*Capitol Recs., LLC v. Vimeo, LLC*,
  826 F.3d 78 (2d Cir. 2016) ...............................................................................4, 7, 14, 17

*Capitol Recs., LLC v. Vimeo, LLC*,
  2021 WL 2181252 (S.D.N.Y. May 28, 2021) ........................................................................4

*Disney Enters., Inc. v. Hotfile Corp.*,
  2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ...............................................................12, 13

*Downs v. Oath Inc.*,
  385 F. Supp. 3d 298 (S.D.N.Y. 2019) ...............................................................................19, 20

*N.L.R.B. v. HH3 Trucking, Inc.*,
  755 F.3d 468 (7th Cir. 2014) ...............................................................................................13

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) ...............................................................................................5

*Perfect 10, Inc. v. Giganews, Inc.*,
  993 F. Supp. 2d 1192 (C.D. Cal. 2014) ...............................................................................11

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) ...........................................................................................3, 15

*Schneider v. YouTube, LLC*,
  2023 WL 3605981 (N.D. Cal. May 22, 2023) ...................................................................14, 17

*Steinmetz v. Shutterstock, Inc.*,
  629 F. Supp. 3d 74 (S.D.N.Y. 2022) ...........................................................................8, 11, 20

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
  718 F.3d 1006 (9th Cir. 2013) ........................................................................................ *passim*

*United States v. Baugh*,
  776 F. Supp. 2d 172 (E.D. Va. 2011) ...................................................................................13

*Usery v. Golden Gem Growers, Inc.*,
  417 F. Supp. 857 (M.D. Fla. 1976) ......................................................................................13

*Ventura Content, Ltd. v. Motherless, Inc.*,
   885 F.3d 597 (9th Cir. 2018) .......................................................................... *passim*

*Venus Fashions, Inc. v. ContextLogic, Inc.*,
   2017 WL 2901695 (M.D. Fla. Jan. 17, 2017) ....................................................... 13

*Viacom Int'l Inc. v. YouTube, Inc.*,
   718 F. Supp. 2d 514 (S.D.N.Y. 2010) ........................................................... 10, 11

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012) ............................................................................ *passim*

*Viacom Int'l Inc. v. YouTube, Inc.*,
   940 F. Supp. 2d 110 (S.D.N.Y. 2013) ............................................................ *passim*

*Wolk v. Kodak Imaging Network, Inc.*,
   840 F. Supp. 2d 724 (S.D.N.Y. 2012) ........................................... 10, 11, 12, 15

**Statutes**

17 U.S.C. § 512 ................................................................................................. *passim*

**Other Materials**

S. Rep. No. 105-190 (1998) ....................................................................................... 11

U.S. Copyright Office, Section 512 of Title 17 (May 2020) ........................................ 10

## **INTRODUCTION**

In his Report and Recommendation (Dkt. 171, "R&R"), Chief Magistrate Judge Torres correctly found that the safe-harbor provision of the Digital Millennium Copyright Act ("DMCA") bars all Plaintiff's claims of copyright infringement. Explaining that those claims failed both legally and factually, Judge Torres saw Plaintiff's case for what it is: an attempt to upend more than a decade of law applying the DMCA safe harbors to protect YouTube and other responsible online service providers against claims for alleged copyright infringement by their users.

Plaintiff's Objections identify no legal or factual errors in Judge Torres's analysis. Instead, Plaintiff rehashes arguments regarding the DMCA that courts have consistently rejected, as Judge Torres did here. Plaintiff's core argument is that, because YouTube went beyond what the law requires and developed industry-leading tools to help copyright owners monitor for potential infringement of their works, YouTube should be charged with knowledge of (and control over) any and all potentially infringing content on its service. In other words, Plaintiff argues that YouTube should be evicted from the DMCA's safe harbor not in spite of—but *because of*—its efforts to protect copyrights. In a detailed and persuasive analysis of the DMCA and its extensive case law, Judge Torres showed that this theory fails as a matter of law. Nor can Plaintiff overcome its failure to proffer evidence in support of its theory. As Judge Torres found, Plaintiff failed to show that *even a single clip* at issue in this case would have been blocked or removed any earlier had YouTube employed its copyright-protection tools in the way that Plaintiff insists it must. That independently supported summary judgment in YouTube's favor.

In the end, Plaintiff's gripe is not with YouTube, which fully complied with the DMCA, but with the DMCA itself. Under established law and the undisputed factual record, YouTube is entitled to summary judgment, and Plaintiff's Objections should be overruled.

## **FACTUAL AND PROCEDURAL BACKGROUND**

### A.    **Athos Declines YouTube's Offer to Use Content ID.**

YouTube, a wholly owned subsidiary of Google LLC, operates a popular video-sharing website that offers users the opportunity to access an enormous and extraordinarily diverse library

of original, creative expression. Dkt. 115 ("YT MSJ") at 3-4. Registered YouTube users can upload videos, which other users can then publicly view, share, and engage with.

Athos Overseas Limited Corp. ("Plaintiff") is an offshore holding company owned and controlled by Carlos Vasallo, a wealthy Spanish businessman and Spanish-language movie mogul, which claims to own copyrights to several hundred movies. YT MSJ at 4-5. Plaintiff alleges that YouTube infringed its copyrighted movies when third parties uploaded portions of those movies to YouTube's website. Dkt. 100 ("Am. Compl.") ¶ 9.

In 2015, YouTube offered Mr. Vasallo access to YouTube's Content ID tool. Dkt. 116 ("YT SUF") ¶¶ 35-36. Content ID is an Emmy-award winning video-fingerprinting technology that allows participating rightsholders to upload reference files of their copyrighted works and scan those files against the corpus of YouTube content. YT MSJ at 4; Dkt. 116-2 ("Zhu MSJ Decl.") ¶ 27. When Content ID finds a video that matches a reference file, it follows the copyright owner's instructions for that video. Copyright owners may choose to "block" the video from appearing on YouTube, "monetize" the video by sharing in advertising revenue it generates, or simply "track" views of the video. YT SUF ¶ 19.

Mr. Vasallo made clear that he did not want to use Content ID. YT SUF ¶¶ 40, 43. Mr. Vasallo demanded instead that YouTube affirmatively police its platform for possibly infringing videos, without his participation. *Id.* YouTube explained that it could not manage Mr. Vasallo's content or determine potential infringement on his behalf, while again informing Mr. Vasallo that Content ID was available for his use at "no cost." YT SUF ¶ 39. Mr. Vasallo did not respond, and neither he nor Athos ever elected to use Content ID (or any of YouTube's other advanced copyright-management tools, such as Copyright Match). YT SUF ¶¶ 40-43.[1] Instead, Mr. Vasallo

---

[1] Plaintiff alleged that YouTube conditioned the offer of Content ID on Plaintiff's agreement to display and monetize its content on YouTube and to release any infringement claims against YouTube. Am. Compl. ¶¶ 18-21. But discovery has established that Plaintiff's allegation is false—and Plaintiff did not even try to suggest otherwise on summary judgment. Plaintiff has now admitted that the "terms on which [YouTube] offered Content ID [were] reflected in the Content Hosting Services Agreement that was provided to [Plaintiff]." YT SUF ¶¶ 37-38. Those terms on their face allowed Plaintiff to block videos matching its works and did not require such content to be displayed or monetized. YT SUF ¶ 38. Plaintiff's own witnesses recognize as much. Dkt. 116-1

---

opted to rely on a law firm to issue manual DMCA takedown notices to YouTube on Plaintiff's behalf. YT MSJ at 4-5. It is undisputed that YouTube removed all the video clips identified in Athos's thousands of takedown notices expeditiously upon receipt of those notices. YT SUF ¶¶ 23, 25. Nevertheless, over six years after refusing YouTube's offer of Content ID, Athos filed this lawsuit on May 3, 2021.

> **B.     YouTube Moves for Summary Judgment Based on the DMCA Safe Harbor.**

After this Court dismissed Plaintiff's Sherman Act, FDUTPA, and time-barred copyright claims (Dkt. 44), and after Plaintiff had over a year to obtain full discovery that might prove its claims, YouTube moved for summary judgment on Plaintiff's remaining infringement claims. YT MSJ at 9-20; YT MSJ Reply at 2-10.

Those claims are based on a particular set of "clips-in-suit"—approximately 7,000 allegedly infringing video clips uploaded by YouTube users that Plaintiff contends include portions of certain copyrighted movies that it purports to own (the "works-in-suit"). YT SUF ¶ 30; *cf. Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017) (an infringement suit "is a specific lawsuit by a specific plaintiff against a specific defendant about specific copyrighted [works]; it is not a lawsuit against copyright infringement in general"). These clips-in-suit define the full scope of Plaintiff's copyright-infringement claims. Am. Compl. ¶ 70 & Ex. B; *accord Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 34 (2d Cir. 2012) ("*Viacom II*") ("By definition, only the current clips-in-suit are at issue in this litigation."). The issue on summary judgment was whether the DMCA safe harbor, 17 U.S.C. § 512(c), applied to those specific alleged infringements.

Congress enacted the DMCA "to update domestic copyright law for the digital age." *Viacom II*, 676 F.3d at 26. Recognizing that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability," *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir.

---

Ex. 20 at 28; *id.* Ex. 19 ¶¶ 49-50. And nothing in the agreement required Plaintiff to release any infringement claims. *Id.* Exs. 3b, 4b.

2013), Congress established four "safe harbors" for everyday activities of online service providers, 17 U.S.C. § 512(a)-(d). The safe harbor relevant here, § 512(c), shields online services from infringement claims that arise "by reason of the storage at the direction of a user" of copyrighted material. Judge Torres aptly summarized the workings of this safe harbor:

> [I]n order to qualify for the protection of this safe harbor, the [service provider] must not know of the infringement; the infringement must not be apparent; it must remove infringing material when it learns about it or upon receipt of a valid DMCA notice; and it must not directly benefit financially from the infringement in situations when it can control the activity.

R&R at 5 (citing *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 604 (9th Cir. 2018); *Viacom II*, 676 F.3d at 28). The DMCA protects service providers from "liability for all monetary relief for direct, vicarious and contributory infringement," *UMG*, 718 F.3d at 1028, 1031, and has repeatedly been applied to grant summary judgment to YouTube and similar services, *see Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 123 (S.D.N.Y. 2013) ("*Viacom III*"); *Capitol Recs., LLC v. Vimeo, LLC*, 2021 WL 2181252, at *13 (S.D.N.Y. May 28, 2021) ("*Vimeo III*").

A foundational principle of this safe harbor is that "hosting material capable of copyright protection, with the general knowledge that the site could be used to share infringing material, is not enough to impute knowledge." *Motherless*, 885 F.3d at 610. Instead, Congress created a notice-and-takedown regime: copyright owners may identify particular instances of alleged infringement, which online services then must expeditiously remove. 17 U.S.C. § 512(c)(1); *see Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 89-90 (2d Cir. 2016) ("*Vimeo II*") (Congress struck "a compromise under which, in return for the obligation to take down infringing works promptly on receipt of notice of infringement from the owner, Internet service providers would be relieved of liability for user-posted infringements of which they were unaware"). Rather than require service providers "to scour matter posted on their services to ensure against copyright infringement," *id.* at 90, "[t]he DMCA notification procedures place the burden of policing copyright infringement— identifying the potentially infringing material and adequately documenting infringement— squarely on the owners of the copyright," *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113

(9th Cir. 2007). To that end, the DMCA has an explicit anti-monitoring provision: an online service's safe-harbor protection cannot be conditioned on "monitoring its service or affirmatively seeking facts indicating infringing activity." § 512(m).

In opposition to YouTube's motion for summary judgment, Plaintiff conceded that YouTube satisfied nearly all the requirements for the safe harbor: that YouTube (1) is a "service provider," § 512(c)(1); (2) maintained a designated DMCA agent, § 512(c)(2); (3) adopted, reasonably implemented, and informed users of its repeat-infringer policy, § 512(i)(1)(A); (4) accommodates "standard technical measures," § 512(i)(1)(B); and (5) that its infringement claims arise by reason of "storage at the direction of a user," § 512(c)(1). Dkt. 150 ("YT MSJ Reply") at 2; YT SUF ¶¶ 3-17, 26-29. Plaintiff challenged only two DMCA requirements, on both of which it bore the burden of proof. Plaintiff argued: (1) that YouTube's Content ID tool conferred knowledge of infringement of clips Plaintiff claimed were similar to, but different from, those identified in Plaintiff's DMCA notices; and (2) that YouTube had the right and ability to control alleged infringements from which it earned a direct financial benefit. Dkt. 138 at 3-18; YT MSJ Reply at 3-10.

### C.   Magistrate Judge Torres Recommends Granting YouTube's Motion for Summary Judgment on the DMCA

Judge Torres's Report and Recommendation carefully analyzed the DMCA and diagnosed the many problems with Plaintiff's main argument: that Content ID confers on YouTube sufficient knowledge of alleged infringement to evict YouTube from the safe harbor. Judge Torres explained that this theory "fail[ed] as a matter of law," as it "r[an] headlong against a brick wall erected by the DMCA" under § 512(m), which expressly precludes Plaintiff's proposed affirmative-monitoring regime. R&R at 19-20. Even if Plaintiff had viable legal arguments, moreover, Judge Torres found that "Athos has failed to present any tangible evidence to establish that, had YouTube used its video-detection technology as it suggests, the software would have identified, blocked, or removed any of the specific clips-in-suit in dispute in this case. This evidentiary deficit is fatal to Athos' case." R&R at 23; *see also id.* at 24-26.

Judge Torres also had no trouble dispatching Plaintiff's second argument: that YouTube had the right and ability to control alleged infringements on its service from which it earned a direct financial benefit. Judge Torres explained that Plaintiff's control arguments were "unfounded" and "repeatedly rejected by applicable case law." R&R at 28-29 (collecting cases). While the absence of control alone is dispositive, Judge Torres went on to find that YouTube did not receive a "direct financial benefit" from the videos at issue. YouTube generated no advertising revenue on the vast majority (91%) of clips-in-suit, "YouTube employs mechanisms designed to avoid showing ads in connection with content that has been claimed by a copyright owner, and . . . if any ad appeared before or after a clip-in-issue, that ad was merely coincidental." R&R at 29.

Because Judge Torres recommended granting summary judgment to YouTube on the DMCA, he had no need to address YouTube's other dispositive summary judgment arguments, including those based on the statute of limitations and on Plaintiff's failure to establish ownership over its works-in-suit. YT MSJ at 7-9.[2]

### ARGUMENT

Plaintiff's Objections (Dkt. 177, "Obj.") take issue with only two elements of the DMCA safe harbor: YouTube's knowledge and control-plus-financial-benefit. Plaintiff does little more than repackage the arguments on those issues it raised in opposition to YouTube's MSJ. Unlike Judge Torres, however, Plaintiff does not contend with the text of the DMCA or the seminal decisions that defined the boundaries of the safe harbor—and rejected the very arguments that Plaintiff advances here. This Court should overrule Plaintiff's Objections and adopt the Report and Recommendation in full.

---

[2] Plaintiff requests in a single sentence that the "Court considers [sic] Plaintiff's Motion for Partial Summary Judgment [Dkt. 113], which the Magistrate Judge denied as moot [Dkt. 171]." Obj. at 21. Plaintiff provides no legal or factual basis for this Court's reconsideration of that motion—much less for objecting to Judge Torres's conclusion that granting summary judgment to YouTube on the DMCA fully resolves this case, mooting Plaintiff's motion, which was solely directed to various of YouTube's other affirmative defenses. R&R at 30; Dkt. 139.

I.      **Plaintiff Has No Legal or Factual Basis for Establishing That YouTube Had Knowledge of Specific Infringing Clips-In-Suit.**

Under the DMCA, Plaintiff bears the burden "to show that the service provider failed to respond appropriately to actual or red flag knowledge." *Atl. Recording Corp. v. Spinrilla, LLC*, 506 F. Supp. 3d 1294, 1317 (N.D. Ga. 2020) (citing *Vimeo II*, 826 F.3d at 95); *see* 17 U.S.C. § 512(c)(1)(A)(i)-(iii); *accord Motherless*, 885 F.3d at 610-11. As Judge Torres explained (R&R at 13), it is "clearly established"—including by specific holdings from both the Second and Ninth Circuits—that "both actual and red flag knowledge relate to *specific* instances of copyright infringement. A general awareness that infringing activity occurs on the provider's site does not preclude use of the safe harbor defense." *Spinrilla*, 506 F. Supp. 3d at 1317 (citation omitted); *see also UMG*, 718 F.3d at 1025 ("[T]he actual knowledge provision turns on whether the provider actually or 'subjectively' knew of *specific* infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the *specific* infringement 'objectively' obvious to a reasonable person." (quoting *Viacom II*, 676 F.3d at 31) (emphasis added)). Specificity is required because the § 512(c) safe harbor "aims at individual infringements, not the service as a whole." *Motherless*, 885 F.3d at 614. In short, the "copyright owner must show knowledge, actual or red flag, for the videos that infringed its copyright and are the subject of its claim." *Id.* at 610; *see* R&R at 13; *accord Viacom III*, 940 F Supp. 2d at 115 (granting summary judgment to YouTube based on lack of evidence of knowledge).

Judge Torres correctly found that Plaintiff cannot meet its burden—and that Plaintiff's knowledge arguments fail both on the law and the facts. R&R at 15-22. Plaintiff offers no basis for overturning that well-reasoned conclusion. Neither in summary judgment briefing nor now has Plaintiff pointed to a single clip-in-suit that YouTube actually knew (or had red-flag knowledge) was infringing but failed to remove. Instead, Plaintiff seeks to rewrite the DMCA's carefully designed notice-and-takedown regime. That regime "assumes that, 'from time to time,' 'material belonging to someone else ends up' on service providers' websites, and establishes a process for ensuring the prompt removal of such unauthorized material." *UMG*, 718 F.3d at 1024. Here, the DMCA process worked exactly as Congress intended. Plaintiff concedes that YouTube

expeditiously removed *every single allegedly infringing clip* that Plaintiff identified in its DMCA takedown notices. R&R at 14; Obj. at 7 ("YouTube removed the material identified only at the URL shown in the takedown notice.").

Even though the "DMCA did not require [YouTube] to do more," *Steinmetz v. Shutterstock, Inc.*, 629 F. Supp. 3d 74, 84 (S.D.N.Y. 2022); YT MSJ at 12-16, more is exactly what Plaintiff demands. Plaintiff focuses on YouTube's supposed knowledge of *non-noticed* clips—clips for which Plaintiff has not yet submitted a DMCA takedown notice to YouTube but were supposedly associated with the same underlying movie as clips removed based on Plaintiff's prior notices. Obj. at 5-6. Plaintiff insists that YouTube should be charged with knowledge that the non-noticed clips existed *and* that they were infringing. Obj. at 6. The sole hook for this argument is YouTube's Content ID technology. As Judge Torres put it, Plaintiff posits "that, because YouTube has automated software that scans videos to help users identify potentially infringing clips, Plaintiff's DMCA notices imputed on YouTube knowledge of each and every single clip that infringed on a noticed film." R&R at 12.

After a detailed exegesis of the DMCA and its case law, R&R at 15-22, Judge Torres found that "[Plaintiff's] theory that specific knowledge of *non-noticed* infringing clips can be ascribed to [YouTube] by virtue of YouTube's copyright management tools fails as a matter of law," R&R at 19. Rehashing the same arguments Judge Torres rejected, Plaintiff objects that Judge Torres erred by holding that YouTube lacked knowledge of the non-noticed clips. Obj. at 8-10. Plaintiff's Objections ignore settled law and fail to show any error in Judge Torres's careful analysis.

### A.   Judge Torres Correctly Found That Plaintiff's Knowledge Argument Fails on the Law.

To begin, Plaintiff's knowledge argument contradicts the DMCA's text and over a decade of settled law. Two provisions of the DMCA—§§ 512(m) and 512(c)(3)(B)(i)—are dispositive.

*First*, § 512(m) is clear that safe-harbor protection cannot be conditioned on the service provider "monitoring its service or affirmatively seeking facts indicating infringing activity." This provision "expressly disclaims any affirmative monitoring requirement," *Viacom II*, 676 F.3d at

41—including any suggestion that YouTube was required to use its proprietary tools to affirmatively search for Plaintiff's works. Plaintiff acts as if "fingerprint technology" is a newfangled development that changes the DMCA analysis. Plaintiff even casts the DMCA itself as superannuated because, supposedly, "both the technology and economics have vastly changed" since Congress enacted the statute. Obj. at 2. Plaintiff is wrong. In case after case, courts have held that § 512(m) rules out any argument that the development of similar content-identification tools override § 512(m) or operate to impose new legal requirements on service providers that Congress disclaimed. *See Capitol Recs., LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 525 (S.D.N.Y. 2013) ("*Vimeo I*") ("§ 512(m) and attendant case law make clear that service providers are under no affirmative duty to seek out infringement. This remains the case even when a service provider has developed technology permitting it to do so." (citations omitted)); *UMG*, 718 F.3d at 1024-25 (rejecting argument that "Veoh should have taken the initiative to use search and indexing tools to locate and remove from its website any other content by the artists identified in the notices" submitted by Plaintiff, and explaining that "to so require would conflict with § 512(m)").

Indeed, YouTube's core fingerprinting technology is not new, and the argument Plaintiff now makes was squarely rejected a decade ago in the *Viacom* case. *See Viacom III*, 940 F. Supp. 2d at 120 (addressing argument regarding YouTube's "digital fingerprinting software," which "automatically blocks submissions" that match "reference databases" for copyrighted works). The Second Circuit held in that case that YouTube could not be evicted from the § 512(c) safe harbor because it allegedly "set up its identification tools to try to avoid identifying infringements of class plaintiffs' works." *Viacom II*, 676 F.3d at 40-41. On remand, the district court rejected the very argument that Plaintiff now seeks to relitigate: "Plaintiffs often suggest that YouTube can readily locate the infringements by using its own identification tools. It had no duty to do so." *Viacom III*, 940 F. Supp. 2d at 116-17 & n.3 (no disqualifying knowledge where "[t]he specific locations of infringements are not supplied: at most, an area of search is identified, and YouTube is left to find the infringing clip"). A contrary holding would "would put the provider to the factual search

forbidden by § 512(m)." *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 528-29 (S.D.N.Y. 2010) ("*Viacom I*"). Judge Torres rightly rebuffed Plaintiff's effort to disturb settled law.[3]

*Second*, the DMCA requires that a valid takedown notice identify the actual "material that is claimed to be infringing" and provide "information reasonably sufficient to permit the service provider to locate the material" and "expeditiously" remove it. § 512(c)(1)(C) & (c)(3)(A)(iii). The statute further provides that a notice "that fails to comply substantially with" the statutory requirements "shall not be considered" for the purposes of determining whether the service provider has knowledge of infringement under the DMCA. These provisions clarify that a DMCA notice identifying *one video* does not create an obligation to search for and remove *different videos* at unknown locations that may have similar content. *See Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 747 (S.D.N.Y. 2012) ("Notices that do not identify the specific location of the alleged infringement are not sufficient to confer 'actual knowledge' on the service provider."), *aff'd*, 569 F. App'x 51 (2d Cir. 2014); *accord UMG*, 718 F.3d at 1022 (discussing § 512(c)(3)(B)(i)'s "exclusionary rule").

Unsurprisingly, therefore, courts have repeatedly rejected arguments nearly identical to the one Plaintiff makes here. In *UMG*, the Ninth Circuit held that Veoh had no obligation "to use search and indexing tools to locate and remove from its website any other content by the artists

---

[3] Ignoring the dispositive rulings in *Viacom*, *Vimeo*, and *UMG*, Plaintiff tries to support its argument based on a footnote from a report by the Copyright Office discussing § 512(m). Obj. at 12-13; *see also id.* at 4 n.3, 6. This report is not law, nor any sort of authoritative interpretation of the DMCA. Indeed, despite being in print for over three years, it has never been cited in any court. And the footnote advocates for an interpretation of § 512(m) that clashes with the statute itself and how courts have consistently applied it. *See* U.S. Copyright Office, Section 512 of Title 17 (May 2020), at 111 n.591 ("Report") (noting that courts "appear to be sympathetic" to a contrary reading). Regardless, the footnote is irrelevant here. Plaintiff argues that its DMCA notices required YouTube to affirmatively search for other potentially infringing items not actually identified in the notices. Obj. at 5-13. But the Report's footnote discusses a different scenario altogether: whether § 512(m) relieves service providers of any obligation to "act upon evidence of infringement of which they become aware, *absent receipt of a takedown notice* that complies with the requirements of section 512(c)(3)." Report at 111 n.591 (emphasis added). That hypothetical does not apply to this case, where Plaintiff's claim of knowledge was based solely on its DMCA takedown notices and YouTube's alleged capability through copyright-management tools to find similar content. Plaintiff has not identified any evidence that anyone at YouTube was actually aware of an allegedly infringing clip-in-suit yet failed to act upon that information.

identified in the [DMCA] notices." 718 F.3d at 1023-24. Likewise, the plaintiffs in *Viacom* argued "that YouTube removes only the specific clips identified in DMCA notices, and not other clips which infringe the same works." *Viacom I*, 718 F. Supp. 2d at 528. The court explained that this argument "would eviscerate the required specificity of notice." *Id.* at 528-29. *Wolk* similarly held that the plaintiff was "incorrect" in arguing that its DMCA notices identifying certain images "serve as DMCA-compliant notice of any and all other unidentified alleged infringements of these nine works that may appear on the Photobucket site." 840 F. Supp. 2d. at 746-47. The court explained that "a system where one notice of infringement would apply to all instances of that image appearing on the website" was inconsistent with § 512(c)(3)(A). *Id.*

Plaintiff nonetheless insists that Judge Torres erred in following this established law because the DMCA "does not require a copyright owner to identify the URL where the infringing content is located in order to trigger an internet service provider's obligation to remove the content." Obj. at 8. This is a red herring. The DMCA requires that copyright owners provide information reasonably sufficient to locate the allegedly infringing material and expeditiously remove it. On services like YouTube, that requires a URL—as courts have repeatedly held. *See Motherless*, 885 F.3d at 612 ("[A]s a practical matter what [defendant] needed to remove [the allegedly infringing content] was a URL for each."); *Steinmetz*, 629 F. Supp. 3d at 84 (because takedown notices that did not include URLs of infringing images "did not comply with the DMCA, Defendant had no obligation to act"); *Perfect 10, Inc. v. Giganews, Inc.*, 993 F. Supp. 2d 1192, 1198-1203 (C.D. Cal. 2014) (holding that the burden of extracting Message IDs—a "unique identifier" that functioned "like a URL"—associated with infringing messages fell on the copyright holder, who "already knows which [materials] are infringing").[4] Without a URL or its

---

[4] Plaintiff's quotation to the DMCA's legislative history only confirms as much. The Senate Report states that "[a]n example of such sufficient information would be a copy or description of the allegedly infringing material *and* the URL address of the location (web page) which is alleged to contain the infringing material." Obj. at 8-9 (emphasis added) (quoting S. Rep. No. 105-190, at 46 (1998)); *accord Viacom III*, 940 F. Supp. 2d at 115 (quoting this same language).

equivalent, YouTube "cannot be held liable for its failure to remove [videos] for which the Plaintiff failed to provide proper notice." *Wolk*, 840 F. Supp. 2d at 747.

The fact that YouTube has Content ID—a tool Plaintiff flatly refused to use when offered (YT SUF ¶¶ 35-40)—makes no difference.[5] The DMCA imposes no obligation on service providers to develop or deploy fingerprinting technology to scan for potential infringements. *See Viacom II*, 676 F.3d at 40-41. Providers that choose to go beyond what the law requires in implementing fingerprinting tools are not thereby saddled with broad new obligations to use such technology in response to every takedown notice they receive. Section 512(c)(1)(C) cannot be read to require YouTube to do exactly what § 512(m) disclaims. *See, e.g.*, *Vimeo I*, 972 F. Supp. 2d at 525 (plaintiff's "frustration that Vimeo did not use sophisticated monitoring technology in its possession to seek out and remove instances of infringing content" provided no basis for stripping safe-harbor protection). As Judge Torres recognized, Plaintiff's effort to force YouTube to affirmatively use Content ID to seek out and block unknown videos that Plaintiff never actually identified (in a DMCA notice or otherwise) would rewrite the statute and impermissibly "shift from the copyright owner to the ISP the burdens of policing and identifying infringement on its systems." R&R at 20-21; *accord Motherless*, 885 F.3d at 603. In short, "YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms." *Viacom II*, 676 F.3d at 41

Against the wealth of established law—including "highly persuasive" out-of-circuit cases that are to be "follow[ed] as our circuit precedent requires absent a compelling showing otherwise" (R&R at 13-14)—Plaintiff offers virtually nothing. It cites two lower-court decisions that Judge Torres found "readily distinguishable." R&R at 25-26; *see* YT MSJ Reply at 6 n.4. *Disney Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *25 (S.D. Fla. Sept. 20, 2013), involved a service

---

[5] Having refused YouTube's offer and instead demanded that YouTube deploy Content ID without any participation from Plaintiff, it is ironic for Plaintiff to assert that "YouTube intentionally fails to cooperate." Obj. at 3. Plaintiff also ignores the fact that YouTube *already* applies MD5 hashing (another fingerprinting technology) to prevent users from uploading exact matches of videos removed via DMCA notices. YT MSJ at 14 n.5; Zhu MSJ Decl. ¶ 22.

totally different from YouTube: Hotfile stored files, then provided individualized links allowing users to download a given file. In dicta, the court observed that there might be a triable issue on knowledge because, in some instances, Hotfile became "attuned to the infringing nature of [the] files"—but only would remove a single link, rather than the underlying file itself. *Disney*, 2013 WL 6336286, at *2-3, *25, *28. Nothing like that occurred here, where it is undisputed that YouTube removed the videos Plaintiff identified as infringing. R&R at 25 (distinguishing Hotfile as involving "tangible evidence demonstrating that [the defendant] engaged in egregious disregard of known infringements").

Plaintiff's other case, *Venus Fashions, Inc. v. ContextLogic, Inc.*, was decided on a motion for preliminary injunction and involved a defendant who was actively scanning photographs but not acting on the knowledge it received from those scans. 2017 WL 2901695, at *24 (M.D. Fla. Jan. 17, 2017). Here, precisely because Plaintiff rejected YouTube's offer to give it access to Content ID, YouTube did not use Content ID to scan for Plaintiff's movies, and (as discussed below) there is no evidence of any Content ID "matches" to Plaintiff's clips-suit. YT SUF ¶¶ 35-40; *infra* at 15-17. And Judge Torres was correct in holding that, "to the extent that this unpublished district court case can be read to suggest that [service providers] are required to affirmatively use fingerprinting technology to search for additional instances of non-noticed infringing content, it erroneously departs from the text of the statute and the many cases, which deserve far greater weight, that have rejected that idea." R&R at 26.[6]

---

[6] Plaintiff suggests that despite multiple decisions rejecting its arguments, the absence of an on-point Eleventh Circuit case somehow, by itself, means that there is a triable issue of fact. Obj. 4. Plaintiff's argument refutes itself. *See, e.g.*, *United States v. Baugh*, 776 F. Supp. 2d 172, 176-77 (E.D. Va. 2011) ("just as the absence of authority for a proposition does not necessarily make the proposition true, the fact that no appellate courts have" applied a law in a certain manner "does not mean that [it] cannot—or should not—be so applied"). Similarly unavailing is Plaintiff's last-ditch suggestion that the Court should ignore well-established DMCA case law and instead update the statute "in the light of todays' [sic] facts." Obj. at 21. "Congress wrote the statute it wrote," *see N.L.R.B. v. HH3 Trucking, Inc.*, 755 F.3d 468, 472 (7th Cir. 2014), and Plaintiff's belief that the DMCA needs to be updated is properly directed to Congress, not this Court.

**B.      Plaintiff's Knowledge Theory Would Disincentivize Development of Copyright-Protection Technology and Threaten Non-Infringing Content.**

Plaintiff's arguments about Content ID are not just bad law, they are bad policy. Under Plaintiff's approach, service providers like YouTube that exceed their legal duties by creating advanced copyright-management technology that benefits copyright owners would face greater risk to their safe-harbor protection than services that do the bare minimum. That would create a serious disincentive for service providers to develop and implement technologies designed to protect copyrighted works—directly contrary to the goal of the DMCA. *See Vimeo II*, 826 F.3d at 98 ("Congress's objective was to serve the public interest by encouraging Internet service providers to make expensive investments in the expansion of the speed and capacity of the Internet by relieving them of burdensome expenses and liabilities to copyright owners."). Plaintiff's argument is especially perverse given the undisputed fact that, at all relevant times, it could have had access to Content ID and used it to manage its content on YouTube, including by blocking unwanted clips. *See supra* at 2.

Plaintiff's approach would also wreak havoc. Contrary to what Plaintiff seems to assume, receipt by YouTube of a DMCA notice alleging that a given YouTube infringes does *not* mean that related content posted by a different user in a different video is necessarily infringing. *See Schneider v. YouTube, LLC*, 2023 WL 3605981, at *8-9 (N.D. Cal. May 22, 2023) ("[T]he DMCA does not contemplate that a takedown of content is a substantive determination of copyright ownership or infringement. . . . [A] takedown under the DMCA indicates only an allegation of infringement."). Mistaken takedown notices, complex licensing practices, and nuanced fair-use issues are endemic on YouTube. Dkt. 137 Ex. 6 ("Zhu Tr.") at 151:02-10; *id.* Ex. 5 ("Carver Tr.") at 29:02-30:14, 51:17-21, 76:02-08; Dkt. 140-1 Ex. N (compiling exemplary DMCA counter-notices asserting licenses to Plaintiff's videos); *id.* Ex. O (same for fair use); *cf. Vimeo II*, 826 F.3d at 97.

Indeed, the record in this case shows numerous instances where *Plaintiff's* takedown notices targeted clips that the posting user contended to be authorized or protected by fair use (such as movie reviews). *See, e.g.*, YT MSJ at 5, 16 n.6; Dkt. 139 at 10, 12; Dkt. 140-1 Exs. N-O. And

there is undisputed evidence that Plaintiff's own agents uploaded thousands of clips from the works at issue to YouTube. Dkt. 151 ("YT SUF Reply") ¶ 33; *see* Dkt. 129-1 Exs. 5-6. These facts underscore that even if it were possible for YouTube to use Content ID to search for and automatically remove any video similar to those removed based on a DMCA notice without any active participation from the copyright owner, the collateral damage to legitimate expression would be immense. The consequences of any incorrect takedown notice would be vastly magnified, and potential fair uses would be swept up in the dragnet, along with many videos properly licensed or even uploaded by rightsholders themselves. Carver Tr. at 30:02-14; *accord Wolk*, 840 F. Supp. 2d at 747.

       **C.**     **Judge Torres Correctly Found That Plaintiff's Knowledge Argument Fails on the Facts.**

Plaintiff's knowledge theory also fails on the facts. As Judge Torres found, "Athos has failed to present any tangible evidence to establish that, *had* YouTube used its video-detection technology as it suggests, the software would have identified, blocked, or removed any of the specific clips-in-suit in dispute in this case." R&R at 23.

As explained above, just as Plaintiff's lawsuit is limited to specific movies (the works-in-suit), so too it is limited to specific alleged infringements of those movies (the clips-in-suit). *E.g.*, *Giganews*, 847 F.3d at 673; *Viacom II*, 676 F.3d at 34. Here, Exhibit B to Plaintiff's Amended Complaint is an accounting of all the clips-in-suit; any clip not included in that list is, by definition, not at issue in this lawsuit. Am. Compl. ¶ 70 & Ex. B; YT MSJ Reply at 7-8. Plaintiff repeatedly asserts that YouTube's technology must have identified other clips of Plaintiff's movies that "matched" against clips that Plaintiff identified as infringing in its DMCA takedown notices, and that YouTube thus "knew" of other infringing content. *E.g.*, Obj. at 5, 9. But, as Judge Torres recognized, Plaintiff offers no actual evidence to support that assertion, which underpins Plaintiff's entire argument. R&R at 26. Plaintiff fails to prove its case on three levels, any one of which is dispositive.

*First*, Plaintiff has no evidence that YouTube's technology even *attempted* to find matches of the clips that Plaintiff identified as infringing. Plaintiff's statements to the contrary rely on the blatant mischaracterization of the testimony of YouTube's Product Manager for Content ID, Kevin Zhu. According to Plaintiff, Mr. Zhu testified that YouTube automatically fingerprints all uploaded videos and generates matches to any other videos. Obj. at 5-6. But Mr. Zhu actually testified that YouTube fingerprints new uploads *and compares them to reference files that participants in the Content ID program have provided*. Zhu Tr. at 103:03-10.[7] It is undisputed that Plaintiff declined to participate in the Content ID program—and so it provided no reference files to run matches against. *Supra* at 2. There is no evidence that YouTube's technology compared new uploads against the clips for which Plaintiff submitted takedown notices.

*Second*, Plaintiff has no evidence that, even if YouTube had used Content ID to search for near-matches of clips identified in Plaintiff's DMCA notices, doing so would have identified and blocked a single clip-in-suit. In other words, after full discovery, Plaintiff failed to show that applying Content ID as it demands would have made any difference for its actual clips-in-suit. Plaintiff offers no basis for disputing Judge Torres's conclusion on this point. Its Objections try to sow confusion by asserting that Plaintiff submitted multiple DMCA takedown notices for clips from the same movie. Obj. at 6-7. But the fact that a clip from a given movie was identified in a DMCA notice does not necessarily mean that Content ID would be able to find some other clip from the same movie. For example, fingerprinting the "King of the World" scene from the movie *Titanic* would not help find a clip of the scene where the ship hits the iceberg.

Plaintiff has made no showing that any of its clips-in-suit are substantially identical to clips previously identified in DMCA notices—much less adduced evidence that YouTube's technology

---

[7] The misrepresentations of Mr. Zhu's testimony do not end there. *Compare* Obj. at 14 (claiming Mr. Zhu testified that the removal of "past, present, and future copies of content [YouTube] knows is infringing material could 'shut down the whole site'"), *with* Zhu Tr. at 198:18-200:12 (in response to question of whether it was "technically feasible" to remove content from YouTube, answering that "nearly anything is possible with software. Like, we could shut down the whole site, you know, potentially, but that doesn't mean that that would be a good thing to do").

would have identified those clips as a match before they were removed through the ordinary DMCA process. That renders Plaintiff's legal arguments about the DMCA's knowledge provision entirely academic—with no evidentiary connection to actual infringements alleged in this case. Judge Torres's recommendation can be affirmed on this basis alone. *See Viacom III*, 940 F. Supp. 2d at 117 (granting summary judgment to YouTube where proffered evidence "d[id] not tie . . . observations [of knowledge] to any specific clips"); *Vimeo II*, 826 F.3d at 99 (declining to address plaintiff's knowledge argument where the evidence "was not shown to relate to any of the videos at issue in this suit").[8]

       *Third*, Plaintiff has not shown (and cannot show) that—had YouTube's technology found any matching clips—such matches would have given YouTube knowledge of *infringement*. As Judge Torres explained, "software-identified video matches are not necessarily tantamount to copyright infringements." R&R at 23-24; *accord Schneider*, 2023 WL 3605981, at *8-9. Thus, in the pure hypothetical where YouTube's technology had identified a clip as overlapping with one that Plaintiff had claimed to be infringing a movie, that would not confer knowledge of infringement on YouTube. For example, the new clip could contain the same scene as the accused clip, but in the context of a film review—a classic example of fair use. Or the same clip posted by a different user in a different territory could be licensed, even though the accused clip was not. *See supra* at 14.

       In sum, Plaintiff's failure of proof on its knowledge argument is an independent basis for summary judgment, and Plaintiff has no basis for overruling Judge Torres on this point either.

---

[8] Plaintiff also objects to Judge Torres's observation that nothing in the record establishes that "YouTube employees interacted with any of the specific clips-in-suit." R&R at 25. According to Plaintiff, this was error because YouTube's system works "automatically" with "minimal, if any, human interaction." Obj. at 15. Plaintiff misses the point: it failed to adduce *any* evidence that YouTube's systems—whether automated or human—ever looked for, much less identified, any of Plaintiff's non-noticed videos as similar to noticed videos. To overrule this objection, the Court need not reach the issue of whether human review is required. *Cf. Capitol Recs., LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 545 (S.D.N.Y. 2013) (granting summary judgment to video-sharing service because of "absence of evidence showing that a Vimeo employee watched a particular Video-in-Suit").

## II.      Judge Torres Correctly Held That Plaintiffs Cannot Create a Triable Issue on the DMCA's Control & Direct Financial Benefit Provision.

That leaves the DMCA's control-plus-financial-benefit provision, which requires Plaintiff to show *both* that YouTube had "the right and ability to control [the infringing] activity" *and* received a "financial benefit directly attributable" to the specific alleged infringements. § 512(c)(1)(B); *see Motherless*, 885 F.3d at 612; YT MSJ at 17-20; YT MSJ Reply at 8-10. Like its knowledge argument, Plaintiff's argument on this provision advocates for a radical departure from settled law, which Judge Torres correctly rejected.

### A.      The DMCA Does Not Codify the Common Law of Vicarious Infringement.

Plaintiff tries to resurrect its theory that the DMCA's control provision codifies the common-law doctrine of vicarious-copyright liability. Obj. at 16-19. But that argument has been expressly rejected by every court to consider it, including "by both the Second and Ninth Circuits as inconsistent with the text and purpose of[] the DMCA." R&R at 27-28 (collecting cases). For good reason; interpreting the control provision as coterminous with common-law vicarious liability would render the DMCA "internally inconsistent" in at least two respects: (1) a service's ability to remove content (a requirement for DMCA safe-harbor eligibility) would also constitute the right and ability to control that content (a disqualifier from eligibility), and (2) "§ 512(m) cuts against holding that [a service's] general knowledge that infringing material could be uploaded to its site triggered an obligation to police its services to the 'fullest extent' possible." *UMG*, 718 F. 3d at 1027-29.

Plaintiff's citation to the DMCA's "legislative history" (Obj. 16) is actually a report describing "a version of the [DMCA] *different from the one ultimately passed*." *UMG*, 718 F.3d at 1028 (emphasis added). As the Ninth Circuit explained in rejecting this same fallacious argument, "the discussion of vicarious liability is omitted from all later reports and, notably, from the statutory language." *Id.*; *accord Viacom II*, 676 F.3d at 36-37. The later legislative history in fact makes clear that Congress intended the statute to protect *against* vicarious liability. *UMG*, 718 F.3d at 1028. Judge Torres thus rightly held that the DMCA does not codify vicarious liability, R&R at 27-28, and instead that the correct test under the statute's "control" provision—as the

Second and Ninth Circuits have expressly held—asks whether the service exerts "substantial influence on the activities of users." *UMG*, 718 F.3d at 1030-31. That renders all of Plaintiff's non-DMCA vicarious-liability cases—the only ones it relies on—irrelevant.

Under the proper standard for "control," Plaintiff has nothing. There is no triable issue that YouTube did not exercise the kind of "substantial influence" that could potentially disqualify it from the DMCA. YT MSJ Reply at 9. Plaintiff's Objections (at 19) simply reprise the argument that "YouTube's management of advertising, monetization, and algorithmic video curation can be construed as control"—a theory that Judge Torres rightly rejected as "unfounded" and "repeatedly rejected by applicable case law." R&R at 28-29 (collecting cases). Plaintiff also makes a cursory effort to argue that "YouTube's decision to restrict access to its video detection software somehow amounts to the right and ability to control." R&R at 28; *see* Obj. at 19. But this argument just repackages its failed knowledge argument and runs squarely into case law. R&R at 28; *Viacom III*, 940 F. Supp. 2d at 120 ("YouTube's decisions to restrict its monitoring efforts to certain groups of infringing clips . . . do not exclude it from the safe harbor."); *UMG*, 718 F.3d at 1030 (rejecting argument that Veoh had "control" because it "could have implemented, and did implement, filtering systems"). It also (again) ignores the undisputed evidence that Plaintiff was offered—and refused—access to Content ID. *Supra* at 2.

### B.      Plaintiff Cannot Carry Its Burden to Show a Direct Financial Benefit.

Plaintiff's argument also fails for the independent reason that Plaintiff cannot show a direct financial benefit, as Judge Torres found. Plaintiff must show that YouTube earned revenue "distinctly attributable to the infringing material at issue." *Motherless*, 885 F.3d at 613. In *Motherless*, the Ninth Circuit held that a video-sharing website had not received a direct financial benefit from infringement even though it derived ad revenue from its website. The court explained that defeating the safe harbor required showing that "some revenue [was] distinctly attributable to the infringing material." *Id.* That link was missing because the website "did not advertise itself as a place to get pirated materials" and plaintiff failed to present sufficient evidence that the website received any direct financial benefit from plaintiff's clips. *Id.*

So too here, "Plaintiff cites no evidence that YouTube encourages infringement on its website, or that YouTube promotes advertising by relying on infringing material." R&R at 29 (citing *Downs v. Oath Inc.*, 385 F. Supp. 3d 298, 307 (S.D.N.Y. 2019)); YT SUF Reply ¶¶ 46-47. Moreover, uncontested evidence establishes that of Plaintiff's total clips-in-suit, 91% generated no advertising revenue on YouTube, that YouTube employs mechanisms designed to avoid showing ads in connection with content that has been claimed by a copyright owner, and that if any ad appeared before or after a clip-in-issue, that ad was merely coincidental. R&R at 29. As in *Downs*, "the undisputed evidence shows that [YouTube] simply ran advertisements on user-generated [videos], some of which inevitably contained infringing material." 385 F. Supp. 3d at 307; *accord Motherless*, 885 F.3d at 613.

Plaintiff's only objection is to complain that YouTube's financial benefit evidence addressed only advertising and not other potential sources of "monetization." But to remove YouTube from the safe harbor, it was *Plaintiff's* burden to put forward evidence that YouTube received a direct financial benefit. *See Motherless*, 885 F.3d at 613 (no financial benefit where plaintiff failed to proffer "evidence that Motherless made any money directly from the [accused] clips"); *Steinmetz*, 629 F. Supp. 3d at 85 (same). Plaintiff has done nothing of the kind. Neither in opposition to summary judgment nor in its Objections has Plaintiff identified any other kind of "monetization" through which YouTube might have received a direct financial benefit—much less "put forth evidence of a connection between the allegedly infringing activity and the financial benefit that [YouTube] received." *Downs*, 385 F. Supp. 3d at 307. Simply pointing to the fact that YouTube users watched allegedly infringing clips (Obj. at 20-21) does not come close to showing direct financial benefit. *Motherless*, 885 F.3d at 613.

## CONCLUSION

YouTube requests that the Court overrule Plaintiff's Objections and adopt Judge Torres's Report recommending that YouTube's motion for summary judgment be granted.

Respectfully submitted,

Dated: July 20, 2023

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3229
Facsimile: (305) 789-2664

By: */s/ Jay B. Shapiro*
   Jay B. Shapiro, Esq.
   Florida Bar No. 776361
   jshapiro@stearnsweaver.com
   David T. Coulter, Esq.
   Florida Bar No. 119874
   dcoulter@stearnsweaver.com

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
   Brian M. Willen, Esq. (*pro hac vice*)
   bwillen@wsgr.com
   Lucy Yen, Esq. (*pro hac vice*)
   lyen@wsgr.com
   Dylan Byrd, Esq. (*pro hac vice*)
   dbyrd@wsgr.com

***Counsel for Defendants***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 20, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

*/s/Jay B. Shapiro*
JAY B. SHAPIRO, ESQ.

## <u>SERVICE LIST</u>

Case No. 1:21-cv-21698-DPG
United States District Court, Southern District of Florida

Rey Dorta, Esq.
Florida Bar No. 0084920
Omar Ortega, Esq.
Florida Bar No. 0095117
Rosdaisy Rodriguez, Esq.
Florida Bar No. 112710
Yvette C. Buergo, Esq.
Florida Bar No. 1003212
**DORTA & ORTEGA, P.A**
3860 SW 8th Street, PH
Coral Gables, Florida 33134
Telephone:(305) 461-5454
Facsimile: (305) 461-5226
oortega@dortaandortega.com
rdorta@dortaandortega.com
rrodriguez@dortaandortega.com
ybuergo@dortaandortega.com
dcruz@dortaandortega.com

*Counsel for Plaintiff*